1  KAMALA D. HARRIS
   Attorney General of California
2  KEVIN VIENNA
   Deputy Attorney General
3  VINCENT P. LAPIETRA
   Deputy Attorney General
4  State Bar No. 255985
    600 West Broadway, Suite 1800
5   San Diego, CA 92101
    P.O. Box 85266
6   San Diego, CA 92186-5266
    Telephone:  (619) 738-9049
7   Fax:  (619) 645-2044
    E-mail:  Vincent.LaPietra@doj.ca.gov
8  *Attorneys for Respondent*

9           IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **DEMETRIUS SISSAC,** | 16cv02287-BAS (JLB) |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |
| **v.** | |
| **W.L. MONTGOMERY, Warden,** | Judge:      The Honorable Jill L. Burkhardt |
| Respondents. | |

14

15

16

17

18

19

20

21                     **INTRODUCTION**

22        Petitioner Demetrius Sissac and his friends persuaded a cabdriver to give them

23  a $27 ride for $20, which was all the money they had. As the group was existing the

24  cab at their destination, Sissac shot the cabdriver. At trial, Sissac's friends testified

25  that Sissac sat in the front passenger's seat. They heard a gunshot as they were

26  getting out of the cab and ran. Sissac admitted to them that he shot the cabdriver

27  because the cabdriver had laughed or smiled. Sissac made similar admissions

28  during a recorded phone call that was played for the jury.

                                   1

1   Sissac claims counsel was deficient for failing to object to cellphone evidence

2   and to his friends' testimony that he had "murdered" an "innocent" victim. He

3   further argues that the cumulative effect of trial counsel's errors compels relief.

4   These claims are unexhausted because they were not, but still can be, presented to

5   the California Supreme Court. The claims are also meritless. On appeal, the state

6   court rejected three of the four underlying evidentiary claims on the merits,

7   obviating the need to discuss the alleged failures to object. The state court found the

8   fourth underlying claim, regarding purported lay-opinion testimony, to have been

9   forfeited but determined that Sissac was not prejudiced by counsel's failure to

10  object. The state court concluded that Sissac is not entitled to relief for cumulative

11  error because all of the alleged errors were harmless.

12              **FACTUAL AND PROCEDURAL BACKGROUND**

13  Respondent sets forth the Statement of Facts from the California Court of

14  Appeal's opinion (Lod. 5). 28 U.S.C. § 2254(e)(1) (the state court's determination

15  of the facts is presumed to be correct); *see, e.g., Dillard v. Roe*, 244 F.3d 758 n.1

16  (9th Cir. 2001) ("the facts are taken from the opinion by the California Court of

17  Appeal"). Further development of the facts, with reference to the trial record, may

18  be found in the parties' briefs filed in the direct appeal. (Lod. 3, 4.) The California

19  Court of Appeal found as follows:

20          *A. The People's Case*

21          *The Killing of Hamrah*

22  Devin Patton, who was also known as "D," was a friend of David
    Glenn, who was also known as "Jodi" or "Jodi Mack." Glenn introduced

23  Patton to Sissac, whom Glenn knew as "Meech" or "Metrie." Sissac
    became one of Patton's best friends.

24

25  On October 29, 2011, Patton went to a party in El Cajon. While
    there he and Sissac texted back and forth about the party, and he

26  convinced Sissac to join him. Sissac arrived at the party at around 11:00
    p.m. with Glenn, Glenn's cousin, Anthony Roy (Roy, who was also

27  known as "Little Ant"), and an unknown male.[FN3] After about an hour or
    an hour and a half, Sissac, Glenn, Roy, and the unknown male left the

28  party. Patton stayed behind.

2

[FN3] Patton, Glenn, and Roy all testified at trial as prosecution witnesses. [END FN3]

About 30 minutes later, Patton was told to leave the party. He began walking, hoping to meet up with his friends. Patton eventually met up with the group, and the five men walked to the El Cajon trolley stop and arrived there between 3:00 and 3:30 a.m. The men went to the upstairs trolley platform but the trolleys were not running because it was so late.

The victim in this case, Hamrah, drove a taxi cab. At around 3:30 a.m. on October 30, 2011, Hamrah was the first taxi driver in line waiting for customers at the El Cajon transit station. Sissac approached Habeel Othman, another cab driver who was at the transit station but not in the cab line. Sissac begged Othman for a ride and offered $20, explaining it was all the money his group had.[FN4] Othman took the money to Hamrah, who was at the front of the cab line. Sissac then managed to obtain a $20 fare for the group to travel to Lemon Grove.[FN5] Glenn testified that he, Sissac, Patton, Roy, and the other male got into Hamrah's cab. Both Patton and Glenn testified that Sissac got into the front seat while the other four sat in the back seat.

[FN4] The fare was about $27. [END FN4]

[FN5] Glenn testified Sissac said he wanted to "[d]itch a cab," which meant to get in the cab and not pay because they had no money. [END FN5]

Patton testified that, during the taxi ride, Hamrah was making jokes, everyone was "cool," and there was no friction. After what Patton described as a "pleasant" ride, the cab stopped at the Lemon Grove trolley station. The five men got out of the cab and Patton began walking away with Anthony Roy and the unknown male. After a few moments, Patton and Roy heard a loud "pop." Patton, Roy, and the unknown male then took off running. As they were running, Patton asked what had happened and one of the men said, "Meech shot the cab driver." The men ran a few blocks and stopped. Roy was crying, and Patton was confused.

Sissac and Glenn caught up with the other men. Patton testified that Glenn yelled at Sissac, "What the fuck did you do? Why the fuck did you do that?" Patton also testified that Sissac looked at Glenn with a blank look on his face and said the cab driver had laughed or smiled at him.

Glenn, who testified under a grant of use immunity, testified he also heard a gunshot. Glenn testified that he asked Sissac, "What happened? What the fuck did you just do?" Glenn also testified that he "jump[ed] in [Sissac's] face" and told him, "You just smoked the cab driver." Glenn told Sissac they had just come from the El Cajon trolley station, indicated there was video surveillance, and told Sissac that everybody could "go down for this." Sissac replied that since he was "the one that did it, there's no need to take everybody down with [him]." The five men then went home. Glenn testified he had given a .38–caliber gun to Sissac the day before the shooting.

San Diego Sheriff's Detective Barbra Oborski testified that she was driving southbound on Main Street near the Lemon Grove trolley station

3

at about 3:45 a.m. that same morning when she saw a car stopped in the middle of the road. Deputy Oborski stopped to investigate and observed that the car was an upside down taxi cab. The driver, who was later identified as Hamrah, was seat-belted and hanging upside down inside the vehicle, and was unresponsive. Hamrah was having difficulty breathing. Deputy Oborski called for an ambulance.

When paramedics arrived and began rendering aid to Hamrah, they removed his shirt, which exposed a bullet hole in his right upper chest. Hamrah was pronounced dead at 4:11 a.m. The cause of death was a gunshot wound to his chest. The bullet recovered from Hamrah's body was consistent with having been fired from a .38–caliber weapon, although other similar calibers could not be excluded.

*Patton's text messages to Sissac, Patton's police interview, and Patton's recorded pretext phone call to Sissac*

Patton testified that at 5:51 a.m. that same morning (October 30) he used his cell phone to text Sissac and told Sissac to turn himself in to the police. Patton also testified that Sissac responded later that he would call back. Patton further testified that he texted Sissac a few minutes later, "You hear what I'm telling you? This is way back." Sissac replied, "I know."[FN6]

[FN6] Additional evidence the prosecution presented at trial regarding text messages that Patton and Sissac sent to each other will be discussed, *post,* in the discussion section of this opinion. [END FN6]

Patton also testified that he texted Sissac that night at 11:03 p.m. and told him to "be a man and own up." At 11:13 p.m., Patton asked Sissac to "[d]o the right thing, please, yo." At midnight, Sissac responded with a text message stating, "You have to pray." Patton testified he did not receive Sissac's text until 9:00 a.m. the next morning (October 31).

Patton also testified that, when it appeared Sissac was not going to turn himself in, he (Patton) left a note for his (Patton's) mother indicating that he needed to talk to her. After Patton told his mother what had happened, she immediately called the police.

During the evening on October 31, Deputy Sheriff Suzanne Fiske learned that a former deputy sheriff, Kim Patton, wished to speak to her. Kim Patton, who is Patton's mother, indicated to Deputy Fiske that Patton had left a note for her. A meeting was set up for Patton to come to the sheriff's department for an interview later that night.

Detectives Palmer and Lebitski interviewed Patton late that night and into the early morning hours of November 1. Patton agreed to participate in a pretext phone call to Sissac.

During his November 1 pretext phone call to Sissac at about 10:42 p.m.—which was recorded, transcribed, and played for the jury—Patton said to Sissac, "To do some shit like that, like that's not my Nigga right there." Sissac responded, "Yeah, it wasn't me. You know? You gotta, you gotta, what you gotta see is *that was the devil....*"[FN7] (Italics added.)

4

[FN7] Patton's and Sissac's statements to each other during Patton's recorded pretext call are discussed more fully, *post,* in the discussion section of this opinion. [END FN7]

Following his police interview and his pretext call to Sissac, Patton left town and relocated to the East Coast for his and his family's safety. After the preliminary hearing in this case, the district attorney's office, at the request of Patton's mother, began financially supporting Patton pursuant to their witness relocation program. At the time of trial, Patton had received about $15,922 from this program to pay for his food, rent, and cell phone.

*Additional Evidence*

A San Diego County Sheriff's Department traffic reconstruction expert opined that Hamrah's cab had been going south when it hit a curb, went onto the sidewalk, struck a palm tree, and rolled from the driver's side onto the roof of the cab. (3 RT 279–281.) Inside the cab sheriff's department investigators found a loose $20 bill and Hamrah's cell phone. Cash in the amount of $300 was found in Hamrah's pants pocket.

The prosecution presented evidence showing that Glenn's DNA was found on the back passenger interior door handle of Hamrah's taxi cab. On that date the Lemon Grove trolley stop was monitored by seven cameras. Brown testified that at around 5:30 a.m. that morning she received a phone call from a law enforcement officer regarding a homicide that involved a taxicab driver. The officer requested that she retrieve surveillance video recordings from the El Cajon and Lemon Grove trolley stations that were recorded at around 3:00 a.m. that morning. Brown testified that the surveillance cameras were working that morning, and she obtained the video recordings and gave them to the officer. Brown also testified that she "was able to locate the taxicab at the El Cajon station" and she "able to save that video, along with the individuals who went inside the taxicab."

At trial Patton was shown a still image taken from one of the video recordings at the El Cajon trolley station. Using a pen to identify the men shown in the picture, Patton identified himself, Sissac, Roy, and Glenn, and pointed out the unidentified male who was with them at the station.

One of the video recordings from the El Cajon trolley station was played for Sergeant Henry Lebitski of the San Diego County Sheriff's Department, who testified that Sissac was shown in the video walking down a ramp and speaking with the taxicab drivers.

*B. The Defense*

James Stam, a former San Diego Police Department criminalist, opined that, based upon the amount of gunpowder particles found on the victim and the absence of sooting, the bullet that killed him was fired from three or more feet away. Stam testified he positioned a mannequin in the seat of a similar model vehicle to determine the trajectory of the bullet. Stam opined that it was unlikely, though not impossible, that Hamrah was sitting in a normal driving position facing forward at the time of the shot, while it was "much more likely" that Hamrah was

5

slightly turned around as if talking to someone in the backseat. Stam testified that the trajectory "line[d] up with having been fired from outside the rear door."

(Lod. 5 at 3-9.)

A jury found Sissac guilty of second-degree murder with a firearm. (Lod. 5 at 2.) The trial court sentenced him to a total term of forty years to life. (Lod. 5 at 2.)

Sissac separately filed both an appeal (Lod. 3) and a petition for writ of habeas corpus (Lod. 6) in the California Court of Appeal. The appeal consisted of evidentiary-error claims. The habeas petition alleged the trial counsel was deficient for failing to object to the evidentiary-error claims made on appeal. The appellate court denied Sissac's motion to consolidate the cases and issued separate disposition orders, affirming the judgment and denying relief. (Lod. 5, 7.) With respect to the appeal, Sissac filed a petition for review. (Lod. 8.) Sissac took no further state-court action on his ineffective-assistance claims, for which he now seeks federal relief.

## GOVERNING LEGAL PRINCIPLES

A state prisoner may obtain federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Relief may not be granted on any claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *see also Cullen v. Pinholster*, 563 U.S. 170, 182-83 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)("clearly established Federal law" consists of holdings, not dicta, of Supreme Court decisions "as of the time of the relevant state-court decision").

1    Here, the California Court of Appeal denied as meritless each of the claims at

2    issues. (Lod. 7.)

3                                      **ARGUMENT**

4    The Petition is wholly unexhausted and the claims are meritless. Sissac asserts

5    he received ineffective assistance of trial counsel. The California Court of Appeal

6    reasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984).

7    Sissac separately filed both an appeal (Lod. 3) and a petition for writ of habeas

8    corpus (Lod. 6) in the California Court of Appeal. The appeal consisted of

9    evidentiary-error claims. The habeas petition alleged the trial counsel was deficient

10   for failing to object to the evidentiary-error claims made on appeal. The appellate

11   court denied Sissac's motion to consolidate the cases and issued separate

12   disposition orders, affirming the judgment and denying relief. (Lod. 5, 7.) With

13   respect to the appeal, Sissac filed a petition for review. (Lod. 8.) Sissac took no

14   further state-court action on his habeas claims, which are the claims asserted in the

15   Petition. Thus, the claims have never been presented to the California Supreme

16   Court.

17   In California, "If the Court of Appeal decides an appeal and denies a related

18   petition for writ of habeas corpus without issuing an order to show cause and

19   without formally consolidating the two proceedings, a party seeking review of both

20   decision must file a separate petition for review in each proceeding." California

21   Rule of Court, Rule 8.500(d). Because Sissac may present his ineffective-assistance

22   claims to the California Supreme Court via a petition for writ of habeas corpus,

23   state remedies are unexhausted and federal relief is unavailable. 28 U.S.C. §

24   2254(b)(1)(A). This Court need not provide Sissac with an opportunity to return to

25   state court, however, because the claims are plainly meritless. *Rhines v. Weber*, 544

26   U.S. 269, 277 (2005) (granting a stay to exhaust plainly meritless claims would

27   constitute an abuse of discretion). Instead, the Court should deny the claims as

28   meritless. 28 U.S.C. § 2254 (b)(2).

7

1    To prevail on a claim of ineffective assistance of counsel, a habeas petitioner

2  must show both that counsel's representation fell below an objective standard of

3  reasonableness and that counsel's deficient performance actually prejudiced the

4  defense. *Strickland*, 466 U.S. at 687–88. This means that a claim of ineffective

5  assistance must be rejected upon a finding either that counsel's performance was

6  reasonable or that the alleged error was not prejudicial. *Id.* at 697.

7    Review of ineffective assistance claims under § 2254(d)(1) is "doubly

8  deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Because the

9  *Strickland* standard is general, there is a substantial range of reasonable applications

10 and federal habeas courts must be mindful that the question presented is not

11 "whether counsel's actions were reasonable." *Richter*, 562 U.S. at 105. Rather,

12 "[t]he question is whether there is any reasonable argument that counsel satisfied

13 *Strickland's* deferential standard." *Id*.

14    In this case, Sissac asserts five claims of ineffective assistance. These claims

15 seem to have been made in the state court primarily as an attempt to preserve

16 evidentiary-error claims that were arguably forfeited for failing to object. The state

17 court addressed all but one of the evidentiary claims on the merits, thereby

18 obviating the need to discuss ineffective assistance for failing to object. With

19 respect to the claim that was forfeited, the court found that failure to object did not

20 result in prejudice. It further concluded that Sissac's trial was not tainted by

21 cumulative error.

22    In ground two, Sissac claims counsel was deficient for failing to renew his

23 objection to admission of Patton's text messages. In ground three, Sissac claims

24 counsel was deficient for failing to object to the admission of evidence discovered

25 pursuant to a forensic examination of his cell phone. The appellate court addressed

26 Sissac's challenge to admission of the evidence and determined that any assumed

27 error in admitting the evidence was harmless under state law. (Lod. 5 at 15, 18, 20.)

28 The state court reasonably applied *Strickalnd* when it determined that Sissac cannot

8

have been prejudiced by counsel's failure to object to evidence because he was not prejudiced by admission of the evidence. The state court reviewed the evidence at length and determined that the unchallenged evidence overwhelmingly established Sissac's guilt. (Lod. 5 at 16-18.) In short, Glenn testified that he had recently given Sissac a .38-caliber handgun, which was the same caliber used to shoot Hamrah. (Lod. 2 at 655-66, 965-66.) Glenn and Patton testified that Sissac admitted shooting the cabdriver. (Lod. 2 at 422, 655, 653.) And Sissac made admissions during a recorded phone call that was played for the jury. (Lod. 1 at 134-41; Lod 2 at 570.) In support of its conclusion that Sissac suffered no prejudice, the state court noted that much of the challenged evidence concerned facts established by unchallenged evidence. (Lod. 5 at 16-17, 22.) Thus, it reasonably concluded that Sissac had failed to establish the reasonable probability of a more favorable outcome had counsel objected to the text messages and cellphone evidence.

In ground four, Sissac claims counsel was deficient for conceding that Sissac made adoptive admissions during a recording phone call. The appellate court addressed Sissac's challenge to the statements and determined that the statements were properly admitted as adoptive admissions under state law. (Lod. 5 at 28.) This Court is bound by the state court's application of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Counsel cannot have been deficient for failing to make an unmeritorious objection. *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

In ground five, Sissac claims counsel was deficient for failing to object to improper lay opinion. As the Court of Appeal explained, Sissac claims it was improper for "Patton to testify that the victim (Hamrah) was 'innocent' and that what Sissac had done was a 'sin,' it was 'wrong,' and it was 'murder'; and [for] Glenn to testify that Sissac 'murder[ed]' the victim." (Lod. 5 at 28.) The state court reasonably determined that "Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result but for counsel's failure to object to Patton's and Glenn's lay opinion testimony." (Lod. 5

9

at 28-29.) As discussed above, and in greater detail by the court of appeal (Lod. 5 at 16-18), the evidence against Sissac was overwhelming. Challenging the witnesses' choice of words would not have undermined the crux of their testimony. Furthermore, Counsel may well have chosen not to object on this point as a tactical matter. The witnesses' testimony that an innocence person had been murdered was not necessarily inconsistent with Sissac's defense that he was not the shooter. For both of these reasons, Sissac is not entitled to relief for ground five.

Finally, in ground one, Sissac claims "The synergistic effect of trial counsel's handling of the multiple serious evidentiary errors compels reversal." The state court reasonably determined that "all of Sissac's claims of evidentiary error are unavailing because any errors that occurred were harmless, whether considered individually or collectively." (Lod. 5 at 30.) Sissac has failed to explain why he believes this determination was unreasonable and no reason is apparent. As stated, even without the text message and cellphone evidence, and even if Glenn and Patton had used different words during their testimony, the evidence of Sissac's identity as the shooter was well established. Sissac is not entitled to relief for ineffective assistance of trial counsel.

## CONCLUSION

Respondent respectfully requests this Court deny the Petition.

Dated:  November 29, 2016

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
KEVIN VIENNA
Deputy Attorney General


*/s/ Vincent P. LaPietra*
VINCENT P. LAPIETRA
Deputy Attorney General
*Attorneys for Respondent*

SD2016800749
71253679.doc