JONATHAN B. JORDAN, CSBN 105815
Law Offices of Jonathan B. Jordan
2534 State Street, Suite 201
San Diego, CA 92103
T (619) 516-8149
attorneyjjordan@aol.com

Attorney for Petitioner

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

DEMETRIUS SISSAC,

     Petitioner,

     v.

W.L. MONTGOMERY, Warden,

     Respondents.

Case No: 16-cv-02287-BAS (JLB)

**PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS**
_____

TO THE HONORABLE CYNTHIA BASHANT DISTRICT JUDGE FOR THE
SOUTHERN DISTRICT OF CALIFORNIA:

# TABLE OF CONTENTS

Page

PETITION FOR A WRIT OF HABEAS CORPUS                                    1

I.  THE SYNERGISTIC EFFECT OF TRIAL COUNSEL'S HANDLING
    OF THE MULTIPLE SERIOUS EVIDENTIARY ERRORS COMPELS
    REVERSAL EVEN IF THE INDIVIDUAL EFFECT OF EACH ERROR
    DOES NOT ITSELF COMPEL REVERSAL                                    8

II. COUNSEL WAS INEFFECTIVE FOR FAILING TO RENEW AT
    TRIAL HIS PRETRIAL OBJECTIONS TO THE ADMISSION OF THE
    PURPORTED TEXT MESSAGES AS UNAUTHENTICATED,
    LACKING ADEQUATE FOUNDATION, AND CONSTITUTING
    INADMISSIBLE DOUBLE HEARSAY EVIDENCE                               10

III. COUNSEL WAS INEFFECTIVE IN FAILING TO SPECIFICALLY
     OBJECT TO THE EVIDENCE OF THE "DELETED" TEXT
     MESSAGES AND THE PHONE CALLS BETWEEN SISSAC AND
     ROY                                                               12

IV. COUNSEL WAS INEFFECTIVE FOR "CONCEDING" THAT THE
    STATEMENTS IN THE PRETEXT CALL WERE ADMISSIBLE AS
    "ADOPTIVE ADMISSIONS"                                             13

V.  COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE
    IMPROPER LAY OPINIONS OF THE PROSECUTION'S PRIMARY
    WITNESSES ON THE ULTIMATE FACTUAL AND LEGAL ISSUES
                                                                      14

MEMORANDUM OF POINTS AND AUTHORITIES                                   16

STATEMENT OF THE CASE                                                  16

STATEMENT OF FACTS                                                    17

    A.  The Death of Hamrah                                          17
    B.  The Investigation                                            19
    C.  The Various Witness Accounts                                 24
        1.  Devin Patton                                             24
        2.  David Glenn                                              29
        3.  Anthony Roy                                              33
    D.  Detective Pearce's "Data Extraction" Records                35
    E.  Defense                                                      32

ARGUMENT                                                              38

    I.  THE MULTIPLE EVIDENTIARY ERRORS INEVITABLY COMPEL
    REVERSAL, FOR NOT ONLY DID EACH ERROR INDIVIDUALLY
    PREJUDICE THE OUTCOME BUT THE SYNERGISTIC EFFECT OF THE
    ERRORS DEPRIVED SISSAC OF HIS FUNDAMENTAL RIGHTS EVEN IF
    EACH ERROR DOES NOT ITSELF COMPEL REVERSAL                        38

II. THE UNAUTHENTICATED, FOUNDATIONLESS INHERENTLY UNRELIABLE HEARSAY EVIDENCE OF THE PURPORTED TEXT MESSAGES BETWEEN DEVIN AND SISSAC HAD NO PLACE IN A PROPER TRIAL AND ITS ADMISSION GRANTED THE PROSECUTION AN UNFAIR ADVANTAGE THAT UNDULY PREJUDICED THE DEFENSE ............................................................ 40

    A.    Background .................................................... 40

    B.    Basic Legal Principles .................................... 43

    C.    The Prosecution Failed to Properly Authenticate or Lay a Foundation for the Purported Text Messages, and Thereby Necessarily Also Failed to Show They Satisfied the Hearsay Rule ................................ 48

    D.    The Purported Statements Themselves Were Not Admissible Under the "Adoptive Admission" Exception to the Hearsay Rule .......................... 50

    E.    The Individual and Cumulative Prejudicial Effect of This Evidentiary Error Compels Reversal ...... 55

    F.    This Claim is Cognizable ................................. 59

III.    THE PROSECUTION PROCURED FURTHER UNFAIR ADVANTAGE THROUGH THE PREJUDICIALLY ERRONEOUS ADMISSION OF THE UNAUTHENTICATED, FOUNDATIONLESS RECORDS OF PURPORTED PHONE ACTIVITY, BECAUSE THAT EVIDENCE SERVED AS THE BASIS FOR THE ADMISSION OF ADDITIONAL PREJUDICIALLY ERRONEOUS EVIDENCE ................. 68

IV.    THE ADMISSION OF THE PRETEXT CALL ALSO CONSTITUTED REVERSIBLE PREJUDICE BECAUSE THE VAGUENESS AND AMBIGUITY OF THE STATEMENTS DID NOT WARRANT DISPENSING WITH THE CORE CONFRONTATION PROTECTIONS UNDERLYING THE HEARSAY RULE ... 68

VI.    THE IMPROPER LAY OPINIONS OF THE PROSECUTION'S PRIMARY WITNESSES ON THE ULTIMATE FACTUAL AND LEGAL ISSUES RESULTED IN YET A FURTHER DEPRIVATION OF FUNDAMENTAL CONSTITUTIONAL PROTECTIONS ... 74

PRAYER ....................................................................... 78

VERIFICATION ............................................................ 80

# TABLE OF AUTHORITIES

Cases                                                                    Page

Alvarez v. Jacmar Pacific Pizza Corp. (2002) 100 Cal.App.4th 1190         46, 50

Apprendi v. New Jersey (2000) 530 U.S. 466                               75

Brecht v. Abrahamson (1993) 507 U.S. 619                                 38, 39

Chambers v. Mississippi (1973) 410 U.S. 280                              10, 38

Coleman v. Thompson (1991) 501 U.S. 722                                  61

Donnelly v. DeChristoforo (1974) 416 U.S. 637                            10, 38

F.T. v. LU (2011) 194 Cal.App.4th 1                                      77

Gee v. Timineri (1967) 24 Cal.App.2d 139                                 44, 47

In re Charlisse C. (2008) 45 Cal.4th 145                                 70

In re Harris (1993) 5 Cal.4th 813                                        58, 59, 67

Lilly v. Virginia (1999) 527 U.S. 116                                    13, 42, 59

Morrow v. Los Angeles Unified Sch. Dist. (2007) 149 Cal.App.4th 1424     16, 69

Old Chief v. United States (1997) 519 U.S. 172                           45, 51, 60

Parle v. Runnels (9th Cir. 2007) 505 F.3d 922                            12, 37, 59, 62, 68, 71

People v. Anderson (2012) 208 Cal.App.4th 851                            49

People v. Arias (1996) 13 Cal.4th 92                                     13, 42, 59

People v. Beckley (2010) 185 Cal.App.4th 509                             13, 43, 48, 59

People v. Bolton (1979) 23 Cal.3d 208                                    41, 51, 67

People v. Butcher (1959) 174 Cal.App.2d 722 — 48

People v. Carroll (1889) 80 Cal. 153 — 69, 70

People v. Carter (2003) 30 Cal.4th 1166 — 50, 58, 60

People v. Clay (1964) 227 Cal.App.2d 87 — 69

People v. Cowan (2010) 50 Cal.4th 401 — 45, 47, 48

People v. Crabtree (2009) 169 Cal.App.4th 1293 — 47

People v. Doolin (2009) 45 Cal.4th 390 — 45, 55, 60

People v. Fauber (1992) 2 Cal.4th 792 — 49

People v. Gardeley (1996) 14 Cal.4th 605 — 61

People v. Gosset (1892) 93 Cal. 641 — 69

People v. Hill (1998) 17 Cal.4th 800 — 12, 36, 37, 59, 62, 68, 71

People v. Houston (2012) 54 Cal.4th 1186 — 70

People v. Hovarter (2008) 44 Cal.4th 983 — 13, 41, 43, 42, 59

People v. Jennings (2010) 50 Cal.4th 616 — 49, 50, 66

People v. Maki (1985) 39 Cal.3d 707 — 15, 49, 50, 66

People v. Marshall (1996) 13 Cal.4th 799 — 16, 68, 71

People v. Pope (1979) 23 Cal.3d 412 — 12, 14, 15, 16, 17

People v. Riccardi (2012) 54 Cal.4th 758 — 14, 15, 16, 17

People v. Riel (2000) 22 Cal.4th 1153 — 49

People v. Robinson (1964) 61 Cal.2d 373 — 51, 66

People v. Rose (1890) 85 Cal. 378 ............................................................... 69

People v. Scott (2011) 52 Cal.4th 452 ...................................................... 45, 51

People v. Simmons (2012) 210 Cal.App.4th 778 ............................... 57, 61, 68

People v. Torres (1995) 33 Cal.App.4th 37 ................................ 58, 71, 70, 71

People v. Williams (2008) 43 Cal.4th 584 ............................................... 14, 56

People v. Williams (2009) 170 Cal.App.4th 587 ........................................... 37

People v. Zavala (2013) 216 Cal.App.4th 242 ............................................... 43

Price v. Superior Court (2001) 25 Cal.4th 1046 ...................................... 12, 36

Strickland v. Washington (1984) 466 U.S. 668 ....................................... passim

United States v. Crawford (9th Cir. 2001) 239 F.3d 1086 ....................... 16, 69

United States v. Espinosa (9th Cir. 1987) 827 F.2d 604 ............................... 69

United States v. Gaudin (1995) 515 U.S. 506 ........................................ 16, 68

United States v. Frederick (9th Cir. 1996) 78 F.3d 1370 ............................. 37

United States v. Lockett (9th Cir. 1990) 919 F.2d 585 ............................ 16, 69

Constitutions

California Constitution, Article I ........................................ 7, 12, 11, 33, 41

United States Constitution

    Fifth Amend. ...................................................................... 11, 25, 33, 41

    Sixth Amend. ................................................................. 7, 10, 11, 33, 41

    Eight Amend. ..................................................................... 11, 33, 41

Fourteenth Amend.                                        7, 11, 33, 41

Statutes                                                          Page

Evidence Code

352                                                          Passim

1200                                                         42

1221                                                         49

1237                                                         45, 47

1271                                                         43, 67

1400                                                         43, 59

Penal Code

187                                        11, 18, 41, 51, 55, 62, 68

12022.53                                                     9, 18

# INTRODUCTION

Petitioner Demetirus Sissac, by and through his attorney Jonathan B. Jordan, hereby petitions this Honorable Court for a Writ of Habeas Corpus to vacate and set aside his conviction in this matter, whereby the respondent would be required to show why his continued incarceration is just.

# PETITION

Petitioner Demetirus Sissac hereby petitions this Honorable Court for a Writ of Habeas Corpus to vacate and set aside his conviction in this matter, whereby the respondent would be required to show why his continued incarceration is just.

Petitioner alleges:

1.     Petitioner Demetirus Sissac is the party for whom this petition is intended and prosecuted. Mr. Sissac is unlawfully restrained of his liberty, being previously imprisoned by W.L. Montgomery, Warden of Calipatria Prison, being currently imprisoned by Daniel Paramo, Warden of Richard J. Donovan Prison and by the Department of Corrections of the State of California.

2.     The People of the State of California, by and through the Office of the District Attorney for the County of San Diego, are responsible for initiating and continuing the prosecution described against petitioner in Paragraph 1, above, and have an interest in the outcome of this writ proceeding. Thus, the People of the State of California are the Real Party in Interest herein.

3.     The conviction stems from the death of Jalaludin Hamrah, a taxicab driver, who was found in the early morning hours of October 30, 2011, near the Lemon Grove trolley station inside his taxicab, which was upside down on the sidewalk, with a gunshot wound to his chest; he had apparently lost control of the cab after being shot, causing it to flip over, and he later died from the gunshot wound. (3RT 136, 140-146, 157-161, 165, 177-182, 194-197, 216, 221, 267, 272-283, 302-306, 310-311; 4RT 401-412; 5 RT 617-618, 637; 7RT 1028-1033, 1038-1042, 1045-1046.) The bullet had apparently been fired from close range (two to three feet), with a general direction and trajectory of right to left, front to back, at a slightly downward angle. (5RT 607-609, 612-617, 619-624, 628-631, 637-638.)

4.     It was a "whodunit" case with no eyewitnesses to the alleged shooting, no surveillance video of any such shooting, and no physical evidence or other solid leads as to the possible perpetrator(s), except evidence that Hamrah was last seen with a group of five young Black males whom he had offered to drive to the Lemon Grove trolley station for less than the actual cab fare because they had little or no money. (3RT 146-147, 151, 167, 181-188, 190-192, 205-208, 223-225, 234-235, 333; 4RT 359362, 383-388, 392-396; 5RT 741-752, 760-763; 6RT 767-768, 846-848, 851-856, 924-926, 931, 957, 963; 7RT 980, 1046-1047, 1066-1067.)

5.     Police pegged Devin Patton (Devin), David Glenn, Anthony Roy, and Sissac as four of the five Black males at issue, because Devin later reported to police

that they were the ones who had last ridden in Hamrah's cab, along with another unidentified Black male, and he went on to claim that Sissac had shot Hamrah at the Lemon Grove station, even though he had not seen Sissac actually do so. Specifically, Devin claimed that the rest of them had just ditched the cab once they got to Lemon Grove but Sissac lagged behind, a gunshot rang out, and when Sissac caught up with the rest of the group, he said he shot Hamrah because Hamrah had laughed at him. (4RT 427-429, 442-444, 447-448, 460, 491-492, 508-509.

6.    Glenn also pinned the shooting on Sissac with an account of events similar to Devin's. (5RT 650-655, 660, 665, 698-707, 716-719.) Roy, on the other hand, reported that Sissac made no such admissions and Roy had neither seen nor heard anything else to suggest that Sissac had shot Hamrah. (6RT 792-793, 813, 820-821, 827-828, 841.) Both Glenn and Roy also claimed to be unable to identify or even name the fifth Black male who was the group. (5RT 641-643 684; 6RT 771-776, 784, 797-798.)

7.    Devin had received and was still receiving at the time of trial substantial financial and other assistance from the witness relocation program, which he had requested after moving out of the area. (4RT 464, 545-549, 562-563; 7RT 983-995.) Glenn had testified under a grant of immunity from prosecution. (5RT 555-558, 658-659; ICT 142.) He admitted having been in possession of the gun involved the day before the shooting (5RT 655-656, 662-663, 670-674, 682, 708-709, 711-714), and

there was evidence to suggest he was in possession of it or other incriminating evidence after the alleged shooting (7RT 1086-1089).

8.    Aside from Devin and Glenn's testimony, the prosecution's evidence of Sissac's guilt consisted of: (l) purported records of cell phone activity between Sissac and the others, introduced to show (a) Sissac had admitted his own guilt through "adoptive admissions," (b) Sissac demonstrated consciousness of guilt by "deleting" the messages, and (c) that Roy had phone contacts with Sissac after the incident even though Roy had denied such contacts (4RT 456-459; 6RT 810-812, 830-835, 870-896); and (2) a pretext call between Devin and Sissac also introduced to show that Sissac had made adoptive admissions of guilt (ICT 135-140)

9.    Physical evidence presented by the defense established that   the shot Hamrah sustained could have been fired from inside or outside the front passenger side, where Sissac had been seated, or from inside or outside the rear passenger side, where Glenn and the unidentified Black male had been seated, though the expert believed it was more likely that the shot was fired inside or outside the side. (7RT 1 1 15-1176.)

10.    Petitioner's was tried by jury trial. The jury ultimately returned a conviction of second degree murder with true findings on the firearm allegations. (1 CT 209-210; 2 CT 347.) The trial court sentenced Sissac to 15 years to life on the murder conviction plus 25 years to life for the firearm enhancement under section

12022.53, subdivision (d), for a total term of 40 years to life; it imposed 10 years and 20 years, respectively, for the firearm enhancements under section 12022.53, subdivisions (b) and (c), but stayed those terms under section 654. (1 CT 209-210; 2 CT 279, 347-349.) The court awarded 654 days of presentence custody credit and imposed various fines and fees. (2 CT 348.) Sissac timely appealed from the judgment. (2 CT 280-281, 348.)

11.    Petitioner Sissac appealed the commitment to the California Court of Appeal, Fourth District. Attorney Raymond M. DiGuiseppe, Esq., PO Box 10790, Southport, NC 28461-0790 represented petitioner for appeal. Mr. DiGuiseppe raised the following issues:

a.    The synergistic effect of trial counsel's handling of the multiple serious evidentiary errors compels reversal even if the individual effect of each error des not itself compel reversal;

b.    Counsel was ineffective for failing to renew at trial his pretrial objections to the admission of the purported text messages as unauthenticated, lacking adequate foundation, and constituting inadmissible double hearsay evidence;

c.    Counsel was ineffective in failing to specifically object to the evidence of the "deleted" text messages and the phone calls between Sissac and Roy;

d. Counsel was ineffective for "conceding" that the statements in the pretext call were admissible as "adoptive admissions";

e. Counsel was ineffective for failing to object to the improper lay opinions of the prosecution's primary witnesses on the ultimate factual and legal issues

On March 3, 2015, the Court of Appeal issued its decision affirming Mr. Sissac's conviction in this matter.

12.    On May 13, 2014, by and through attorney Raymond M. DiGuiseppe, Esq., Mr. Sissac filed a Petition for Writ of Habeas Corpus in the Court of Appeal for the Fourth District, Division One. On June 14, 2014, the Court issued an order to consider the appeal and the Writ of Habeas Corpus together. On March 3, 2015, the Court of Appeal issued its decision affirming Mr. Sissac's conviction on this matter.

13.    On April 8, 2015, by and through his attorney Raymond M. DiGuiseppe, Esq., Mr. Sissac filed a Petition for Review in the California Supreme Court. The Petition for Review raised the following issues:

a. The synergistic effect of trial counsel's handling of the multiple serious evidentiary errors compels reversal even if the individual effect of each error des not itself compel reversal;

b. Counsel was ineffective for failing to renew at trial his pretrial objections to the admission of the purported text messages as

unauthenticated, lacking adequate foundation, and constituting inadmissible double hearsay evidence;

   c. Counsel was ineffective in failing to specifically object to the evidence of the "deleted" text messages and the phone calls between Sissac and Roy;

   d. Counsel was ineffective for "conceding" that the statements in the pretext call were admissible as "adoptive admissions";

   e. Counsel was ineffective for failing to object to the improper lay opinions of the prosecution's primary witnesses on the ultimate factual and legal issues

On June 10, 2015, the California Supreme Court issued its decision denying the Petition for Review.

## JURISDICTION

14.   This petition is being filed in this Court pursuant to its original habeas corpus jurisdiction. (Cal. Const., art. VI, § 10; Cal. Pen. Code § 1473; Cal. Pen. Code § 1475.) Petitioner maintains that new evidence in the form of hospital error, combined with his trial counsel's inadequate pretrial investigation deprived him of his due process rights to a fair trial.

Penal Code section 1484 allows the Court to act as required in the interests of justice in a particular case. As such, Code of Civil Procedure section 187 provides:

> [w]hen jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code. (Cal. Code Civ. Proc. § 187.)

In addition, Code of Civil Procedure section 576 allows "[a]ny judge, at any time before or after commencement of trial, in the furtherance of justice, and upon such terms as may be proper, may allow the amendment of any pleading or pretrial conference order." (Cal. Code Civ. Proc. § 576.)

## PRELIMINARY ALLEGATIONS

I. THE SYNERGISTIC EFFECT OF TRIAL COUNSEL'S HANDLING OF THE MULTIPLE SERIOUS EVIDENTIARY ERRORS COMPELS REVERSAL EVEN IF THE INDIVIDUAL EFFECT OF EACH ERROR DOES NOT ITSELF COMPEL REVERSAL

This trial was plagued with multiple serious evidentiary errors, each of which forms a separate basis for reversal, as set forth below:

(1) the admission of unauthenticated, foundationless inadmissible hearsay evidence of cell phone activity records purportedly reflecting text messages and phone calls between Sissac and the others to show (a) that Sissac essentially admitted his own guilt through "adoptive admissions," (b) he demonstrated consciousness of guilt by "deleting" the text messages, and (c) that Roy was not a believable witness because he

said he never contacted Sissac after the incident when the records showed otherwise; (2) the admission of a pretext call between Devin and Sissac for the purpose of introducing additional statements the prosecution claimed were "adoptive admissions" of guilt; and (3) Devin and Glenn were permitted to testify, in their role as the primary witnesses in support of the prosecution's case, to the ultimate legal and factual issues that were for the jury to decide.

12. Trial counsel failed to properly challenge this evidence for purposes of preventing its admission in the first place and for preserving Sissac's right to challenge its admission on appeal, in violation of Sissac's state and federal rights to the effective assistance of counsel. (U.S. Const., Amend. VI; Cal- Const., art. I, S 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685, 694; *People v. Pope* (1979) 23 Cal.3d 412, 422.)

13. While each error, coupled with counsel's omissions that prejudiced Sissac's ability to challenge admission of the evidence, independently prejudiced the outcome, their cumulative impact also worked to deprive Sissac of his fundamental rights to a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt. (U.S. Const., Amends. V, VI, Vlll, XIV; cal. Const., art. 1, 7, 14, 15, 16,) Thus, reversal is required even if each error does not independently rise to the level of constituting reversible error. (*Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 928; *People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on another ground in

*Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see also *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643, and *Chambers v. Mississippi* (1973) 410 U.S. 280, 290, fn. 3.)

II. COUNSEL WAS INEFFECTIVE FOR FAILING TO RENEW AT TRIAL HIS PRETRIAL OBJECTIONS TO THE ADMISSION OF THE PURPORTED TEXT MESSAGES AS UNAUTHENTICATED, LACKING ADEQUATE FOUNDATION, AND CONSTITUTING INADMISSIBLE DOUBLE HEARSAY EVIDENCE

The prosecution failed to carry its burden of authenticating, laying a foundation for, and establishing an exception to the hearsay rule for the evidence of purported text messages between Devin and Sissac. (See *People v. Beckley* (2010) 185 Cal.App.4th 509, 517-518 [a writing must be "authenticated" with evidence "sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is"]; *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 [proponent must "establish the foundational requirement of trustworthiness"]; *Lilly v. Virginia* (1999) 527 U.S. 116, 138 [hearsay must be reliable]; *People v. Arias* (1996) 13 Cal.4th 92, 149 [multiple hearsay must satisfy an exception at each level to be reliable].)

Counsel requested a pretrial evidentiary hearing for purposes of establishing the necessary authentication and foundation for this evidence (ICT 125), objected that some of the statements were not "adoptive admissions" and lacked foundation as to the

times that the purported text messages were sent (ICT 100-101, 125; 4RT 444-445, 451452, 457). However, he did not object to each statement, challenge the hearsay at each level, raise a specific trial objection to the lack of foundation or authentication as to the records in their entirety, specifically object on authentication or foundation grounds to Detective Pearce's testimony concerning additional purported records of cell phone activity, or argue that the evidence should have been excluded under Evidence Code section 352 as unduly prejudicial or confusing even if it was otherwise admissible. Trial counsel has not proffered a reasonable tactical or strategic basis to justify these omissions; nor does such a basis exist. (Exhs. A & B.)

Counsel was ineffective in failing to raise such objections because these omissions not only prejudiced Sissac's fundamental trial rights but also placed Sissac in jeopardy of forfeiting the right to challenge the admission of the evidence on appeal. (See *People v. Williams* (2008) 43 Cal.4th 584, 620 [a specific objection on the same grounds is generally required to raise an issue on appeal]; *People v. Riccardi* (2012) 54 Cal.4th 758, 845, fn. 27 [a pretrial objection is generally not sufficient to preserve this right].) Had counsel raised these objections, Sissac would not have suffered these undue adverse consequences, and there is a reasonable probability he would have achieved a better result. So Sissac was denied his right to effective assistance of counsel. (*Strickland v. Washington*, supra, 466 U.S. at pp. 684-685, 694; *People v. Pope*, supra, 23 Cal.3d at p. 422.)

### III. COUNSEL WAS INEFFECTIVE IN FAILING TO SPECIFICALLY OBJECT TO THE EVIDENCE OF THE "DELETED" TEXT MESSAGES AND THE PHONE CALLS BETWEEN SISSAC AND ROY

Even though it was based upon the same unauthenticated, foundationless, inherently unreliable purported cell phone records, counsel did not specifically object to the admission of the evidence that Sissac "deleted" the purported text messages between him and Devin (see 6RT 888-889) and that Sissac and Roy had phone contacts after the incident (see 6RT 810-812, 830-835) — evidence that obviously exacerbated the violation of Sissac's fundamental rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt. Trial counsel has not proffered a reasonable tactical or strategic basis to justify these omissions; nor does such a basis exist. (Exhs. A & B.)

Counsel was ineffective in failing to raise such objections because these omissions also prejudiced Sissac's fundamental trial rights and placed him in jeopardy of forfeiting the right to challenge the admission of the evidence on appeal. (See *People v. Williams*, supra, 43 Cal.4th at p. 620; *People v. Riccardi*, supra, 54 Cal.4th at p. 845, ff. 27.) Had counsel raised these objections, Sissac would not have suffered these undue adverse consequences, and there is a reasonable probability he would have achieved a better result. Accordingly, Sissac was denied his right to effective

assistance of counsel. (*Strickland v. Washington*, supra, U.S. at pp. 684-685, 694; *People v. Pope*, supra, 23 Cal.3d at p. 422.)

IV. COUNSEL WAS INEFFECTIVE FOR "CONCEDING" THAT THE STATEMENTS IN THE PRETEXT CALL WERE ADMISSIBLE AS "ADOPTIVE ADMISSIONS"

Before trial, trial counsel "concede[d]" that the statements in the pretext call were admissible as "adoptive admissions." (2 RT 82.)

Counsel was ineffective in making this concession because the statements at issue did not constitute "adoptive admissions" within the meaning of that exception to the hearsay rule and thus were inadmissible and, to the extent any of them may have fit within that exception, they were subject to exclusion under Evidence Code section 352 as unduly prejudicial or confusing given the vagueness and ambiguity of their meaning. (*People v. Maki* (1985) 39 Cal.3d 707, 712 [evidence of a hearsay statement is admissible under this exception only if it is clear that (1) the defendant had knowledge of the meaning and content of an accusatory statement and (2) "by words or other conduct, manifested his adoption or his belief in its truth"].) The admission of this evidence also violated of Sissac's fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt. Trial counsel has not proffered a reasonable tactical or strategic basis to justify these omissions; nor does such a basis exist. (Exhs. A & B.)

Counsel's concession prejudiced the outcome requiring reversal because, had counsel objected, Sissac would not have suffered these undue adverse consequences from the admission of the evidence and the potential forfeiture of the right to challenge evidence on appeal (*see People v. Williams*, supra, 43 Cal.4th at p. 620; *People v. Riccardi*, supra, 54 Cal.4th at p. 845, ff. 27), leaving open the reasonable probability of a better result absent this deficient performance. So Sissac was denied his right to effective assistance of counsel. (*Strickland v. Washington*, supra. U.S. at pp. 684-685, 694; *People v. Pope*, supra, 23 Cal.3d at p. 422.)

V. COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE IMPROPER LAY OPINIONS OF THE PROSECUTION'S PRIMARY WITNESSES ON THE ULTIMATE FACTUAL AND LEGAL ISSUES

Counsel failed to object to Devin's testimony that the victim was "innocent" in the situation and that what Sissac had done was not only "just wrong" and a "sin" but constituted "murder," and counsel failed to object to Glenn's similar assertion that Sissac was responsible for "murdering" the victim. (4RT 444-445, 473; 5RT 656.)

Counsel was ineffective in failing to object to this testimony because it constituted improper lay opinions in violation of Sissac's fundamental right to have the jury decide the ultimate issues in the case. (See *People v. Marshall* (1996) 13 Cal.4th 799, 878, quoting *United States v. Gaudin* (1995) 515 U.S. 506, 513 [the defendant has the constitutional right "to demand that the jury decide guilt or innocence on every

issue"]; *United States v. Lockett* (9th Cir. 1990) 919 F.2d 585, 590 ["A witness is not permitted to give a direct opinion about the defendant's guilt or innocence"]; *United States v. Crawford* (9th Cir. 2001) 239 F.3d 1086, 1090 [a lay witness may not testify to a legal conclusion]; *Morrow v. Los Angeles Unified Sch. Dist.* (2007) 149 Cal.App.4th 1424, 1444-1445 "[t]he manner in which the law should apply to particular facts is a legal question and is not subject to expert, much less lay, opinion"].) Trial counsel has not proffered a reasonable tactical or strategic basis to justify these omissions; nor does such a basis exist. (Exhs. A & B.)

Counsel's omissions prejudiced the outcome requiring reversal because, had counsel objected, Sissac would not have suffered these undue adverse consequences from the admission of the evidence and the potential forfeiture of the right to challenge evidence on appeal (see *People v. Williams*, supra, 43 Cal.4th at p. 620; *People v. Riccardi*, supra, 54 Cal.4th at p. 845, fn. 27), leaving open the reasonable probability of a better result absent the omissions. Thus, Sissac was denied his right to effective assistance of counsel. (*Strickland v. Washington*, supra, U.S. at pp. 684-685, 694; *People v. Pope*, supra, 23 Cal.3d at p. 422.)

15. Pursuant to the provisions of California Evidence Code sections 452(b)(1), 453 and 459, petitioner Sissac respectfully requests that this Court take judicial notice of the superior court file in *People v. Demetrius Sissac*, San Diego Superior Court criminal case no. SCE315928, the file in the Fourth District Court of Appeal, case no.

D064910, and the file in the California Supreme Court, case no. S225613, comprising the direct appeal of petitioner's case in the trial court.

16. At this time, the petitioner has no plain, speedy, or adequate remedy at law to challenge the illegality of the restraint of liberty complained of herein in this petition. Due to the fact that there is no adequate remedy at law, petitioner hereby requests issuance of a writ of habeas corpus.

## MEMORANDUM OF POINTS AND AUTHORITIES
## STATEMENT OF THE CASE

The San Diego District Attorney charged appellant, Demetrius Sissac, with first degree, special circumstance murder in connection with the October 30, 2011 shooting of taxicab driver Jalaludin Hamrah, alleging that Sissac shot and killed Hamrah with premeditation and deliberation (§ 187, subd. (a)) through the intentional and personal use and discharge of a handgun (§ 12022.53, subds. (b), (c), & (d)), while knowing that Hamrah was engaged in the performance of his duties (§ 190.25). (1 CT 4-6.) The jury hopelessly deadlocked on the first-degree murder charge, and the trial court dismissed it on the prosecution's motion. (1 CT 205-208; 2 CT 345.) The jury ultimately returned a conviction of second degree murder with true findings on the firearm allegations. (1 CT 209-210; 2 CT 347.) The trial court sentenced Sissac to 15 years to life on the murder conviction plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), for a total term of 40 years to life; it imposed 10 years and 20 years, respectively, for the firearm enhancements under section 12022.53, subdivisions (b) and (c), but stayed those terms under section 654. (1 CT 209-210; 2 CT 279, 347-349.) The court awarded 654 days of presentence custody credit and imposed various fines and fees. (2 CT 348.) Sissac timely appealed from the judgment. (2 CT 280-281, 348.)

In this appeal, Sissac contends that a series of serious evidentiary errors, primarily arising from the purported records of cell phone activity that the prosecution used to argue that he essentially admitted the crime, both individually and collectively worked to deprive Sissac of his fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt. He therefore respectfully requests that this Court reverse the judgment.

## STATEMENT OF FACTS

### A.     The Death of Hamrah

Around 3:45 a.m. on October 30, 2011, police and emergency medical personnel responded to the 3500 block of Main Street, near the intersection of Main and North Avenue in the vicinity of the Lemon Grove trolley station, to find Hamrah's taxicab, a white Ford Crown Victoria, upside down on the sidewalk with Hamrah still belted to the driver's seat. (3RT 136, 140-143, 157-158, 165, 177, 194-195, 221, 267, 302; 4RT 401-412; 7RT 1028-1033, 1038-1042, 1045.) He had apparently lost control and struck the curb, propelling the vehicle up on to the sidewalk where it ultimately collided with a tree and then flipped over. (3RT 142, 177, 272-283, 304-306, 310-311.) Hamrah was unresponsive with shallow, labored breathing. (3RT 141-142, 157-158, 177-178.) He was wearing three layers of clothing on his upper body – an undershirt, outer shirt, and a sweatshirt; when they were removed, it was discovered that he had a gunshot wound to the right side of his chest from which he was bleeding profusely. (3RT 145-146, 160-161, 180, 196-197, 216; 7RT 1046.) Hamrah died at the scene within minutes of being removed from the taxicab. (3RT 161, 180, 182.)

Police investigated the crash site and the area around it as the scene of a homicide, canvassing for firearms, shell casings, witnesses, and other evidence, but no witnesses could be located, and no shell casings, guns, weapons, or other significant leads were found. (3RT 146-147, 151, 167, 181-188, 190-192, 205-208, 223-225, 234-

235, 333; 5RT 760-763; 6RT 767-768, 924-926, 931, 957, 963; 7RT 980, 1046-1047, 1066-1067.) Hamrah's cell phone was recovered from the cab. (7RT 1069-1070.) A call to 9-1-1 had been placed from the phone at 3:44 a.m. that morning, but it was very brief, the caller never spoke, and the only thing heard on the caller's end of the communication was the apparent sound of a car crash. (7RT 1070-1071, 1100.) Hamrah had $300 cash in various denominations in his pants pocket. (6 RT 921.) A loose $20 bill was also in the cab. (6RT 933-934; 7RT 1091.) The taxicab was impounded. (6RT 924-925.)

The autopsy revealed that Hamrah had superficial cuts on his hands, face, forehead, and shoulder, consistent with injuries from shattered glass (5 RT 601-604, 609), in addition to the gunshot wound to the right upper chest (5 RT 600). It was an entry gunshot wound; the bullet was still in the body. (5 RT 604-607, 609-610.) The gunshot caused significant internal bleeding, which was the ultimate cause of Hamrah's death. (5 RT 611, 637.) The manner of death was classified as homicide. (5 RT 617.) Neither the vehicle accident nor any other factor contributed to the death. (5 RT 618, 637.) No drugs or alcohol were detected in Hamrah's system. (5 RT 618.) The bullet was recovered from Hamrah's body. (7RT 1048.) It did not appear to have been damaged, deformed, or otherwise marred as a result of the path it traversed before coming to a rest. (5 RT 619-620, 629.) The bullet was "most consistent" with having been fired from a .380 caliber gun, though other similar weapons could not be excluded. (6RT 965-966.)

No stippling, soot, or burns were evident around the gunshot wound, which could be due to the multiple layers of clothing that Hamrah was wearing or due to the distance from which the shot was fired since such effects normally only occur when the shot is fired from "very close" range – less than two feet away. (5 RT 607-609, 620-621, 623-624.) The pathologist could not determine the distance or the position of the shooter relative to Hamrah at the time of the shooting without knowing more about

the circumstances surrounding the shooting, such as if the shooter was inside or outside of the car and the actual position of Hamrah in the seat at the time. (5 RT 632-636.) Attempting to determine the actual distance from which the shot was fired would require conducting test fires with the actual weapon and an examination of Hamrah's clothing. (5 RT 609, 622-623, 626-627.) The general trajectory of the bullet indicated it entered the right side of Hamrah's chest, went through his heart, into the upper abdomen, and stopped in the left side of the diaphragm (5 RT 612-615, 619, 628-630); the general direction of the bullet was right to left, front to back, at a slightly downward angle (5 RT 613-614, 615-617, 630-631, 637-638).

## B.    The Investigation

According to Naseer Yousif and Habeel Othman, a couple of the other taxicab drivers who were also on duty at the El Cajon trolley station in the early hours of October 30, 2011, Hamrah was first in line in the taxicab lane around 3:30 a.m., and it was customary for the driver first in line to take the next customer. (5RT 741-744, 747-750.) Around this time, a group of Black males was on the trolley platform. (5RT 744.) One of them, whose hair was "curly," "long," and "rolled around something," came down to the taxicab lane and asked another of the drivers to take them to Lemon Grove "for the sake of God" because they had no money. (5RT 744, 747-748.) When the driver did not agree, the male rejoined his group on the platform. (5RT 744-745.) Shortly thereafter, one of the males came down and spoke to Othman. (6RT 846-847.) Yousif could not specifically describe this male and did not recall if he was the same one who had first come down, and Othman could only describe the male as slender and young. (5RT 746, 752; 6RT 846-847, 851-852.) The male was "begging" the drivers for a ride, offering $20, and eventually handed Othman a $20 bill. (6RT 847-848, 850.) The trip that the group wanted actually cost about $27. (6RT 847, 850.) The male did not appear threatening at all, but was polite and seemed "very normal." (6RT 853,

855.) Othman handed the cash to Hamrah since he was the first in line. (6RT 845, 847, 852.) Hamrah took the cash, even though it was less than the total fare, and the group got in the cab – one in the front and four in the back. (6RT 847-848, 851, 853-854, 856.) Othman had not seen any of them with a gun. (6RT 854-855.)

The day after the incident, October 31, 2011, Kim Patton (Kim) contacted the Lemon Grove Sheriff's station and asked to speak to Suzanne Fisk, a homicide detective. (3RT 334-335; 4RT 447, 508; 7RT 1003.) Kim and Fisk had worked together at a correctional facility for a period sometime in the past. (3RT 334-335.) Kim said that her son, Devin Patton (Devin), had some information to report about this incident.[1] (3RT 335; 7RT 1009.) So Kim and Devin went to the station to be interviewed. (3RT 335, 347; 7RT 1004, 1049-1050.) Devin met with Detectives Henry Lebitski and Mark Palmer and reported that he was among the group in Hamrah's taxicab the morning of the previous day, along with Sissac, David Glenn, Anthony Roy, and another Black male whose name Devin did not know, and that Sissac had shot Hamrah after the taxicab reached the Lemon Grove trolley station. (4RT 427-429, 447-448, 460, 491-492, 508-509.) Devin and Kim consented to a search of Kim's residence, where Devin lived, and Devin agreed to conduct pretext phone calls. (7RT 1004-1007, 1050-1052, 1074-1076, 1082.) Police seized from Devin's room the clothing he said he was wearing at the time of the incident. (3RT 337-338, 347-353.) They did not find a gun, though they had not searched any other part of the residence and were not looking for a gun. (7RT 1082-1083.)

Devin made a pretext call with his cell phone from the police station in the presence of Detective Lebitski on the night of November 1, 2011. (7RT 1052-1053, 1075; 1CT 134.) The basic substance of the phone call, which was presented to the jury at trial, was as follows:      Devin said he was "stressed" about the situation, to which Sissac responded: "it ain't your situation to stress . . . [¶ . . . ¶] you just got to let

it go." (1CT 135.) Devin asked "what is this doin' for you?" (*Ibid.*) Sissac said: "you just have to trust your faith in God; "You know all sin is forgiven." (1CT 135-136.) Devin remarked that he might need to talk to Sissac's pastor since "he got [Sissac] all kinds of calm." (1CT 136.) Sissac responded that he had talked to the pastor and offered to take Devin to see him. (*Ibid.*) Sissac went on to say: "everything happens for a reason. You know, this is just an eye opener that, you know, I need you to wider. [*sic*] [¶ . . . ¶] "I ain't trippin' off what you said . . . [¶ . . .¶] I was feelin' the same way at first." (1CT 136-137.) Devin said: "I don't want to look at you in a different light like that . . . [¶ . . .¶] that night, I just didn't see Meech . . . [¶ . . . ¶] [t]o do some shit like that, like that's not my Nigga right there." (*Ibid.*)[2] Sissac responded: "Yeah, it wasn't me. You know? You gotta, you gotta, what you gotta see is that was the devil . . ." (*Ibid.*) When Devin then asked, you "feel like the devil was in you?" Sissac said: "Yeah. It was, I just – just fuckin' else that would do somethin' like that. God wouldn't, wouldn't do nothing like that. He wouldn't put that in me . . ." (1CT 138.) Devin said, "this is somebody else inside of this dude," to which Sissac responded: "Yeah. [¶ . . . ¶] I mean it's sad to say this had to happen but it will turn me around, you know, so . . ." (*Ibid.*) Sissac said: "nobody cares but God so, you know, like I said, just put your faith in 'im and see how it does for you. You know?" (1CT 139.) Devin then asked: "Did you, you didn't get any money out of it?" (*Ibid.*) Sissac said: "No, I didn't. [¶ . . . ¶] [t]hat's not the point." (*Ibid.*) The "devil makes you do crazy things," Devin said. (*Ibid.*) Sissac responded: "He does, and that's what you need to know … [¶ . . . ¶] just put your faith in God and you'll see." (*Ibid.*) Devin said: "I don't never want to hear no shit like that. I don't know who the fuck you was that night dog but don't ever be that person again. You feel me? That's not you . . ." (1CT 140.) "Yeah," Sissac said. (*Ibid.*)

---

[1]   Devin was also known as "D." (5RT 642, 644.)
[2]   Sissac went by "Meech" and "Metrie." (4RT 415-418; 5RT 638.)

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Devin also made a pretext call to Glenn the same night. (4RT 462; 5RT 570.)[3] According to Fisk, neither Kim nor Devin was promised any special consideration or benefits for their assistance. (3RT 336.)

Glenn was arrested the next day, November 2, 2011, and was taken to the police station where he was interviewed and consented to a search of his residence. (5RT 666, 708-709; 7RT 1061.) The search did not reveal any weapons or other evidence. (7RT 1063.) Police also searched Sissac's apartment. (7RT 1010.) They looked for, but did not find, a gun, ammunition, or the clothing he was suspected to have been wearing at the time of the incident.  (7RT 1011-1017.) Devin and Glenn both turned over their cell phones to police. (5RT 724; 7 RT 1052, 1082.) Lebitski also interviewed Anthony Roy around this time. (7RT 1062-1063.)

Surveillance cameras at the El Cajon trolley station captured a white cab parked in the taxicab lane and a group of Black men around the trolley platform from 3:21 to 3:37 a.m. on the morning of the incident. (4RT 359-362, 383-388, 392-396.) Based on David and Glenn's descriptions of the clothing each of them was wearing at the time, police identified Sissac, Devin, David, and Anthony Roy as among this group, but they could not identify the fifth Black man, who was seen breaking away from the group when they first arrived and heading toward the area of the taxicab lane before meeting up with the rest of the group on the platform. (5RT 1056-1060, 1076-1077, 1094-1096.) The video also showed Sissac speaking with the taxicab drivers in the taxi area at one point. (7RT 1060.) The cameras at the Lemon Grove trolley station captured the later accident in which the taxicab flipped over. (4RT 361, 369-370, 372-373, 389-392, 395.) The surveillance did not capture all of the activity at the trolley stations during this time frame because the cameras did not cover the entire area and some were only motion activated. (4RT 363-369, 374-389, 397-398.)

---

[3]     This evidence was not presented at trial.

Investigators attempted to recover fingerprint and deoxyribonucleic acid (D.N.A.) evidence from areas within the taxicab as well as various items within it, including the $20 bill, a pack of cigarettes, Hamrah's taxicab driver identification card, and receipts. (6RT 935-936, 942-945; 7RT 969-970, 973-974, 1034-1036.) No usable fingerprints could be lifted from the interior surfaces of the cab or the various items inside. (6RT 936-937; 7RT 976-977, 980.) For the D.N.A. testing, reference samples were collected from Hamrah, Devin, Glenn, and Sissac. (6RT 898-899, 920-923, 942; 7RT 1051-1052.) The comparisons did not yield any pertinent information, except that the majority of David Glenn's D.N.A. profile matched that of the major contributor to the sample of the right rear passenger interior door handle and grip, which contained a mixture of two or more D.N.A. profiles. (6RT 945-946, 948-950.) The probability of a mismatch here was extremely remote. (6RT 946-947.) The amount of D.N.A. from the minor contributor was insufficient to make a determination as to who might be the contributor. (6RT 948-949, 951-953.) Testing for gunshot residue on the front passenger side of the cab did not yield any results. (7RT 973, 977-978.) Investigators did not test for the presence of gunshot residue on either Sissac or Glenn. (6RT 900.) They also did not perform an accident reconstruction analysis in an effort to determine how the accident actually occurred, the respective positions of those in the vehicle, or the distance or position of the shooter. (7RT 1104.)

After having assisted police in the initial investigation, Devin relocated to the east coast. (7RT 985-986, 997.) In April or May of 2012, a couple of months after the preliminary hearing on the charges against Sissac, Kim contacted the District Attorney's Office requesting financial assistance for Devin through the witness relocation program. (7RT 986, 991-993, 1007-1008.) Devin was approved for such assistance at the residence to which he had already relocated the previous year, based upon what the District Attorney's Office deemed the possibility of a threat to Devin's safety as a witness. (7RT 984-985.) Devin started receiving monthly payments in May

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

2012 for his food, rent, and cell phone. (7RT 987-988.) His travel and lodging expenses for the trial proceedings were also covered through the program. (7RT 995.) A District Attorney Investigator drove Devin to and from the courthouse. (7RT 989.) By the time of trial in June 2013, Devin had received about $15,922 through the program. (7RT 989, 994.) The cut-off date for assistance was the point at which Sissac was able to support himself or three months after the last court appearance, whichever came first. (7RT 988-989.)

As for Glenn, despite attempts to procure his testimony for the preliminary hearing, the District Attorney's Office was unable to locate him. (7RT 983-984, 993.) He appeared and testified at trial only under a grant of immunity from prosecution, as he otherwise intended to invoke his right against self-incrimination. (5RT 555-558, 658-659; 1CT 142.)

## C.    The Various Witness Accounts

Devin, Glenn, and Roy testified at trial and gave the following accounts of the circumstances surrounding Hamrah's death:

### 1.    Devin Patton

According to Devin, he and Glenn (whom he also knew as "Jodi" or "Jodi Mack") had been friends since they met while Devin was visiting the San Diego area from his home state in 2008, and he had met Sissac (whom he also knew as "Meech" or "Metrie") through Glenn after Devin moved to San Diego in January 2011. (4RT 413-415, 418-419, 473-475.) Thereafter, Devin became close to Sissac and his family. (4RT 416-417, 501.) Devin had also gotten to know Roy (known as "Ant" or "Little Ant"), who was Glenn's cousin. (4RT 502-503, 507-508, 510-512; 5RT 639-640, 676.) Devin had Sissac's phone number stored in his phone under "Meech." (4RT 420.) He did not have Glenn's number stored in his phone. (4RT 420-421.)

In October 2011, Devin was living with Kim in her Lemon Grove home. (4RT 421, 423.) He was 21 years old at the time while Sissac was around 19 years old. (4RT 425, 429.) On the night of October 29, 2011, Devin went to a Halloween party with some friends, Natasha and Shalena, at a house on Peach Street in El Cajon, arriving around 8:00 p.m. (4RT 421-426, 475-478.) Devin was wearing black jeans, a gray "Hollister" polo, and a blue hat. (4RT 424, 449.) While at the party, Devin contacted Sissac by phone, telling him to come to the party. (4RT 426.) Sissac arrived around 11:00 p.m., along with Glenn, Roy, and another Black male whom Devin did not know. (4RT 426-427.) Sissac was wearing a light brown or tannish "hoodie" sweatshirt with a white T-shirt underneath and jeans below the hip-level. (4RT 481; 5RT 564, 574-576.)[4] Glenn was wearing a somewhat heavy jacket. (4RT 506.) The "other guy" was young, 17 to 18 years old, with dark complexion and dreaded hair locks, and he was wearing a jacket with a "hoodie." (4RT 428-429, 486, 506-507, 510.)

Sissac left with the others around midnight while Devin stayed behind at the party, believing he could spend the night there. (4RT 430-431, 454.) Shortly thereafter, however, the homeowner told Devin to leave, so he texted Sissac to reconnect with the others. (4RT 431-432, 454, 480, 488.) They all eventually met up again somewhere in the general area. (4RT 432-433, 486-488.) After walking around for a while trying to arrange a ride home with no success, the group decided to walk to the El Cajon trolley station, which was about three to four miles away, and take the next trolley. (4RT 433, 489-491.) The walk took two to two and a half hours, so they arrived at the station between 3:00 and 3:30 a.m. (4RT 433-434, 454, 491-494.) Devin had been drinking alcohol at the party, and was a "little tipsy" when he had left, but felt "sober" again by

---

[4]    Devin had previously told police that Sissac was wearing a black jacket with white-striped sleeves, but he testified that this was incorrect and the description he had given at trial was correct. (4RT 482-483; 5RT 564.)

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

the time the group reached the trolley. (4RT 425-426, 432, 434-435, 479-480, 483-484, 488.)

When the group first arrived, everyone immediately went up to the trolley platform via the most the direct route, except the unknown fifth guy, who took a different, longer route and thus was the last to reach the platform. (4RT 434-435, 494-497.) Glenn kept trying to reach someone who could give them a ride. (4RT 434, 497.) At some point, a cab driver in the taxicab area announced to the group that it would be two hours before the next trolley arrived and suggested they take a cab. (4RT 435, 497-499.) Devin had no money. (4RT 435-436, 488-489.) Sissac went down to the taxicab area, spoke to the driver, handed him some money, and then announced to the group that he had given the driver $20 to get them "as far as $20 would get [them]" toward Lemon Grove. (4RT 436, 498-500.) Relieved that they had a ride, the group got into the cab: Sissac sat in the front seat, Devin sat in the back on the far left directly behind the driver, Roy sat right next to Devin, the fifth guy next to Roy, and Glenn sat on the far right directly behind Sissac. (4RT 436-437, 500-502, 512-513.)

Once they reached the Lemon Grove trolley station, Sissac said something to the effect that the station was as far as they could go for $20, so the driver stopped there. (4RT 437-438, 465-472, 515.) The ride had lasted about 15 minutes. (4RT 437.) The mood had been pleasant in the cab throughout: the driver was "making jokes," everyone was "just cool" and "ready to get home," and there was no friction. (4RT 438-439.) Once the cab stopped, Devin immediately got out and started quickly walking away, down North Avenue towards his mother's house. (4RT 438-440, 514-516.) He noticed that Roy and the fifth guy had also gotten out right away and were quickly walking directly behind him. (4RT 440, 515, 517.)

Devin had walked about 15 to 20 feet away from the cab when a "loud pop" – like a single gunshot – rang out behind him. (4RT 440, 516-518, 527, 565-566, 577-579.) He had not seen anyone fire a gun and did not hear anyone running in the area

before this sound rang out. (4RT 517, 519.) Devin took off running down North, scared someone might be shooting at them. (4RT 440-441, 472, 517-519.) Roy and the fifth guy ran behind him. (4RT 441.) Along the way, Devin asked the other two "What was that? What happened?" and one of them (Devin did not know who) said "Meech shot him. Meech shot the cab driver." (4RT 442, 522.) They eventually stopped behind a Home Depot. (4RT 441, 472, 518-519, 522; 5RT 580-582.) A couple of seconds later, Sissac and Glenn approached, running in their direction. (4RT 442-443.) As they approached, Glenn yelled at Sissac "What the fuck did you do? Why the fuck did you that?" to which Sissac replied, with a "cold blank look" on his face, that the driver had laughed or smiled at him. (4RT 442-444.) "Meech wasn't like in an angry mode or anything like that. He looked kind of scared too." (4RT 443.) Devin did not see Sissac with a gun; he had never seen Sissac with a gun. (4RT 503-505, 513, 525-526.) He had not seen any of the others in the group with a gun at any time before or after the incident either. (5RT 564-565, 574.)

Scared, Devin ran straight home from there without attempting to call or contact anyone. (4RT 442, 444, 455, 523-526; 5RT 582.) Later that morning, Devin learned from a news report the driver was dead. (4RT 522.) He started texting Sissac, asking him to "do the right thing" and turn himself in because the cab driver "was innocent" and "this is a sin." (4RT 444-445.) Devin was allowed read into the record a series of statements that, according to the prosecution, purportedly reflected text messages between Devin and Sissac between the morning of October 30, 2011 and the morning of October 31, 2011, the substance of which was as follows:

Devin wrote: "turn yourself in, Meech. This shit is not going to be on my heart. This is crazy, nigga. I'm so serious." (4RT 456-457, 527.) Sissac replied: "I'ma call you later." (4RT 456-457.) Devin said: "You hear what I'm telling you? This is way back." (4RT 456-457.) Sissac replied: "I know." (4RT 456-457.) Later, Devin wrote: "Nigga, this ain't cool at all. I can't sleep or nothing. Yo, I didn't even do shit. You

need to be a man and own up, Meech. [¶] You ain't thinking about my life, my fam, and this shit hurt like fuck." (4RT 458-459, 528.) When Devin did not receive a response, he wrote: "Do the right thing, please, yo." (4RT 459.) Sissac replied: "You have to pray." (4RT 459.) Devin responded: "No, you pray, nigga. That's some coward ass shit. I got nothing else to say." (4RT 459.)

Devin testified that "I gave [Sissac] a day to realize what he did and I hoped that he had done the right thing on his own. I didn't want to have to be the person for everybody in this situation." (4RT 445-446.) But he believed from the text messages that Sissac was not going to take action, so Devin went ahead and told his mother, Kim. (4RT 460.) Kim called the police. (4RT 447, 508.) Devin met with detectives shortly thereafter, reported this account of events, and consented to a search of his room and his cell phone. (4RT 447-449, 460, 508-509, 536.) He offered to assist police in any way. (4RT 460-461, 537-538.) When he made the pretext call to Sissac the next day, the detectives were present and suggested questions for him to ask during the conversation. (4RT 537-538, 567-570, 584-586.)

Devin testified that he used to smoke marijuana but had quit doing so on the day of the incident. (4RT 544.) He acknowledged having said in a text to Glenn a couple of days after the incident that he (Devin) had "some trees to scoop" that day, which meant he was going to pick up some marijuana, but he denied this was really true. (4RT 543-544.) Devin moved to the east coast shortly after the incident because he could be considered a "snitch" and was concerned about his family's safety. (4RT 463-464, 535; 5RT 561-562.) Devin was "struggling" in his new residence and obtained financial assistance from the District Attorney's Office in the form of regular monthly payments for food, rent, and his cell phone, starting in May 2012. (4RT 464.) He received a larger than average payment in June 2012 "to make up for the time that they weren't helping [him]." (4RT 545-548.) Devin was still receiving this assistance at the time of trial, having accepted payments for May and June 2013. (4RT 545-546, 548-

549.) He testified that he did not really need the money any more, as his situation had become "stable" and he expected to be "just fine" after the trial. (4RT 548.) Devin said this case was not about the money, but about "the truth." (4RT 562-563.) When the prosecutor asked Devin at trial why he had "come forward" in the case, Devin testified: "Because certain things I can't live with, sir. Murder isn't – murder just one of them. It was wrong." (4RT 473.)

Devin was ultimately never accused of any criminal conduct in this case. (4RT 550.) He had been involved in another incident in which Sissac was targeted as a suspect. In May 2011, police began to pursue a car in which Devin was riding passenger and Sissac was driving, and Sissac led them on a highspeed chase before pulling over and running away, while Devin stayed behind and unhesitatingly told police he had believed that Sissac was legitimately in possession of the vehicle. (4RT 532-535, 566-567.) Sissac pleaded guilty to vehicle theft and evading charges; Devin was not prosecuted for any crime. (5RT 566-567, 579-580.) Devin had been convicted of misdemeanor embezzlement in 2010. (4RT 454-455.)

## 2.   David Glenn

Testifying under his grant of immunity from prosecution, Glenn relayed the following: He had known Sissac for about four years and Devin for three to four years. (5RT 638-639.) On the night of October 29, 2011, Glenn was with his cousin, Roy, and Sissac. (5RT 674-675, 682.) They decided to take up Devin on his invitation to join the party on Peach Street. (5RT 642, 644, 677.) They took the trolley to the El Cajon station and walked the rest of the distance. (5RT 642-643.) Sometime while they were en route, the other unidentified Black male joined them. (5RT 640-641.) Glenn described him as early twenties, dark skinned, with a braided hairstyle; Glenn never learned this person's name. (5RT 641-643, 684.) Glenn drank "quite a bit" of hard liquor at the party; the rest of the group drank too, including Sissac. (5RT 643-644, 678, 687-688, 722-723.) They all left together after a couple of hours, except Devin

who met up with them about 20 minutes later when they were on the way to Glenn's sister's house, where he had planned to stay that night. (5RT 643-644, 679-680, 682-683.) Their group ended up being too large to stay at the house, so they walked to the trolley station, arriving around 3:00 a.m. (5RT 645, 679-684.) By this point, Glenn "wasn't drunk" but he was "high" because he had smoked marijuana before, during, and after the party. (5RT 685-686, 688-689.) He had general memory problems because he smoked marijuana "heavily," but Glenn testified that this did not affect his memory of the events because he could "handle" his marijuana. (5RT 684, 722-723.)

While on the trolley platform, the group was unable to call anyone for a ride because their cell phones were dead. (5RT 686.) No one had any money as far as Glenn knew. (5RT 693.) So Glenn had suggested "trolley hopping" – riding without paying – to get home once the trolley started running again around 5:00 a.m. (5RT 645-646, 689-690, 692-693.) Sissac proposed they "ditch a cab" – take a cab but not pay the fare – and eventually all five of them agreed to this plan. (5RT 646, 693.) Sissac went down to the taxicab lane, talked to drivers, and eventually announced "We got somebody to give us a ride." (5RT 646-647, 694.) Glenn did not know whether Sissac had actually given the driver any money and had not heard Sissac say he had done so. (5RT 647-648, 693-694.) They all got into the cab with Sissac in the front, Glenn directly behind him in the back, and the others seated in the back to Glenn's left. (5RT 648, 694-697.) On the way to the Lemon Grove trolley station, the mood in the cab was positive with no tension or hostility between anyone, as everyone was happy and the driver was laughing and talking to them. (5RT 649, 659, 696.)

When the driver stopped the cab next to the Lemon Grove station, Glenn, Devin, Roy, and the fifth guy immediately got out and started running away. (5RT 650-651, 660, 698-702.) When they were about a block away from the cab, a gunshot rang out. (5RT 651, 665, 702-703, 706-707.) They slowed down their pace and Sissac caught up with them. (5RT 651-652, 703.) Glenn asked Sissac "What happened? What the fuck

did you just do? Did you just shoot that guy?" (5RT 652, 703-704.) Sissac said nothing in response; he just looked "scared," as if "he peed on himself." (5RT 652, 655, 704-706.) Sissac had a gun in his hand. (5RT 655, 705-706.) Glenn had given Sissac that gun the previous day. (5RT 655-656, 662, 711-713.) It was a small .38 caliber handgun that Glenn had found in a "gang area" about a month earlier and had been storing at his mother's house for "protection." (5RT 656, 670-674, 682, 708-709, 714.) Glenn had given Sissac the gun because he had asked for it. (5RT 662-663.)

The group kept running until they reached the area behind the Home Depot. (5RT 652.) Roy was "hysterical" and Devin was saying, "Meech, you need to turn yourself in, dog, like right now." (5RT 652.) Glenn told Sissac, "You just smoked the cab driver," and they could all "go down" for it because there were surveillance cameras at the trolley station. (5RT 652-653.) Sissac just looked at Glenn with a "blank look on his face, like he didn't know what he did." (5RT 653.) As Roy continued crying and saying he could not be part of this because he had kids, Sissac said," Since I'm the one that did it, there's no need to take everybody down with me." (5RT 653.) Glenn said, "okay," and "[h]eld him to his word." (5RT 653.) Then they all left the area, heading their separate ways. (5RT 653-654.) Glenn was "shocked" because nothing about Sissac or the surrounding events had suggested any reason for Sissac to have done this. (5RT 707, 707-719.)

Glenn had spoken to Sissac again sometime after the incident. (5RT 654.) He asked what Sissac was going to do because it was going to "come out." (6RT 654.) Sissac replied, "You don't have nothing to worry about." (5RT 654.) As for why he had done this, Sissac said "dude laughed at me." (5RT 654-655.) Glenn may have told police that he did not know whether Sissac had said this but testified that this was

indeed the case. (5RT 716-719.)[5] Glenn testified that he believed Sissac "wasn't in his right state of mind" and "wasn't hi[m]self when it happened." (5RT 655.) Glenn had also spoken with Devin after the incident and discussed how they would protect Sissac by not reporting the matter to the police themselves until it came to the point that Sissac needed to "take the rap for what he did" and turn himself in. (5RT 709-710, 724-726, 730-731.) Glenn had wanted to make sure that everyone stuck to this "agreement." (5RT 709-711.)

Asked if he felt responsibility for supplying the gun, Glenn said: "I felt like everybody is responsible for their own actions. I didn't give him a gun to shoot anybody. I don't believe in murdering nobody. I don't believe anybody should deserve to die by the hands of another, that's God's choice." (5 RT 656.) Glenn denied any involvement in "the murder," saying he had no idea of a plan to use the gun for any purpose, as he believed they were just going to "ditch the cab" after getting to Lemon Grove. (5RT 659, 663-664, 667.) His cell phone records reflected that he received a text message from his girlfriend the day after the incident, saying: "Baby, you need to get rid of yo shit. That shit's dirt and you don't need that on you. Kev Bo told me to tell you this and I totally agree or sell that S." (7RT 1086-1089.) Glenn testified that he did not recall this message or having ever discussed the shooting or the gun with his girlfriend, and he denied having ever possessed the gun after the incident. (5RT 710-711, 728-730.)[6]

Glenn was in custody at the time of trial, having been arrested for failure to respond to service of process in this case. (5RT 656, 670.) He did not want to be involved because he had been threatened and "ostracized" for being a "snitch," but he

---

[5]     During the police interview, Detective Lebitski asked Glenn if Sissac said he had shot the cab driver because he had laughed at Sissac. (7RT 1089-1090.) Glenn said "I don't know that," indicating he had not heard Sissac say this. (7RT 1089-1090.)

[6]     No follow-up investigation had been done to determine whether Glenn was in possession of the gun at issue. (7RT 1089.)

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

was trying to do the right thing. (5RT 656-658.) According to the terms of the immunity agreement, he was to be released from custody after testifying in the case. (5RT 667-669, 720-721.)

### 3.  Anthony Roy

As for his part, Roy testified that he knew Sissac and Glenn well and was close to them both (6RT 771, 773, 799-800, 832-834), but he too did not know the identity of the young Black male with "spiky braids" who went to the party with him, Sissac, and Glenn on the night of October 29, 2011 (6RT 771-772, 774-776, 784, 797-798). It appeared that the guy was Glenn's friend because he talked the most to Glenn. (6RT 784, 796.) They all smoked marijuana on the way to the party, where they met up with Devin and continued smoking marijuana and drinking alcohol; Roy himself smoked and drank heavily. (6RT 776-779, 814.) After three to four hours, Roy, Sissac, Glenn, and the fifth guy left, briefly went to another party, and then went to a nearby park, where Devin met back up with them and everyone smoked more marijuana. (6RT 779-781.) After reaching the trolley station by foot, Sissac tried to get them a cab ride. (6RT 781-782.) At this point, Roy was still "drunk" from the party and "high" from smoking marijuana along the walk. (6RT 803, 821, 825-826, 836.) Eventually, Devin announced that they had gotten a cab for which Sissac had paid, though Roy did not know whether Sissac had in fact paid. (6RT 783, 798-799, 816.) Roy was not aware of any advance plan to ditch the cab. (6RT 816.) He too recalled that Sissac sat up front, Glenn directly behind him and, from Glenn's left, it was the fifth guy, Roy, and then Devin on the far left side behind the driver. (6RT 783-785, 806.) Roy also recalled that there was no anger or hostility during the ride. (6RT 816.)

As the cab approached the drop off point, before it had stopped completely, Devin jumped out and started running away, and Glenn and the fifth guy ran after him, so Roy followed suit. (6RT 785-788, 817-818.) Sissac was running away with them as well; Roy was not certain of the respective positions of each person but believed he

and the others were ahead and Sissac was last as they were running. (6RT 802, 818, 829.) As they ran away, there was a "bam, like a loud ass tire pop." (6RT 788, 818, 841.) They all just kept running to Roy's apartment complex. (6RT 788.) Once there, Roy asked why everyone was running, but no one said anything. (6RT 788-789, 813, 818-822, 826-827, 842.) They all stood outside the complex for some time, about 20 minutes, but no one discussed what had happened. (6RT 792-793, 813, 820-821, 827-828, 841.) During this time, Sissac's facial expression was "like plain," as if "nothing happened." (6RT 828.) Roy believed the rest of them had decided to ditch the cab but since no one would say, he told them to leave because he had children and did not want to be involved in any illegal activity. (6RT 790, 806-807.) Everyone left except Glenn, who stayed at Roy's that night. (6RT 790-791, 801.) Sissac and the fifth guy walked in the direction of the trolley station while Devin went in another direction. (6RT 801-802, 822-823.)

Roy later learned that the cab driver had died when he was contacted by police as part of a homicide investigation. (6RT 792.) During an interview at the police station, detectives told him that Devin and Glenn had implicated Sissac as the shooter and Roy said he did not know what they were talking about. (6RT 803-804, 819-820.) Roy told them he did not believe Sissac had shot anyone; he did not think any of those in the group could have been responsible because he had never seen a gun. (6RT 794, 800-801, 807-808, 819.) Roy denied having spoken to Sissac, Glenn, or Patton about the incident itself or about anything in general after the incident. (6RT 793-794, 800-801, 808-809, 823-824, 836-837.) Shown records that, according to the prosecution, purportedly reflected a series calls between Roy's and Sissac's cell phones leading up to and after the incident between October 29, 2011 and October 31, 2011, Roy testified that he had not contacted Sissac or actually connected with him over the phone at these times, saying the communications may have been between his sister and Sissac because she had access to the phone and had previously used it to talk to Sissac. (6RT

810-812, 830-835.) Roy denied having made any "agreement" with the others to protect Sissac. (6RT 812-813.)

### D.     Detective Pearce's "Data Extraction" Records

After presenting and relying upon documentary exhibits that purportedly constituted records or representations of the text messages and phone calls at issue in the case, the prosecution put on the testimony of Daniel Pearce concerning the purported activity of the cell phones involved. Pearce was a homicide detective with previous experience working on the Sheriff's computer crimes task force. (6RT 870-872.) Pearce had conducted a "data extraction" process with the cell phones of Sissac, Glenn, Devin, and Hamrah using a "cellebrite" device, which transfers data about the contacts stored on the phone as well as the phone's activity to a computer file, from which it is then copied to a disc. (6RT 872-876, 880, 896.)

According to the results of Pearce's data extraction process, Sissac's phone had contacts stored under the names of "D," "Jodi," and "Little Ant." (6RT 880.) The results also reflected a series of incoming and outgoing phone calls between Sissac and "D," Sissac and "Little Ant," Sissac and "Jodi," "D" and "Jodi," and "Jodi" and "Little Ant," between October 29, 2011 and October 31, 2011, as well as incoming and outgoing calls between "Jodi" and "Little Ant" between November 1, 2011 and November 2, 2011. (6RT 875, 877, 880-896.) The text messages produced from the data extraction process of Devin's phone did not appear in the data extracted from Sissac's phone. (6RT 888-889.) In Pearce's opinion, the only reasonable explanation for the discrepancy was that the messages had been deleted from Sissac's phone. (6RT 889.) Pearce also believed that the record of calls between Devin's and Glenn's phones had been deleted because the data extraction for Devin's phone did not produce a record of the calls reflected in the extraction from Glenn's phone. (6RT 891-893.)

**E.     Defense**

James Stam, a supervising criminalist with the San Diego Police for 25 years before becoming a private consultant, testified about the results of the accident reconstruction and ballistics analyses he conducted for the defense. (7RT 1115-1116.) Stam had processed 100 to 150 crime scenes and testified as an expert on firearms and crime scene processing numerous times. (7RT 1116-1117.) He had analyzed the evidence of soot, gunpowder, and stippling on Hamrah's body and clothing as it may have pertained to distance from which the shot was fired. (7RT 1122-1127, 1130-1131.) There was no evidence of stippling, and Stam would not have expected to see any, given the multiple layers of clothing on Hamrah's upper body. (7RT 1164.) There was also no evidence of soot and there appeared to be at most a few particles of gunpowder on the outermost garment, leading Stam to conclude, based on the distances from which soot and gunpowder are normally deposited, that the shot was fired from three or more feet away. (7RT 1128-1132, 1163-1165, 1172.) The bullet was "very intact" and consistent with having been fired from a ".380 colt." (7RT 1135-1136.)

Stam inspected the taxicab at the place of impound, took measurements of the interior and exterior, and conducted the accident reconstruction analysis with another vehicle substantially similar in make, model, and specifications. (7RT 1132-1138.) Stam, who was about the same height as Hamrah, positioned the driver's seat to comfortably suit him. (7RT 1138-1142, 1167.) He then placed a mannequin of slightly smaller size in the seat to test the possible trajectories of the bullet and the distances and positions from which it could have been fired, using the autopsy report as the reference for the path of the bullet. (7RT 1142-1148.) The mannequin presented limitations in the comparisons made, as its body could not be bent or shaped in all the various ways in which the human body could be positioned. (7RT 1146-1147.) The mannequin's chest was also narrower than Hamrah's which could affect the trajectory,

as the bullet would travel at a shallower or steeper downward angle. (7RT 1146-1147, 1166, 1170, 1174.) Based on the testing, Stam opined that it was unlikely, though not impossible, that Hamrah was sitting in a normal driving position facing forward at the time of the shot, while it was "much more likely" that Hamrah was slightly turned around as if talking to someone in the backseat. (7RT 1150-1154.) The trajectory "lines up with having been fired from the outside the rear door." (7RT 1152-1153.) It also about as equally probable that the shot had been fired from outside the passenger door. (7RT 1169-1173.) So one could not rule out the possibility that the shot had been fired from the backseat just as one could not rule out the possibility that the shot had been fired from the front seat – either was plausible. (7RT 1154, 1157-1158, 1168-1171.) Thus, given the likely distance from which the shot was fired, the shot could have been fired from the backseat, outside the back door, the front seat, or outside the front door. (7RT 1154-1155.) The only thing Stam could say with certainty was that the shooter was on the passenger side of the vehicle and fired the shot at a downward angle. (7RT 1164-1165, 1168, 1173-1174.) Though the shot could have been fired from the front or back on the passenger side, there were "slightly more" angles from which to make the shot from the backseat than from the front seat and, based on all the evidence, it was Stam's opinion that the shooter was "standing just outside the backseat." (7RT 1155-1157, 1175-1176.)

//
//
//
//
//
//
//
//

# ARGUMENT

# I

**THE MULTIPLE EVIDENTIARY ERRORS INEVITABLY COMPEL REVERSAL, FOR NOT ONLY DID EACH ERROR INDIVIDUALLY PREJUDICE THE OUTCOME BUT THE SYNERGISTIC EFFECT OF THE ERRORS DEPRIVED SISSAC OF HIS FUNDAMENTAL RIGHTS EVEN IF EACH ERROR DOES NOT ITSELF COMPEL REVERSAL**

While a criminal defendant may not be entitled to a "perfect" trial, "such a truism should not be allowed to obscure the true nature of the pertinent inquiry now before us." (*People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) The United States Supreme Court "has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." (*Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 928, citing *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643, and *Chambers v. Mississippi* (1973) 410 U.S. 280, 290, fn. 3; see also *Hill*, at p. 844 ["[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."]; accord *People v. Williams* (2009) 170 Cal.App.4th 587, 646.) The reviewing court considers the cumulative effect of the individual errors because "'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." (*United States v. Frederick* (9th Cir. 1996) 78 F.3d 1370, 1381, internal quotes omitted.) "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' *Chambers,* 410 U.S. at 294 … , and thereby had a 'substantial and injurious effect or influence' on the jury's verdict, (*Brecht v.*

*Abrahamson* (1993) 507 U.S. 619, 637) . . .” (*Parle*, at p. 928; see *Williams*, at p. 646, internal quotations omitted [describing the question under state law as whether “it is reasonably probable the jury would have reached a result more favorable to the defendant in their absence”].)

Cumulative prejudice of this nature may arise from the combination of trial errors involving the admission of evidence, jury instructions, and the like, but also other events affecting the fundamental fairness of the proceedings, such as ineffective assistance of counsel or prosecutorial misconduct. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1004-1006, 1009 [where the court considered the defendant’s claim of cumulative prejudice based upon various claims of trial error as well as claims of ineffective assistance of counsel]; *People v. Ochoa* (1998) 19 Cal.4th 353, 435-436 [same]; *People v. Hill*, *supra*, 17 Cal.4th at p. 818 [finding cumulative prejudice requiring reversal based upon the combined effect of various trial errors and instances of prosecutorial misconduct].)

Most of the problems in this case stem from the purported records of cell phone activity among Sissac, Devin, Glenn, and Roy in the wake of the alleged shooting incident, on which the prosecution heavily relied in persuading the jury to convict Sissac of murder, but for which there was no proper authentication or foundation establishing that the content was in fact a true and accurate representation of the phone activity. And beyond that, even if the records could be considered as true and accurate, the statements in the records were inadmissible unreliable hearsay. The introduction of this evidence alone gives rise to multiple reversible errors, which are separately addressed in Sections II and III. But the purported statements in the pretext call were also inadmissible unreliable hearsay, giving rise to another reversible error which is the subject of Section IV. On top of all this, the prosecution’s primary witnesses were allowed to issue improper lay opinions on the ultimate factual and legal issues the jury was to decide, which presents a further basis for reversal as discussed in Section V.

In calling attention to these evidentiary errors on appeal, Sissac is not simply claiming he was denied a "perfect" trial on the charges. He is arguing that these errors ultimately denied him a *fair* trial and thus the right to a *reliable* determination of guilt. While each of the errors individually worked to deprive him of this fundamental constitutional guarantee, the bigger picture cannot be ignored in resolving the central question, common to all the claims, of whether there has been a miscarriage of justice. And this pictures shows that, when taken together, the cumulative prejudicial impact worked this sort of injustice and requires reversal even if the individual impact of each evidentiary error may not itself rise to that level.

The errors of concern are addressed below in turn.

## II

**THE UNAUTHENTICATED, FOUNDATIONLESS INHERENTLY UNRELIABLE HEARSAY EVIDENCE OF THE PURPORTED TEXT MESSAGES BETWEEN DEVIN AND SISSAC HAD NO PLACE IN A PROPER TRIAL AND ITS ADMISSION GRANTED THE PROSECUTION AN UNFAIR ADVANTAGE THAT UNDULY PREJUDICED THE DEFENSE**

The evidence of the text messages between Devin and Sissac in the wake of the alleged shooting incident – like the supposed evidence of Sissac's having deleted those messages and Roy's having communicated with Sissac after the incident, which is addressed below in Section III – was based upon the prosecution's purported records of their cell phone activity.

## A.  Background

Trial counsel filed a motion in limine seeking exclusion of the prosecution's evidence of text messages between Devin and Sissac. He argued that the prosecution was first required to authenticate the evidence and lay a proper foundation for it at a pretrial evidentiary hearing, stating:

> [T]he prosecution must establish the integrity of the text messages, that they were not altered in any sense, who typed them, when they were typed, whether any date and time stamp associated [with] said text messages [is] accurate, etc. This foundation requires testimony of sufficient expertise and technical knowledge of the particular cell phones involved, the cell phone carriers used to transmit the messages, how the data was extracted from the cell phones, and whether it is possible to alter the messages or their metadata after they are sent.

(1CT 125.)

Counsel also argued even if the prosecution could make this showing, the underlying statements in the messages were inadmissible because they did not constitute "adoptive admissions" so as to be excepted from the hearsay rule. (1CT 100-101, 125.) He cited as an example text messages purportedly sent the day after the alleged shooting in which Devin wrote that Sissac needed "do the right thing" and turn himself in and Sissac responded "You have to pray." (1CT 100-101.) Counsel argued these purported statements did not rise to the level of admissions and were instead "effectively empty as to content" or evidentiary value. (1CT 101.)

During the pretrial discussions about the matter, the prosecutor and trial court recognized the need for authentication and foundation to support the introduction of this evidence. (2RT 27-28.) The court excluded the purported messages between Devin and Sissac before the alleged shooting as irrelevant. (2RT 29-35.) As for the purported messages "later on after the fact," the court agreed with the prosecutor's argument that they constituted "adoptive admissions of [Devin] calling [Sissac] out." (2RT 29, 30, 35.) Ultimately, the court did not hold pretrial hearing for the purpose of authenticating and laying the appropriate foundation for this evidence.

At trial, when Devin first started testifying about text messages that he sent Sissac later in the morning on the day of the incident -- saying "I texted and asked him to do the right thing and to turn himself in" because the situation was "crazy" and "the cab driver, he was innocent" -- trial counsel interjected, "Object, this is hearsay." (4RT

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

444-445.) The court responded: "Not the innocent part. That's not hearsay. So it's overruled." (4RT 445.) Devin then went on to testify that he had texted Sissac, asking him to "man up" and "turn himself in because if he didn't, things were going to get really bad, things like this is what I was saying to him, things like this don't just pass over, this is a sin." (4RT 445.) Counsel renewed his hearsay objection, which the trial court overruled, saying Devin could describe what he had texted. (4RT 445.) Then, when the prosecutor first inquired as to how Sissac responded to the texts, the court interjected saying: "All right. This is kind of delicate here. As far as what his response may have been, unless it's in some kind of admission, I don't know that it is. Be careful with your questions[.]" (4RT 446.) The prosecutor's next questions did not elicit the specific content of the responses, just that the messages did not indicate Sissac was going to turn himself in. (4RT 446.)

During a break in Devin's testimony, trial counsel objected to the prosecutor's intent to introduce evidence of the text messages in which Sissac had purportedly responded saying "You have to pray," arguing this was inadmissible hearsay and "just a gratuitous out of court statement." (4RT 451.) The court said Devin could testify to what he recalled having texted. (4RT 451-452.) Counsel maintained that the actual context of the text messages "in any form, whether in writing or orally, is still hearsay." (4RT 452.) The court ultimately overruled the objection. (4RT 452.)

When Devin retook the stand, the prosecutor showed him exhibits which purportedly represented the actual text messages between Devin and Sissac after the alleged shooting and had Devin read the content directly from the exhibits into the record. (4RT 455-459.) During this testimony, trial counsel interjected, "I'm going to object as to lack of foundation for the times" that the messages were purportedly sent. (4RT 457.) The court told the prosecutor to simply have Devin confirm that "those are the times of those texts" as reflected in the exhibits, implicitly ruling that was sufficient to resolve the matter. (4RT 457.) The prosecutor then elicited from Devin the

rest of the purported messages between him and Sissac after the alleged shooting. (4RT 457-459.) Later, the prosecutor presented the testimony of homicide detective Daniel Pearce, who testified to another set of records which he had produced for trial and which purportedly also reflected the text messages and phone calls at issue. (6RT 870-896.)

The introduction of this evidence raises three fundamental issues: (1) Did the prosecution lay an adequate foundation so as to satisfy the authentication and reliability requirements of the business record or past recollection recorded exceptions to the hearsay rule?; (2) Even if the prosecution laid an adequate foundation, did the additional layer of hearsay contained in the underlying statements themselves satisfy the "adoptive admission" exception to the hearsay rule?; and (3) Even if the evidence of these purported text messages was otherwise admissible, did the potential risk of undue prejudice or confusion of the issues compel its exclusion?

## B.     Basic Legal Principles

As with virtually all rulings of a trial court on evidentiary matters, the "abuse of discretion" standard applies in reviewing their propriety (*People v. Waidla* (2000) 22 Cal.4th 690, 725), which generally means such rulings "will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004). "However, '[the] courts have never ascribed to judicial discretion a potential without restraint.'" (*People v. Bolton* (1979) 23 Cal.3d 208, 216, quoting *People v. Russel* (1968) 69 Cal.2d 187, 194.) "'The abuse of discretion standard is deferential, but it is not empty. [Citation.]   [I]t asks in substance whether the ruling in question falls outside the bounds of reason under the applicable law and the relevant facts.'" (*People v. Jones* (2010) 187 Cal.App.4th 418, 423, quoting *People v. Giordano* (2007) 42 Cal.4th 644,

663, internal quotes omitted, alterations original.) "Discretion is compatible only with decisions 'controlled by sound principles of law, ... free from partiality, not swayed by sympathy or warped by prejudice ....'" (*Bolton*, at p. 216, quoting *People v. Surplice* (1962) 203 Cal.App.2d 784, 791.)

"Hearsay" is evidence of a statement made outside the presence of the trier of fact which is introduced to prove the truth of the matter asserted. (Evid. Code, § 1200, subd. (a).) Such evidence is inadmissible except as permitted by law. (Evid. Code, § 1200, subd. (b).) The "ultimate goal" of the Confrontation Clause, from which the hearsay rule originates, is to ensure reliability of the evidence. (*Crawford v. Washington* (2004) 541 U.S. 36, 61.) "Because the rule excluding hearsay is based on these particular difficulties in assessing the credibility of statements made outside the jury's presence, the focus of the rule's several exceptions is also on the reliability of the out-of-court declaration." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608, citing *Chambers v. Mississippi*, *supra*, 410 U.S. at pp. 298-299.) Indeed, "an exception to the hearsay rule is not valid unless the class of hearsay evidence proposed for admission is inherently reliable." (*In re Cindy L.* (1997) 17 Cal.4th 15, 28.) Thus, the various hearsay exceptions generally reflect situations in which circumstances affording some assurance of trustworthiness compensate for the absence of the oath, cross-examination, and jury observation." (*Cudjo*, at p. 608, citing *Chambers*, at pp. 298-299.) "'[H]earsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.'" (*Lilly v. Virginia* (1999) 527 U.S. 116, 138, quoting *Idaho v. Wright* (1990) 497 U.S. 805, 822.) "The [Confrontation] Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." (*Crawford* at p. 61.) These principles apply to each level of hearsay within a statement: multiple hearsay is admissible only "if each hearsay layer separately meets the requirements of

a hearsay exception." (*People v. Arias* (1996) 13 Cal.4th 92, 149; accord *People v. Ayers* (2005) 125 Cal.App.4th 988, 993.)

A "statement" for purposes of the hearsay rule is an oral or written expression or nonverbal conduct intended as an oral or written expression. (Evid. Code, § 225.) A "writing" is broadly defined as "handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic email or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." (Evid. Code, § 250.)

A record of a person's statement that is prepared or stored in a medium by a third party presents inherent evidentiary difficulties. At the outset, for the proponent to carry its preliminary burden of "establishing the foundational requirement of trustworthiness" (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010), the writing must be "authenticated" with evidence "sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is" (*People v. Beckley* (2010) 185 Cal.App.4th 509, 517-518; Evid. Code, § 1400). And this is necessary for the proponent to the meet its further preliminary burden of establishing that the evidence is relevant: "Without such proof the writing is irrelevant because it has no 'tendency in reason' to prove or disprove a fact at issue in the case." (*Beckley*, at p. 517, internal quotations omitted; Evid. Code, § 210.) Additionally, a third party's recording of another person's statement effectively creates a separate level of hearsay, such that both the record of the statement and the statement itself must satisfy an exception to the hearsay rule for the evidence to be admissible. (See *People v. Ayers*, *supra*, 125 Cal.App.4th at p. 995 ["Marisa's statements to the AAFV employee was the first hearsay layer and the employee's recordation of those statements was the second

hearsay layer." Thus, "the AAFV forms contained multiple layers of hearsay" each requiring its own exception].)

Certain types of records may satisfy the "business record" exception to deal with the hearsay problem at the level of the record itself. However, all of the following requirements must be met: "'(a) The writing was made in the regular course of a business; (b) The writing was made at or near the time of the act, condition, or event; (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness.'" (*People v. Zavala* (2013) 216 Cal.App.4th 242, 246, quoting Evid. Code, § 1271; *People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010.) Thus, unlike the "official record" exception, which "permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation," the business record exception "'requires a witness to testify as to the identity of the record and its mode of preparation in every instance.'" (*People v. Nelson* (2012) 209 Cal.App.4th 698, 710, quoting *People v. Bhatt* (2005) 133 Cal.App.4th 923, 929.) "The chief foundation of the special reliability of business records is the requirement that they must be based upon the first-hand observation of someone whose job it is to know the facts recorded." (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1205.) "[I]f the evidence in the particular case discloses that the record was not based upon the report of an informant having the business duty to observe and report, then the record is not admissible under this exception, to show the truth of the matter reported to the recorder." (*Ibid.*)

"Such testimony is essential in order for the court to be able to make a finding . . . that the sources of information for the business-record entries and the method and time of preparation of such entries were such as to indicate trustworthiness of the entries." (*People v. Shirley* (1978) 78 Cal.App.4th 424, 438.) Consistent with the need

for such trustworthiness, the failure to demonstrate that the records were prepared in the normal course of business as opposed to in anticipation of litigation necessarily cannot be deemed to satisfy the business record exception. (See *Gee v. Timineri* (1967) 24 Cal.App.2d 139, 148 [finding a purported business record inadmissible where the evidence indicated that the record was prepared in anticipation of litigation, not in the normal course of business].)

Evidence of a statement contained in a record may also satisfy the hearsay rule at the level of the record itself as a "past recollection recorded" if the proponent demonstrates all of the following: "'the statement would have been admissible if made by [the witness] while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1)[w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2)[w]as made ... (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3)[i]s offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4)[i]s offered after the writing is authenticated as an accurate record of the statement." (*People v. Cowan* (2010) 50 Cal.4th 401, 465, quoting Evid.Code, § 1237, subd. (a).)

Even if the foundational requirements can be met and the hearsay rule satisfied with an exception at each level for a statement contained in a writing so as to otherwise be relevant and admissible, like all evidence, it remains subject to exclusion if poses a risk of undue prejudice against other party. This rule is codified in Evidence Code section 352.[7] "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish

one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Scott* (2011) 52 Cal.4th 452, 491, quoting *People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) That is, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged" – creating "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (*Old Chief v. United States* (1997) 519 U.S. 172, 180.)

## C. The Prosecution Failed to Properly Authenticate or Lay a Foundation for the Purported Text Messages, and Thereby Necessarily Also Failed to Show They Satisfied the Hearsay Rule

Here, the prosecution made essentially no showing at all to authenticate or lay a foundation for the text messages purportedly exchanged between Devin and Sissac before Devin testified at length to the purported content of the messages and even read them directly into the record. (See 2RT 29-35; 4RT 444-459.) The only evidence that the prosecution presented concerning the origin or authenticity of the messages' content was the testimony of homicide detective Daniel Pearce – put on long after Devin had left the witness stand – using "printouts" and "logs" of the cell phone data that Pearce had generated himself in preparation for trial.[8] And Pearce did nothing more than testify that he had used a software program to download and create records of the activity of the cell phones collected from Sissac, Devin, and Glenn, which

---

[7]     Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[8]     These records were apparently different from the records presented through Devin. In examining Devin about the text messages, the prosecutor referred to Exhibits 116 and 117 (4RT 456-459), which the Exhibit List describes as "photographs" of the messages (1CT 219), while he referred to "printouts" or call "logs" with different "bate stamp"

contained the text messages and phone calls at issue. (6RT 870-896.) The purported text messages were clearly themselves hearsay: they were written assertions ("statements") introduced to prove the truth of the matter asserted – specifically, that Sissac had admitted or "adopted" the truth of Devin's assertions that "this is crazy," "I didn't even do shit," "You need to be a man and own up," "Do the right thing," and the like. (4RT 456-459.) And any purported records of the messages had to satisfy the foundational requirements of the business record exception to the hearsay rule.

Pearce's testimony about having produced records of the phone activity through his own "data extraction" as part of the investigation fell far short of satisfying the requirements of the "business record" exception. To satisfy this exception, the proponent of cell phone activity evidence must present the testimony of an actual custodian of records from the entity responsible for servicing and maintaining the primary records of the phone. This Court's opinion in *People v. Zavala*, *supra*, 216 Cal.App.4th 242 is illustrative. The authenticity and foundation of the cell phone activity evidence introduced there was adequate and satisfied the business record exception to the hearsay rule because the custodian of records for both cell phone companies that serviced the phones at issue testified that the records presented at trial were kept in the regular course of business and produced for third parties in only response to lawful demand. (*Id.* at pp. 244-245.) In support of its opinion, this Court cited as an example the case of *Dutch v. United States* (2010) 997 A.2d 685, where computer printout information generated for trial constituted a business record for purposes of the hearsay rule because "the detailed testimony about how the system functions to gather and store the data, together with testimony about how the data was collected, established how the records were created and what business purpose they served" (*Zavala*, at p. 247, discussing *Dutch*, at pp. 689-690; see also *People v.*

---

numbers in eliciting Pearce's testimony (6RT 881-889). The printouts and logs were not made part of the actual exhibits received into evidence. (See 1CT 211-219.)

*Crabtree* (2009) 169 Cal.App.4th 1293, 1312-1313 [where it was error to admit a sales receipt from "Bath and Body Works" with nothing more than an investigating agent's testimony about it because the agent "was not a 'qualified witness' in lieu of the custodian of records of the 'Bath and Body Works' business or some other qualified witness," and thus the purported receipt was ultimately "inadmissible hearsay"].)

In this case, there was no testimony from any employee of any entity involved in the record keeping or account maintenance of any of the cell phones at issue – much less testimony from such a custodian of records about the authenticity of the records presented at trial as being representations of the actual content of the text messages. Unlike a custodian of records for the cell phone company who services and maintains the cell phone account, Detective Pearce is clearly not "someone whose job it is to know the facts recorded" – "the special reliability" requirement of the business record exception. (*Alvarez v. Jacmar Pacific Pizza Corp.*, *supra*, 100 Cal.App.4th at p. 1205.) Likewise, his testimony certainly could not serve to carry the prosecution's fundamental burden of showing that the records presented at trial were prepared in the "normal course of business" and not simply in anticipation of litigation. (See *Gee v. Timineri*, 24 Cal.App.2d at p. 148.) Indeed, the records that Pearce produced were anything but "trustworthy" since he produced them in his role as a homicide investigator for the specific purpose of preparing for the prosecution of this case. (See *People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010 [the evidence must be "such as to indicate its trustworthiness"].)

The hearsay problem with the records presented at trial also cannot be resolved under the "past recollection recorded" exception. Perhaps the purported text messages were exchanged "at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory" and perhaps they may be considered as having made "by some other person for the purpose of recording the witness'[s] statement at the time it was made" since the cell phone companies kept records of the activity.

(*People v. Cowan*, *supra*, 50 Cal.4th at p. 465, quoting Evid. Code, § 1237, subd. (a).) But the statements in the writing at issue must also pertain to "a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately" (*ibid.*), and there was never any showing that Devin lacked sufficient independent recollection of the text messages to testify about them without reviewing the records presented. In fact, this is the only circumstance in which a witness may be permitted to read the specific content of the writing from the stand. (See *People v. Butcher* (1959) 174 Cal.App.2d 722, 728 [a witness may read the contents of a writing but "must testify first that he is unable to refresh his memory or testify independently therefrom"]; *People v. Cowan*, *supra*, 50 Cal.4th at p. 465 ["insufficient independent recollection to testify 'fully and accurately'" about the subject of the writing is the first requirement of this exception].)

And, even if these other requirements were satisfied, such testimony could only be "offered after the writing is authenticated as an accurate record of the statement." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 465.) Given the woefully inadequate foundational showing for this evidence, the prosecution failed to meet the most basic requirement of authenticating the records to show they were what they were purported to be, which was essential to showing the evidence was even relevant to a fact in dispute. (*People v. Beckley*, *supra*, 185 Cal.App.4th at pp. 517-518 [where the court found evidence of a purported "roster" of gang members "should have been excluded as unauthenticated and, therefore, irrelevant," because the prosecution had simply offered the testimony of an investigating detective who had printed out the "roster" from a website and no one with personal knowledge of the reliability or accuracy of the information testified].)

**D.     The Purported Statements Themselves Were Not Admissible        Under the "Adoptive Admission" Exception to the Hearsay Rule**

The foregoing analysis concerns just one level of the problem. Even assuming the hearsay problem could be resolved with an exception to the hearsay rule at the level of the purported records themselves, the underlying statements themselves constituted a separate level of hearsay requiring a separate exception for the evidence to be admissible. The theory here, according to the prosecution, was that the purported text message exchanges between Devin and Sissac constituted "adoptive admissions."

"The law pertaining to adoptive admissions is well settled." (*People v. Jennings* (2010) 50 Cal.4th 616, 661.) "'Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.'" (*Ibid.*, quoting Evid. Code § 1221.) Under this exception, "[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." (*Ibid.*)

"'[A] direct accusation in so many words is not essential'" for this exception to apply. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 661, quoting *People v. Fauber* (1992) 2 Cal.4th 792, 852.) "'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.'" (*Jennings*, at p. 661, quoting

*People v. Riel* (2000) 22 Cal.4th 1153, 1189.) What matters is that the evidence show the person "(1) had knowledge of the contents of declarant's statement, and (2) having such knowledge, has, by words or other conduct, manifested his adoption or his belief in its truth." (*People v. Maki* (1985) 39 Cal.3d 707, 712; accord *People v. Anderson* (2012) 208 Cal.App.4th 851, 883.) When these factors exist in support of statements being introduced against the defendant, "we are no longer concerned with the veracity or credibility of the original declarant" and it is fair to deem the statements those of the defendant himself, such that "[t]he 'witness' against the defendant is the defendant himself, not the actual declarant," because he has adopted the statements as true. (*Jennings*, at pp. 661-662.) But "[i]n the absence of these factors, the evidence would be inadmissible." (*People v. Robinson* (1964) 61 Cal.2d 373, 401-402.)

Here, the purported statements in the text messages at issue indeed were not *direct* accusations that Sissac had shot Hamrah or had committed any other specific crime, because Devin made no mention of the particular incident or conduct they were discussing, the place, date, or time that the incident or conduct had occurred, or who else was involved. Devin simply referred to "this" or "this shit" to describe the subject of concern in telling Sissac "turn yourself in," "do the right thing," and "pray." (4RT 456-459.) So it is simply not clear from the face of these messages what particular incident or conduct made Devin think Sissac should do these things. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1196-1197 ["There being, in essence, nothing for defendant to deny, a condition of the hearsay exception for adoptive admissions did not exist, and the trial court therefore erred in concluding Moore's remarks were admissible as adoptive admissions."].)

Nor can Sissac's purported responses be fairly read to supply the missing link. The sum and substance of what he supposedly said was: "I'ma call you later" after Devin said "turn yourself in" because "[t]his shit is not going to be on my heart"; "I know" after Devin said "[t]his is way back"; and "You have to pray" after Devin told

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

him to "do the right thing." (4RT 456-459.) Sissac's simply having supposedly said he would call Devin later, that he agreed the situation was "way back," and that Devin should pray about it hardly means he both *understood* these vague, non-specific statements to mean Devin accused him of having shot Hamrah *and* intended to *adopt* the statements as the truth so to *admit* such conduct through his vague, non-specific replies. (See *People v. Maki*, *supra*, 39 Cal.3d at p. 712 [both components must exist for this exception to apply].)

It would be fundamentally unfair to rely upon such vague and ambiguous statements to justify dispensing with the traditional confrontation protections against hearsay so to conclude that "[t]he 'witness' against the defendant is the defendant himself, not the declarant." (*People v. Jennings*, *supra*, 50 Cal.4th at pp. 661-662.) This is particularly true where, as here, the evidence of these purported messages is inherently unreliable given the prosecution's failure to satisfy the most basic requirements of authentication and foundation for the evidence. In fact, without an adequate showing that the purported records of these messages were a true and accurate representation of the phone activity, one cannot even conclude with a sufficient degree of confidence that the evidence reflects what really was said and when it was said. There may well have been other messages exchanged between Devin and Sissac, or the messages exchanged may have been different in content than what was represented. Without testimony from a custodian of records of the cell phone companies servicing each of the phones involved, there is simply no reliable evidence in the record to establish the accuracy and reliability of this evidence.

In sum, the evidence of the purported text messages was inherently unreliable, and thus effectively irrelevant, for lack of an adequate foundation showing it was what it was purported to be, and the statements did not satisfy confrontation concerns at either level of the hearsay. Moreover, to whatever degree any of the statements might be deemed relevant and admissible, their probative value to the question of guilt or

innocence was minimal at best given their vague and ambiguous meaning, and was thus substantially outweighed by the risk of undue prejudice and confusion of the issues in allowing the prosecution to rely upon them as evidence of Sissac's having effectively admitted that he shot Hamrah. (See Evid. Code, § 352; *People v. Scott*, *supra*, 52 Cal.4th at p. 491; *Old Chief v. United States*, *supra*, 519 U.S. at p. 180.) Accordingly, "under the applicable law and the relevant facts," the trial court abused its discretion in admitting the evidence (*People v. Jones*, *supra*, 187 Cal.App.4th at p. 423); exclusion was the only ruling compatible with a decision "controlled by sound principles of law" (*People v. Bolton*, *supra*, 23 Cal.3d at p. 216).

## E.    The Individual and Cumulative Prejudicial Effect of This Evidentiary Error Compels Reversal

Erroneous evidentiary rulings are ordinarily reviewed under the *Watson* standard and thus do not require reversal unless "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Vasquez* (2006) 39 Cal.4th 47, 66, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) But the application of state evidentiary rules may not offend fundamental principles of justice. (*Chambers v. Mississippi*, *supra*, 410 U.S. at p. 302; *Crane v. Kentucky* (1986) 476 U.S. 683, 687.)  And "federal law governs the standard for harmless error when the error results in the violation of federal constitutional rights." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 885.) These fundamental rights, which are guaranteed under the state Constitution as well, include to right to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt. (U.S. Const., Amends. V, VI, VIII, XIV; Cal. Const., art. I, §§ 7, 14, 15, 16.) Evidentiary errors violate principles of due process and fundamental fairness "if there are *no* permissible inferences the jury may draw from the evidence . . . ." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) In such cases, "'the

presence or absence of a state law violation is largely beside the point' because 'failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis' for granting relief on federal due process grounds." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, quoting *Jammal*, at pp. 919-920.)

The ultimate test for a violation of federal due process is whether the admission of the challenged evidence was "so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70; see also *Perry v. New Hampshire* (2012) __ U.S. __ [136 S.Ct. 716, 723], quoting *Dowling v. United States* (1990) 493 U.S. 342, 352 [the admission of evidence offends due process when it is "'so extremely unfair that its admission violates fundamental conceptions of justice . . .'"].) And the general test for other violations of this magnitude is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (*Chapman v. California* (1967) 386 U.S. 18, 23; *People v. Aranda* (2012) 55 Cal.4th 342, 363-364.) The erroneous admission of this evidence, based as it was on the foundationless records of purported cell phone activity that served as the basis for the other erroneously admitted evidence discussed below, indeed violated Sissac's fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt.

There were no witnesses to the alleged shooting of Hamrah, nor any surveillance video depicting his being shot by Sissac or anyone else in Sissac's group after the cab arrived at the Lemon Grove station in the early morning of October 30, 2011. While Devin and Glenn claimed that Sissac admitted the act – through testimony shrouded in auras of bias and unreliability – no one really knows just how or exactly when Hamrah was shot. The prosecution had no physical evidence tying Sissac to the act. What physical evidence there was simply created more doubt, as the D.N.A. placed Glenn in the backseat directly behind Sissac, and that it was equally plausible (and more likely

in the expert's opinion) that the shot was fired from or outside the backseat as it was from or outside the front seat. (7RT 1132-1176.) In fact, no gunshot residue was found in the front passenger seat where Sissac was apparently seated. (7RT 973, 977-978.) Aside from Devin and Glenn's questionable claim that Sissac said Hamrah had "laughed" at him (4RT 442-444; 5RT 654-655), there is no evidence that anyone in the group had a greater or different motive than any of the others. They had the same basic purpose in mind: to get a ride home, and possibly "ditch" the cab to save on the fare. (5RT 646, 693.) So, with the exception of the questionable claims of Devin and Glenn, nothing makes it more likely that Sissac was the shooter as opposed to Glenn or the "unidentified" fifth guy seated right next to him in the back, both of whom had "slightly more" angles from which to make the shot. (7RT 1155-1157, 1175-1176.) Indeed, Glenn admitted having been in possession of the particular gun involved just the day before and there was evidence to indicate that he may have been in possession of the gun after the incident. (7RT 1086-1089.) As for the supposedly unidentifiable fifth guy, the witnesses' claims that they did not even have so much as a first name for him, even though everyone socialized with him for several hours and he was apparently a friend or associate of Glenn's, raises real suspicions about his role in the affair as everyone was apparently concealing his identity.

The bias and reliability problems with Devin and Glenn's testimony claiming that Sissac directly admitted shooting Hamrah are plain. Devin's testimony in support of the prosecution's theory of the case came while he was still receiving substantial financial assistance through the witness relocation program, for his food, rent, cell phone, and travel expenses. (7RT 987-989, 994-995.) While this program was sponsored with state funds, it is clear from Devin's testimony that he considered the assistance as coming directly from the District Attorney's Office. (See 4RT 464 [where Devin testified that the District Attorney's Office had helped him by paying for his living expenses].) His testimony also indicates that he felt entitled to these monies by

virtue of his participation in the case. (See 4RT 546 [when questioned about the large payment he had received in June 2012, Devin said "It was to make up for the time that they weren't helping me"].)

So Devin had a strong incentive to color the facts in the light most favorable to the prosecution's theory of the case. He claimed that he was just telling "the truth," of course, but what else would he have said on the stand? And Devin's claim that someone said "Meech shot the driver" as the group was running away from the cab itself raises questions about his veracity. Devin testified it was Roy or the fifth guy who said this. (4RT 442, 552.) Roy denied having made any such statement, or that anyone had heard, seen, or said anything to implicate Sissac as the shooter for that matter (6RT 788-789, 813, 818-822, 826-827, 842), and the supposedly unidentifiable fifth guy conveniently could not be examined on this point. Devin had also previously been convicted of a crime of moral turpitude and it is evident he was not being truthful in testifying about his marijuana use. (4RT 543-544.) Glenn too had strong incentives to help the prosecution: he was being held in custody at the time of trial, and the prosecution granted him immunity from any liability under an agreement that virtually ensured his release upon the conclusion of his testimony. (5RT 667-669, 720-721.) And the veracity of his testimony is also questionable given the suspicious events surrounding Glenn's admission to possession of the gun at issue the day before the shooting, his possible possession of it or some other "dirt" related to the incident after the fact, and his apparent prior connection to the fifth guy whom he claimed he could not identify or even name.

Besides this testimony of dubious weight and credibility, the only other potential evidence independent of the erroneously admitted messages was the pretext call and Pearce's testimony that Sissac had "deleted" the text messages between him and Devin after the incident. However, based on the analysis set forth below in Sections III and IV which Sissac incorporates here, it was prejudicial error to admit this evidence as

well, and whatever value the evidence may have been to prosecution, it is not enough erase, *beyond a reasonable doubt*, the "reasonable possibility" that the text messages "might have contributed to the verdict." (*Chapman v. California*, *supra*, 386 U.S. at p. 23; *People v. Aranda*, *supra*, 55 Cal.4th at pp. 363-364.) Such a finding is appropriate when the independent evidence of guilt is "overwhelming." (See *People v. Doolin*, *supra*, 45 Cal.4th at p. 439 [finding an evidentiary error harmless given the other overwhelming evidence of guilt]; *People v. Jablonski* (2006) 37 Cal.4th 774, 832 [same].) That is not what we have on this record. In fact, the prosecutor specifically relied upon the text messages during his closing argument, even rereading them in contending they were proof of guilt (8RT 1268, 1270, 1281, 1291), and the jury was specifically instructed that it could draw the inferences from this evidence for which the prosecutor advocated (1CT 185).

Both singularly and in combination with the other errors under the rubric of cumulative prejudice, it was fundamentally unfair and in violation of the core constitutional protections for criminal defendants to admit the foundationless, inherently unreliable records of purported text messages between Devin and Sissac as evidence of "adoptive admissions" to artificially bolster the prosecution's dubious case against Sissac for murder. Given the weak independent evidence of guilt, this error could not survive scrutiny even under the less stringent state law standard; for there is at least "merely a *reasonable chance*, more than an *abstract possibility*'" of a better outcome absent the error. (*People v. Eid* (2010) 187 Cal.App.4th 859, 882, quoting *People v. Blakely* (2000) 23 Cal.4th 82, 99, italics original.)

## F.    This Claim is Cognizable

Both before and during trial, trial counsel challenged the evidence of the purported text messages as lacking adequate authentication and foundation and as constituting inadmissible hearsay. (1CT 100-101, 125; 4RT 446, 451-452, 457.) That

is the crux of the claim on appeal, as Sissac contends the prosecution failed to adequately authenticate or lay a foundation for the evidence and, even so, the evidence did not satisfy an exception at either level of the double hearsay. The trial court did not hold the evidentiary hearing trial counsel had requested for the purpose of requiring the prosecution to authenticate the evidence and lay the appropriate foundation, and it overruled counsel's trial objections.

While counsel did not challenge each specific text message, or argue that the evidence was inadmissible on policy grounds even if it was otherwise admissible, he objected on hearsay grounds when the prosecutor first started to elicit the messages from Devin and during a break in the testimony; so further objections would have been a futile effort. (*People v. Clark* (2011) 52 Cal. 4th 856, 960 ["The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm."].) While counsel did not re-raise the specific authentication and foundation issues he raised pretrial, or specifically challenge Pearce's testimony as lacking adequate authentication or foundation, he did object to the lack of foundation for the dates and times of the purported records. And his pretrial request for an evidentiary hearing made clear that more specific testimony from a person with responsibility over the original records of the cell phone activity (i.e., a records custodian) was necessary to satisfy the requirements. This was enough to preserve the claim. (*People v. Letner* (2010) 50 Cal.4th 99, 159-160 ["an in limine motion, without a contemporaneous objection at trial, is sufficient to preserve an objection for appeal only when (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context"].)

This is not a case of "'engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error,'" which the forfeiture rule is designed to prevent (*People v. Williams* (2008) 43 Cal.4th 584, 624, quoting *People v. Kennedy* (2005) 36 Cal.4th 595, 612), but should this Court find that one or more of the issues related to claim was not properly preserved for lack of sufficiently specific objections, Sissac should be spared the effect of the forfeiture rule under the doctrine of ineffective assistance of counsel. That doctrine is a well-recognized exception to the forfeiture rule: "'if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State.'" (*Coleman v. Thompson* (1991) 501 U.S. 722, 754, quoting *Murray v. Carrier* (1986) 477 U.S. 478, 488.) "In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of [defendant's] right to counsel, so that the error must be seen as an external factor, *i.e.*, 'imputed to the State.'" (*Ibid.*, citing also *Evitts v. Lucey,* 469 U.S. 387, 396 ["The constitutional mandate [guaranteeing effective assistance of counsel] is addressed to the action of the State in obtaining a criminal conviction through a procedure that fails to meet the standard of due process of law"].)

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; *Strickland v. Washington* (1984) 466 U.S. 668, 686.) "This right 'entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*People v. Simmons* (2012) 210 Cal.App.4th 778, 795, quoting *Ledesma*, at p. 215, alterations original.) "'Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.'" (*People v. Hernandez*

(2012) 53 Cal.4th 1095, 1102, quoting *United States v. Cronic* (1984) 466 U.S. 648, 653-654.)

"[T]he Sixth Amendment right to counsel has two aspects: the right to counsel derived from the 'root meaning' of the amendment [citation], which includes the right to counsel of choice; and the right to a fair trial guaranteed through the due process clause, but defined through the Sixth Amendment." (*People v. Hernandez*, *supra*, 53 Cal.4th at p. 1105, quoting *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 147-148.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his [or her] 'representation fell below an objective standard of reasonableness ... under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Simmons*, *supra*, 210 Cal.App.4th at p. 796, quoting *In re Harris* (1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687.)

"A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter*, *supra*, 30 Cal.4th at p. 1211.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*Ibid.*) And "'counsel cannot be 'ineffective' unless his mistakes have harmed the defense (or, at least, unless it is reasonably likely that they have). Thus, a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is

prejudiced.'" (*People v. Hernandez*, *supra*, 53 Cal.4th at p. 1105, quoting *United States v. Gonzalez-Lopez*, *supra*, 548 U.S. at p. 147, alterations original.) So, "'[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*In re Cudjo* (1999) 20 Cal.4th 673, 687, quoting *Strickland*, *supra*, 466 U.S. at p. 686.)

"Generally, the failure to make objections is a matter of trial tactics which appellate courts will not second-guess. [Citations.] Occasionally, however, a case arises in which there simply could be no satisfactory explanation for counsel not objecting to the proffered evidence." (*People v. Torres* (1995) 33 Cal.App.4th 37, 48-49.) Here, "there simply could be no satisfactory explanation" based on an "objective standard of reasonableness ... under prevailing professional norms" for failing to take all steps necessary to challenge the issues at the core of the erroneous admission of the text messages – namely, the failure to properly authenticate and lay a sufficient foundation for the evidence, the specific inadequacies of Pearce's testimony in this regard, the inadmissibility of the evidence as being double hearsay that did not fall within an exception at either level, and the inadmissibility of the evidence as unduly prejudicial and confusing to the jury even if it was otherwise relevant and admissible. Moreover, for the reasons outlined in this section and below concerning the prejudicial error in the admission of the other evidence flowing directly from these purported records, there is indeed a "reasonable probability" of a better outcome for Sissac had the inherently unreliable evidence of the text messages been excluded. Thus, whether viewed individually or collectively with the other evidentiary errors (*People v. Hill*, *supra*, 17 Cal.4th at p. 844; *Parle v. Runnels*, *supra*, 505 F.3d at p. 928), the prejudicial effect of this error entitles Sissac to relief from any applicable effect of the forfeiture rule, as well relief on the merits of his claim (*In re Harris*, *supra*, 5 Cal.4th at pp. 832-833; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687).

**III**

**THE PROSECUTION PROCURED FURTHER UNFAIR ADVANTAGE THROUGH THE PREJUDICIALLY ERRONEOUS ADMISSION OF THE UNAUTHENTICATED, FOUNDATIONLESS RECORDS OF PURPORTED PHONE ACTIVITY, BECAUSE THAT EVIDENCE SERVED AS THE BASIS FOR THE ADMISSION OF ADDITIONAL PREJUDICIALLY ERRONEOUS EVIDENCE**

The prejudicially erroneous admission of the various foundationless, inherently unreliable purported records of cell phone activity led to additional prejudicially erroneous errors; namely, the admission of the evidence that Sissac had supposedly "deleted" the purported text messages between him and Devin (6RT 888-889) and that Sissac and Roy had phone contacts after the incident (6RT 810-812, 830-835) contrary to Roy's testimony that they did not communicate after the incident (6RT 793-794, 800-801, 808-809, 823-824, 836-837). Being derived from the same purported records of cell phone activity, the same basic principles and analysis apply to the admission of this evidence: It was error in the sense that it was an "abuse of discretion" to admit it (*People v. Waidla*, *supra*, 22 Cal.4th at p. 725) because the prosecution failed to authenticate the evidence (*People v. Beckley*, *supra*, 185 Cal.App.4th at pp. 517-518; Evid. Code, § 1400), the prosecution failed to lay an adequate foundation for it (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010), the evidence was inadmissible double hearsay because neither the purported underlying records nor the statements purportedly contained within them satisfied an exception to the hearsay rule (*Lilly v. Virginia*, *supra*, 527 U.S. at p. 138; *People v. Arias*, *supra*, 13 Cal.4th at p. 149), and the evidence should have been excluded in any event given that whatever probative value it may have had was substantially outweighed by the risk of undue prejudice or confusion of the issues (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 438-439; *Old Chief v. United States* (1997) 519 U.S. 172, 180).

The only real issues here are whether this claim is cognizable based on the objections raised below and whether the erroneous admission of this evidence was prejudicial. As to the issue of cognizability, trial counsel's initial objections to the underlying records on foundational and hearsay grounds were arguably adequate to preserve a claim challenging the admission of any evidence which flowed directly from the records, such as the evidence of Sissac's alleged message deletions and calls with Roy. (See *People v. Letner*, *supra*, 50 Cal.4th at pp. 159-160 [initial objections were sufficient to preserve the related issues without further objections contemporaneous with the admission of the evidence]; *People v. Clark*, *supra*, 52 Cal.4th at p. 960 [the express and implied overruling of the initial objections would have rendered any such further objections a futile effort].) Should this Court find that the claim was not properly preserved for lack of more specific or contemporaneous objections, Sissac should not have to bear the resulting burden, because any such procedural default was the product of ineffective assistance of counsel. (*Coleman v. Thompson*, *supra*, 501 U.S. at p. 754, *Murray v. Carrier*, *supra*, 477 U.S. at p. 488.) "[T]here simply could be no satisfactory explanation" for competent counsel to fail to take the steps necessary to properly challenge the admission of this evidence. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1211.) This evidence consisted of extrapolations and conclusions drawn from the already inherently unreliable purported records of phone activity, which obviously served to emphasize and artificially bolster the underlying records and thereby procure for the prosecution further unfair advantage in the case.

The prejudice in the admission of the underlying purported records of cell phone activity inevitably beget further prejudice in the admission of this additional evidence built directly upon those records, which inevitably served to exacerbate the violation of Sissac's fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt. (U.S. Const., Amends. V, VI, VIII, XIV; Cal. Const., art. I, §§ 7, 14, 15, 16.) Therefore, it becomes

even more important to apply the federal standards in assessing the possible harmlessness of the error at issue – i.e., "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" (*Chapman v. California*, *supra*, 386 U.S. at p. 23; *People v. Aranda*, *supra*, 55 Cal.4th at pp. 363-364) – or similarly, under the doctrine of ineffective assistance of counsel, whether there exists a "reasonable probability" of a better result that is "sufficient to undermine confidence in the outcome"' (*People v. Simmons*, *supra*, 210 Cal.App.4th at p. 796; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687).

The unfair advantage that the prosecution gained in being allowed to draw out unsupported extrapolations and conclusions from the purported cell phone records took shape in two palpably prejudicial forms. First, in eliciting Detective Pearce's opinion that – from his review of the "printouts" and "logs" that he himself produced in preparation for trial – Sissac had actually deleted the text messages between him and Devin, the prosecution not only became the benefactor of improper expert opinion (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 [the opinion was nothing more than "a house built on sand" without a reliable foundation]), but it went on to cite the opinion as showing consciousness of guilt. Indeed, the prosecutor characterized Sissac's supposed act of having deleted the messages as an attempt to "hide" evidence of his guilt. (8RT 1261, 1368.) This was particularly inappropriate and unfair given that, without the testimony of a neutral custodian of the actual phone records who could explain how such information is stored and "deleted," we simply have no way of knowing whether (a) any of the purported records of the cell phone activity – either the exhibits that the prosecutor presented or the "printouts" and "logs" that Pearce produced for trial – even accurately reflected the information that was and was not on each phone and (b) whether, even if the records were accurate, there could be some other, completely innocent technical reason why the messages did not appear on Sissac's phone.

Second, in relying upon the purported cell phone records to question Roy about his alleged phone contacts with Sissac after the incident (6RT 810-812, 830-835), the prosecutor was able to take further unfair advantage of this unreliable evidence by using it to suggest that Roy was being untruthful in testifying that he did not communicate with Sissac after the incident (see 6RT 793-794, 800-801, 808-809, 823-824, 836-837). Roy's credibility as a witness mattered to the defense. The pivotal question of whether Sissac had actually admitted shooting Hamrah on the scene ultimately turned on whom the jury would believe: Devin and Glenn who claimed Sissac made such statements or Roy who said he did not. So any basis upon which the prosecution could rely in arguing that Roy's version of events should be disbelieved was obviously prejudicial to Sissac. That is precisely how the prosecutor used the evidence at issue: he argued Roy's version of the events should be disregarded as incredible because the purported phone records showed he was being untruthful in his testimony. (8RT 1277-1279, 1290, 1368.) It was fundamentally unfair to grant the prosecution such an unwarranted advantage in this credibility contest given that the notion of Roy's having supposedly been untruthful in this regard was based on nothing more than a series of completely foundationless, unauthenticated records of purported cell phone activity.

So the exacerbation of the prejudicial error in the admission of underlying purported cell phone activity records through the testimony drawing out purported extrapolations and conclusions from those records constitutes reversible error both independently and when viewed collectively with the other errors under the rubric of cumulative prejudice. (*People v. Hill*, *supra*, 17 Cal.4th at p. 844; *Parle v. Runnels*, *supra*, 505 F.3d at p. 928.) Based on these circumstances, reversal would be required even under the less stringent state law standard given the "*reasonable chance*" of a better outcome. (*People v. Eid*, *supra*, 187 Cal.App.4th at p. 882, quoting *People v. Blakely*, *supra*, 23 Cal.4th at p. 99, italics original.)

## IV

**THE ADMISSION OF THE PRETEXT CALL ALSO CONSTITUTED REVERSIBLE PREJUDICE BECAUSE THE VAGUENESS AND AMBIGUITY OF THE STATEMENTS DID NOT WARRANT DISPENSING WITH THE CORE CONFRONTATION PROTECTIONS UNDERLYING THE HEARSAY RULE**

The pretext phone call that Devin made to Sissac was also an evidentiary centerpiece at trial, at least according to the prosecution's theory that the statements in it reflected strong evidence of Sissac's guilt.

Before trial, trial counsel had argued that the statements in this call did not constitute "true admissions." (2RT 46.) However, the court ultimately decided to admit the evidence on the basis that it contained "some incriminating language in it," referring to the statements concerning "the devil and those kinds of inferences." (2RT 79, 80.) Counsel thereafter agreed with the court's ruling here, stating he "concede[d]" that the call contained "what could be deemed admissions." (2 RT 82.)

While this is the evidence at issue, the discussions about similar evidence which the court ultimately excluded are pertinent here. Specifically, the court excluded another pretext call between Devin and Sissac made earlier on the day of the call that was admitted, as well as a post-arrest jail call between Sissac and his mother, because the court found the evidence irrelevant and precluded by Evidence Code section 352 to the extent the evidence may have been relevant. (2RT 45, 79-81, 105-106.) The prosecutor had also sought to introduce the statements in these calls as "adoptive admissions." (2RT 80.) The court, however, reasoned that "[t]here's no admissions in them," "[t]here's nothing incriminating about them," and "[t]here's nothing in that call, one way or another, without a lot of speculation, conjecture, it's ambiguous." (2RT 79, 80.)

More particularly, regarding the jail call, the prosecutor had argued that the exchange in which Sissac's mother said "You're going to get out of this" to which Sissac responded "It doesn't work that way" showed Sissac "knows he's guilty of that." (2RT 80.) The court believed that the exchange simply reflected Sissac's recognition that he was in trouble, and trial counsel agreed. (2RT 80-81.) The prosecutor also cited the statements in which Sissac's mother told him "It's not going to be pinned on you," "You have to have faith," and "You better not be claiming that," along with Sissac's responses to her that "I'm just praying for forgiveness. I pray now for mercy. I am good in God's eyes. I have repented. [¶ . . . ¶] Yeah, mom, you're right. I need to come clean." (2RT 98-99, 104-105.) The prosecutor argued these exchanges reflected "very clear statements and admissions" because they showed Sissac was "essentially admitting that he's committed this crime." (2RT 98-99.) Trial counsel argued that nothing in the exchanges reflected adoptive admissions, saying "[t]hey're talking about God and faith" and "how the system works" in prosecutions. (2RT 101-102.) The court believed it was simply speculation to infer Sissac was making adoptive admissions through statements of this sort. (2RT 104.)

As for the other pretext call between Devin and Sissac, the prosecutor had argued that it also contained "adoptive admissions" insofar as it showed Devin "basically calling [Sissac] out." (2RT 95-96.) In this regard, the prosecutor cited Devin's statements, "Why would you do some stupid shit like that?" and "You do wrong, you get caught, dog." (2RT 96-97.) The prosecutor argued that "normal people would want to respond to that" by saying something to the effect that "No, it wasn't me," but Sissac simply said Devin should talk to God. (2RT 97.) The trial court disagreed, saying: "How can you conclude that [Sissac] knows what he's talking about? You may feel that way, but on the four corners of this document, that certainly is not apparent at all." (2RT 96-97.) The prosecutor also cited Sissac's response, "Everybody else is feeling the same way except you though," as a further indication of

an admission of guilt. (2RT 97-98.) Trial counsel contended that nothing in this exchange reflected adoptive admissions, as Sissac was simply "running his mouth, saying a lot of things." (2RT 99-100.) He argued one simply could not tell from the content or context of the call exactly what Devin and Sissac meant. (2RT 100.) Counsel contended that nothing Devin had said would have caused a normal person to feel the need to respond with a denial to the effect of "I didn't do it" or "I don't know what you're talking about." (2RT 100-101.) Counsel also argued that the evidence should be precluded under Evidence Code section 352 as "inflammatory" and unduly prejudicial. (2RT 100, 101.) The court did not believe the statements to the effect that "I have repented," and "I'm asking for mercy" meant Sissac was admitting guilt, saying they simply reflected "vagaries" and "ambiguous statements" about faith and therefore did not constitute adoptive admissions. (2RT 102-103.)

The court went on to say it had taken the transcripts of these calls home, read them three times, and had not found anything that "rises to the level that a person can make an adoptive admission out of it, other than speculation." (2RT 103.) It also believed the evidence raised concerns under Evidence Code section 352: "It can't be ambiguous because that's where [Evidence Code section] 352 kicks in and that's where I've got to determine whether or not it's ambiguous, whether or not it has any meaning, whether or not it's vague, whether it's speculative or ambiguous." (2RT 103.) The court ultimately excluded both these calls as precluded under Evidence Code section 352: "The conversations, at best, are vague, speculative, they're ambiguous. There's no specific adoptive admission and even if there is, it's, at most, confusing to the jury." (2RT 106.)

The reasoning of the court and trial counsel regarding these excluded statements was absolutely correct: they did not express any sort of adoptive admission of guilt and, to the extent one might be able to glean such an inference from them, the vagueness and ambiguity of the statements ultimately rendered them too confusing to

be admitted for this purpose. The trouble on appeal is, these statements were substantially similar in content and context to the statements in the pretext call that the court admitted, with counsel's agreement, on the basis that they were "adoptive admissions," and thus they too should have been excluded for the very same reasons.

At the outset, just as in the case of the purported text messages, both the admitted and excluded statements vaguely refer to "this" or "that" in describing the topic of discussion in the conversations, leaving it simply unclear as to just what the participants in the conversations were discussing. In fact, while one might infer from the context of the jail call that Sissac and his mother were referring to this particular incident because he had been arrested (see 2RT 80 [where Sissac's mother said "You're going to get out of this"]), he had not yet been arrested or even directly approached by police at the time of the pretext calls. So the context of the calls does not support a similar inference without a direct reference to the incident. And what really is the difference in content between the statements the court excluded and those the court admitted? A side by side comparison of their basic substance shows there is no material difference between them:

| Excluded Jail Call | Excluded Pretext Call | Admitted Pretext Call |
|---|---|---|
| In response to his mother's statements to the effect that he was "going to get out of this," Sissac said: | Apparently with no response from Sissac, Devin made statements to the effect of: | In response to Devin's statements to the effect that it wasn't like Sissac "to do some shit like that," Sissac said: |
| -"I'm just praying for forgiveness. I pray now for mercy. I am good in God's eyes.<br>-"I have repented." | -"Why would you do some stupid shit like that?"<br>-"You do wrong, you | -Trust and put "your faith in God"<br>-"Just let it go"<br>-"God wouldn't do |

| | | |
|---|---|---|
| -"Yeah, mom, you're right. I need to come clean." | get caught, dog." | nothing like that"<br>- "what you gotta see is that was the devil" |
| (2RT 98-99, 104-105.) | (2RT 96-97.) | (1CT 135-139.) |

What the trial court said to the prosecutor about the excluded statements applies with equal force to the statements in the pretext call that it ultimately admitted: "How can you conclude that [Sissac] knows what he's talking about? You may feel that way, but on the four corners of this document, that certainly is not apparent at all." (2RT 96-97.) And to the extent one could reasonably infer that the topic of discussion actually related to the incident at issue, these statements about God, faith, forgiveness, prayer, and the forces of good in evil in the world do not support a further inferential leap to the conclusion that Sissac intended, through his statements, responses, or lack of responses, to directly or indirectly admit guilt in the shooting of Hamrah. (See *People v. Maki*, *supra*, 39 Cal.3d at p. 712 [the evidence must show (1) he had knowledge of the meaning and content of an accusatory statement and (2) "by words or other conduct, manifested his adoption or his belief in its truth"].) Without this showing, there is simply no justification for dispensing with the protections of the hearsay rule and deeming the situation as one in which "[t]he 'witness' against the defendant is the defendant himself" for purposes of an "adoptive admission" (*People v. Jennings*, *supra*, 50 Cal.4th at pp. 661-662; *People v. Robinson*, *supra*, 61 Cal.2d at pp. 401-402 ["[i]n the absence of these factors, the evidence would be inadmissible"].)

Just as the trial court itself emphasized with respect to the substantially similar statements it excluded: "[t]here's no admissions in them," "[t]here's nothing incriminating about them," and "[t]here's nothing in that call, one way or another, without a lot of speculation, conjecture, it's ambiguous" (2RT 79, 80); and nothing in

them "rises to the level that a person can make an adoptive admission out of it, other than speculation" (2RT 103). Instead, "[t]he conversations, at best, are vague, speculative, they're ambiguous. There's no specific adoptive admission and even if there is, it's, at most, confusing to the jury." (2RT 106.) Having recognized the inadmissible quality of these statements, it was an abuse of discretion for the court to admit the statements of the very same sort in the other pretext call. (*People v. Bolton*, *supra*, 23 Cal.3d at p. 216 ["Discretion is compatible only with decisions 'controlled by sound principles of law"].)

This also speaks to why Sissac should not be saddled with the effects of the forfeiture rule based on counsel's failure to challenge this evidence. Given counsel's own recognition that statements of this very sort were not only inadmissible as irrelevant but also subject to preclusion under Evidence Code section 352 to the extent they may have been relevant, there could have been no reasonable strategic or tactical basis for ultimately "conceding" these statements were admissible. (See *In re Harris*, *supra*, 5 Cal.4th at pp. 832-833, and *Strickland v. Washington*, *supra*, 466 U.S. at p. 687 [the representation is "deficient" when it "fell below an objective standard of reasonableness under prevailing professional norms"].) In fact, since the court clearly understood the problems with statements of this very sort, had counsel continued to pursue his initial position that these statements were also inadmissible (see 1CT 101, 125), it is likely that the court would have been persuaded to exclude them as well. And the resulting undue prejudice is plain: the prosecutor relied heavily upon the statements in the pretext call in arguing that the jury should find Sissac had essentially admitted the charged offense, at one point even replaying the recording of the conversation for the jury. (8RT 1261, 1262, 1271-1273, 1281, 1351-1352, 1357-1358.) Again, the jury was specifically instructed that it could draw such inferences against Sissac on the theory that the statements constituted "adoptive admissions" of his guilt. (1CT 185.) Therefore, as in the context of the other prejudicially erroneous evidentiary

rulings in this case, it was fundamentally unfair to allow the prosecution to present this inherently unreliable hearsay evidence as a proxy for the jury to draw such inferences and to thereby artificially bolster the prosecution's theory of the case that Sissac was his own worst witness against himself.

It follows that both individually, and in combination with the other evidentiary errors (*People v. Hill*, *supra*, 17 Cal.4th at p. 844; *Parle v. Runnels*, *supra*, 505 F.3d at p. 928), this error resulted in a violation of Sissac's fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt (U.S. Const., Amends. V, VI, VIII, XIV; Cal. Const., art. I, §§ 7, 14, 15, 16). Given the weak state of the independent evidence in the record, there exists a "reasonable possibility that the evidence complained of might have contributed to the conviction" (*Chapman v. California*, *supra*, 386 U.S. at p. 23; *People v. Aranda*, *supra*, 55 Cal.4th at pp. 363-364) under the general error standard, and a "reasonable probability" of a better result that is "sufficient to undermine confidence in the outcome" (*People v. Simmons*, *supra*, 210 Cal.App.4th at p. 796; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687) under the doctrine of ineffective assistance of counsel. Similarly, there would exist a "'*reasonable chance*'" of a better outcome in the absence of the error should the state standard apply. (*People v. Eid*, *supra*, 187 Cal.App.4th at p. 882, quoting *People v. Blakely*, *supra*, 23 Cal.4th at p. 99, italics original.)

# V

**THE IMPROPER LAY OPINIONS OF THE PROSECUTION'S PRIMARY WITNESSES ON THE ULTIMATE FACTUAL AND LEGAL ISSUES RESULTED IN YET A FURTHER DEPRIVATION OF FUNDAMENTAL CONSTITUTIONAL PROTECTIONS**

This trial was plagued with yet another form of prejudicially erroneous evidentiary error: the admission of improper lay opinions on the central factual and legal issues that *the jury* was to decide.

The fundamental right to a jury trial as guaranteed under the state and federal Constitutions "at base, is the right to have the jury decide the ultimate question of a defendant's guilt or innocence. (*People v. Marshall* (1996) 13 Cal.4th 799, 877-878, citing *United States v. Gaudin* (1995) 515 U.S. 506, 514; see Cal. Const., Art. I, § 16 [state law jury trial right].) "This, then, was the historical guarantee of the Sixth Amendment: '[the] right of criminal defendants to demand that the jury decide guilt or innocence on every issue.'" (*Marshall*, at p. 878, quoting *Gaudin*, at p. 513.) "Taken together [with the right of due process], these rights indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 476-477, quoting *Gaudin*, at p. 510.) And "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." (*Gaudin*, at p. 514.)

For these reasons, it is axiomatic that no witness, lay or expert, may directly opine upon the ultimate issue of the defendant's guilt or innocence. (*People v. Torres, supra*, 33 Cal.App.4th at pp. 46-47 ["A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant."]; *United States v. Lockett* (9th Cir. 1990) 919 F.2d 585, 590 ["A witness is not permitted to give a direct opinion about the defendant's guilt or innocence."]; *United States v. Espinosa* (9th Cir. 1987) 827 F.2d 604, 612 [same].) Witnesses may only testify to opinions that assist the trier of fact, and opinions on the ultimate question of guilt or innocence are necessarily of no such assistance since they simply usurp the role of the jury. (*Torres*, at p. 47; *United States v. Crawford* (9th Cir. 2001) 239 F.3d 1086, 1090.)

In a similar vein, a witness is not permitted to testify to a legal conclusion, to the meaning or definition of a legal term, or to the manner in which the law is to be applied to the facts. "'It is the court and not the  witness which must declare what the law is, it not being within the province of a witness, for example, to testify as to what constitutes larceny or burglary.'" (*People v. Torres*, *supra*, 33 Cal.App.4th at pp. 45-46, quoting *People v. Clay* (1964) 227 Cal.App.2d 87, 98.) Thus, "[e]arly in our state's judicial history our Supreme Court held the definition of a statutory term is a matter of law on which the court should instruct the jury; it is not a subject for opinion testimony." (*Torres*, at p. 45, citing *People v. Carroll* (1889) 80 Cal. 153, 158, *People v. Rose* (1890) 85 Cal. 378, 382, and *People v. Gosset* (1892) 93 Cal. 641, 645-646.) And "[t]he manner in which the law should apply to particular facts is a legal question and is not subject to expert, much less lay, opinion." (*Morrow v. Los Angeles Unified Sch. Dist.* (2007) 149 Cal.App.4th 1424, 1444-1445; accord *United States v. Crawford*, *supra*, 239 F.3d at p. 1090 ["A lay witness may testify as to an ultimate issue of fact, so long as the testimony is otherwise admissible. [Citation.] The lay witness may not, however, testify as to a legal conclusion, such as the correct interpretation of a contract."].)

Nevertheless, these very sort of improper opinions became part of this trial. During his testimony, Devin was allowed to announce his opinions that Hamrah was "innocent" in the situation,[9] and that what Sissac had done was "a sin," "just wrong," and in fact "murder," which is why Devin had "come forward," because he could not "live with" that. (4RT 444-445, 473.) Glenn was also permitted to testify that by having shot Hamrah (according to Glenn's version of the facts), Sissac was responsible for "murdering" him. (5RT 656.) Of course, claims that Hamrah was "innocent" and that Sissac had committed "murder" purported to be conclusions not only on the

---

[9]    Trial counsel raised an objection to this statement on hearsay grounds, which the trial court overruled. (4RT 445.)

ultimate question of whether Sissac was the perpetrator of the shooting but also on the particular form of his alleged culpability – i.e., that it was "murder" as opposed to manslaughter. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1222 ["it is the role of the trier of fact, not the witness, to make such an inference"].) Further, in being permitted to testify that Sissac's alleged conduct constituted "murder," the witnesses were also purportedly rendering improper opinions on the definition or meaning of this specific legal term and how that term should be applied to the facts as the witnesses had relayed them. (See *People v. Torres*, *supra*, 33 Cal.App.4th at p. 46, quoting *People v. Carroll*, *supra*, 80 Cal. at p. 158 [allowing the definition of a statutory term to vary from case to case "'would lead to great uncertainty in the administration of justice'"].)

Because this testimony directly contravened well settled principles of law intended to protect the defendant's fundamental constitutional right to have *the jury* decide the ultimate issues in the case, the admission of the testimony was an abuse of discretion. (See *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [It is settled that "a disposition that rests on an error of law constitutes an abuse of discretion."]; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 25 ["[I]f a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law."].) For the same reasons, trial counsel's failure to object to this testimony as improper opinions constituted ineffective assistance of counsel. (See *People v. Torres*, *supra*, 33 Cal.App.4th at p. 49 [there was "no tactical advantage to defendant in allowing [improper opinion] testimony to go unchallenged"].) Accordingly, it would be inappropriate to hold Sissac accountable for counsel's omission. (See *Coleman v. Thompson*, *supra*, 501 U.S. at p. 754 [the forfeiture rule does not apply to omissions resulting from ineffective assistance of counsel].)

This improper intrusion upon the province of the jury to decide the ultimate questions in the case based upon the law as defined by the court resulted in a violation of Sissac's fundamental right to a jury trial (*People v. Marshall*, *supra*, 13 Cal.4th at pp. 877-878; *United States v. Gaudin*, *supra*, 515 U.S. at p. 514), invoking the federal standards in reviewing the prejudicial effect of the error (*Chambers v. Mississippi*, *supra*, 410 U.S. at p. 302; *People v. Lewis*, *supra*, 139 Cal.App.4th at p. 885). But given the weakness of the independent evidence of guilt (much of which was itself erroneously admitted, as discussed), both individually and in combination with the other prejudicial evidentiary errors, the erroneous admission of this evidence requires reversal under any prejudice standard. (*People v. Hill*, *supra*, 17 Cal.4th at p. 844; *Parle v. Runnels*, *supra*, 505 F.3d at p. 928.)

## PRAYER

WHEREFORE, petitioner prays that this Court:

1. Take judicial notice of the transcripts and court records in *People v. Sissac*, San Diego County Superior Court Number SCE315928, the previous petition in and in the appeal, *People v.* Sissac, D064910;

2. Order respondent to file and serve a certified copy of the record on appeal and show cause why petitioner is not entitled to the relief sought;

3. After full consideration of the issues raised in the petition, vacate the judgment and sentence imposed upon petitioner or, in the alternative;

4. Depending on whether the state's Answer to this petition denies any of the material factual allegations of the petition, permit discovery, grant additional funding,

and order an evidentiary hearing at which petitioner may offer proof concerning the allegations in this petition; and

     5. Grant such other and further relief as may be appropriate.

Dated:     December 21, 2017

                        Respectfully submitted,

                        /s/ Jonathan B. Jordan
                        JONATHAN B. JORDAN, CSBN 105815
                        Law Offices of Jonathan B. Jordan
                        2534 State Street, Suite 201
                        San Diego, CA 92103
                        T (619) 516-8149
                        attorneyjjordan@aol.com
                        Attorney for Demetrius Sissac

# VERIFICATION

I, Jonathan B. Jordan, declare that I am habeas counsel for petitioner Demetrius Sissac. I make this verification for petitioner because of his status as an incarcerated individual. I have read the attached petition and believe the matters stated therein to be true. On that basis, I allege they are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of December, 2017 in San Diego, California.

<u>/s/Jonathan B. Jordan</u>
Jonathan B. Jordan
Attorney for Petitioner