# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIUS SISSAC, <br><br> Petitioner, <br><br> v. <br><br> W. L. MONTGOMERY, Warden, <br> Respondent. | Case No.: 16cv2287-BAS (JLB) <br><br> **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** <br><br> **(1) GRANTING MOTION TO AMEND PETITION FOR A WRIT OF HABEAS CORPUS; and** <br><br> **(2) DENYING FIRST AMENDED PETITION** |

Petitioner Demetrius Sissac, a state prisoner, initiated this action by filing a pro se Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego County Superior Court conviction for second degree murder. (ECF No. 1.) He has since retained counsel who has filed a Motion to Amend the Petition with an attached proposed First Amended Petition which presents the same claims with more extensive briefing. (ECF No. 28.) Petitioner claims here, as he did in state court, that, either individually or cumulatively, the admission of evidence of text messages and telephone calls between himself and the men he was with at the time of the murder, the testimony of two of those men to ultimate legal and factual issues when they testified they thought it

was a sin that he had murdered an innocent victim, and the admission of testimony about the deletion of text messages from Petitioner's phone, as well as the manner in which his trial counsel handled the admission of the evidence, violated his constitutional rights. Specifically, Petitioner claims violations of his rights to due process, a fair trial, a reliable determination of guilt, the confrontation and cross-examination of witnesses, and the effective assistance of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (Id.)

Respondent has filed an Answer and a Notice of Lodgment of the state court record. (ECF Nos. 7-8.) Respondent contends that state court remedies have not been exhausted as to any claim in the pro se Petition because the only claims it presents are ineffective assistance of counsel claims raised only on habeas in the state appellate court. (ECF No. 7 at 2.) Respondent contends the claims can be denied here notwithstanding the failure to exhaust because the state appellate court adjudication is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. (Id.; ECF No. 7-1 at 6-10.) Respondent opposes the Motion to Amend on the basis that amendment would be futile because the proposed amended petition does not add any new claims, merely argument in support of the claims in the pro se Petition. (ECF No. 29.)

As set forth herein, the Court makes the following findings and recommendations. The Court recommends granting the timely Motion to Amend. The proposed amended petition contains the same claims as the original pro se Petition, but presents a more thorough briefing closely resembling the manner in which the claims were presented to the state court. Both versions of the federal petition contain five claims with four subparts (due process, confrontation, a fair and reliable determination of guilt, and ineffective assistance of counsel), all of which, other than the ineffective assistance of counsel claims, are exhausted because they were presented to the state supreme court on direct appeal. The ineffective assistance of counsel claims were presented only to the state appellate court on habeas, but the exhaustion requirement is technically satisfied as to those claims because

more than three years have passed since they could have been timely presented to the state supreme court and state court remedies no longer remain available. The Court recommends denying habeas relief because the state court adjudication of all claims, other than the ineffective assistance of counsel aspect of claim one, is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts, because any evidentiary errors are harmless, and because the ineffective assistance of counsel aspect of claim one fails under a de novo review.

## I.    STATE PROCEDURAL BACKGROUND

In a one-count Information filed in the San Diego County Superior Court on February 16, 2012, Petitioner was charged with first degree murder in violation of California Penal Code § 187(a), with the special circumstance that the victim was a taxicab driver intentionally killed while engaged in the course of his duties within the meaning of California Penal Code § 190.25. (Lodgment No. 1, Clerk's Transcript ["CT"] at 4-6.) The Information also alleged Petitioner personally used a firearm within the meaning of California Penal Code §§ 12022.5(a) & 12022.53(b), personally used and intentionally discharged a firearm within the meaning of California Penal Code § 12022.53(c), and personally used and intentionally discharged a firearm causing great bodily injury or death within the meaning of California Penal Code § 12022.53(d). (Id.)

On June 28, 2013, after deliberating for about ten hours over three days, the jury indicated they were deadlocked on first degree murder, and the People dismissed that charge. (CT 345.) After deliberating an additional thirty minutes, the jury found Petitioner guilty of second degree murder and returned true findings on the firearm use allegations. (CT 209-10, 346.) On August 16, 2013, Petitioner was sentenced to fifteen years to life for second degree murder, with a consecutive term of twenty-five years to life for the California Penal Code § 12022.53(d) firearm use enhancement, with terms on the other enhancements stayed, for a total term of 40 years to life in state prison. (CT 191.)

/ / /

Petitioner appealed, alleging, as relevant here, that his federal constitutional rights to due process, to a fair trial, to confront and cross-examine witnesses, and to a reliable determination of guilt were violated, individually or cumulatively, because: (1) evidence regarding cellular telephone communications between him and the men he was with on the night of the murder constituted unreliable inadmissible hearsay which lacked adequate foundation and proper authentication; and (2) the trial testimony of two of those men that they thought it was a sin for Petitioner to have murdered an innocent victim constituted improper lay opinion as to ultimate legal and factual issues. (Lodgment No. 3.) Petitioner filed a habeas petition in the appellate court on the same day, accompanied by a motion to consolidate it with the direct appeal, alleging any forfeiture of the evidentiary claims arising from a failure to object at trial was due to ineffective assistance of trial counsel, and raising additional claims of ineffective assistance of counsel predicated on trial counsel's failure to object to the admission of the evidence supporting the underlying claims of evidentiary error. (Lodgment No. 6.) The People responded by arguing that defense counsel's failure to object at trial to the alleged evidentiary errors resulted in forfeiture of those claims, that the challenged evidence was properly admitted, and any errors were harmless. (Lodgment No. 4.)

The appellate court affirmed, finding: (1) the claims of evidentiary error involving the telephone communications (claims two through four here) failed, regardless of any forfeiture resulting from a failure to object as to some of the evidence, because they were harmless in light of the strong evidence of guilt; (2) Petitioner forfeited the claim challenging the introduction of lay opinions (claim five) due to trial counsel's failure to object, but this did not amount to ineffective assistance of counsel because Petitioner was not prejudiced as there was no reasonable probability of a more favorable result had an objection been made; and (3) there was no cumulative error (claim one). (Lodgment No. 5, <u>People v. Sissac</u>, No. D064910, slip op. (Cal.App.Ct. Mar. 3, 2015).) In a separate order the appellate court denied the motion to consolidate, and denied habeas relief stating: "For

/ / /

reasons explained in our opinion in the direct appeal, we reject Sissac's claims." (Lodgment No. 7, In re Sissac, No. D065927, Order (Cal.App.Ct. Mar. 3, 2015).)

On April 6, 2015, Petitioner filed a petition for review in the California Supreme Court in which he raised the same claims presented on direct appeal. (Lodgment No. 8.) The petition for review did not include the ineffective assistance of counsel claims raised on state habeas, although Petitioner argued that to the extent any issue was forfeited by his trial counsel's failure to object to the introduction of the challenged evidence it was a result of constitutionally ineffective assistance of counsel. (Id.) That petition was denied in an order which stated: "The petition for review is denied." (Lodgment No. 9, People v. Sissac, No. S225613, order (June 10, 2015).)

## II.   FEDERAL PROCEEDURAL BACKGROUND

Petitioner initiated this action by filing a pro se Petition on September 6, 2016. (ECF No. 1.) The headings on the claims in the pro se Petition are taken from the state appellate court habeas petition which allege ineffective assistance of counsel for failing to object to the introduction of the challenged evidence (id. at 6, 9, 13, 17, 20), but the substance of the claims in the body of the Petition uses language from the briefs on direct appeal to allege the admission of that evidence violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process, a fair trial, confrontation and cross-examination of witnesses, and a reliable determination of guilt. (Id. at 13-15, 18-20.) Petitioner alleges he exhausted all claims by presenting them to the state supreme court in the petition for review (id. at 6-9, 13, 16-17, 19-20, 23), despite the fact that the ineffective assistance of counsel claims were not presented in the petition for review. (See Lodgment No. 8.) As discussed below, he attributes that mistake to his not being informed that his motion to consolidate his habeas petition with his direct appeal had been denied.

"The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants." Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987), quoting Boag v. MacDougall, 454 U.S. 354, 365 (1982). Liberal construction of pro se prisoner habeas petitions is especially important with regard to the determination as

to which claims are presented.  <u>Zichko v. Idaho</u>, 247 F.3d 1015, 1020 (9th Cir. 2001).  The Court finds that the pro se Petition presents the same claims of evidentiary error raised on direct appeal, as well as the ineffective assistance of counsel claims raised on state habeas that trial counsel's performance was deficient due to the manner in which he handled the admission of that same evidence.

Respondent filed an Answer on November 29, 2016, construing the Petition as only raising ineffective assistance of counsel claims.  (ECF No. 7-1 at 6.)  Respondent contends that because none of those claim were presented to the state supreme court, Petitioner has not exhausted state court remedies as to any claim presented here, but that he retains the right to file a habeas petition in the state supreme court to exhaust those claims.  (ECF No. 7 at 2.)  Respondent argues habeas relief can be denied notwithstanding the failure to exhaust because the adjudication of the ineffective assistance of counsel claims by the state appellate court is objectively reasonable.  (ECF No. 7-1 at 7-10.)

Petitioner replied to Respondent's characterization of his pro se Petition as containing only unexhausted claims by filing a Motion for Stay and Abeyance on January 19, 2017.  (ECF No. 14.)  Respondent filed an Opposition to the stay motion, contending that stay and abeyance is not appropriate because Petitioner failed to establish good cause for not timely presenting his claims to the state supreme court.  (ECF No. 16.)  Petitioner replied by stating he was unaware his request to consolidate his state habeas action with his direct appeal had been denied by the state appellate court, and requested a stay in order to present any claims he had not yet "wholly exhausted" to the state supreme court.  (ECF No. 18.)  The Court granted the motion on May 10, 2017, issued a stay, and notified Petitioner he was required to file a status report by June 9, 2017, informing the Court he had filed a state court petition.  (ECF No. 19.)

Petitioner failed to file a status report and on July 11, 2017, the Court ordered him to show cause why the stay should not be lifted.  (ECF No. 20.)  On July 28, 2017, Petitioner's newly retained counsel appeared and filed a status report.  (ECF No. 21.)  Petitioner's counsel contended (erroneously, as explained below), that state court remedies

as to the ineffective assistance of counsel claims had been exhausted when the state appellate court denied the habeas petition on March 3, 2015, prior to initiating this action. (Id. at 1.) Counsel indicated that this matter was therefore ready to proceed, but requested a 120-day extension in order to research and explore issues which may not have been raised, and to prepare a "more legal" and analytical presentation of the claims. (Id. at 1-2.)

On August 15, 2017, the Court vacated the stay, dismissed the show cause order, and set a deadline to file a motion to amend the petition, which was extended to December 22, 2017. (ECF Nos. 23-27.) Petitioner's counsel timely filed a Motion to Amend the Petition on December 21, 2017, with an attached proposed First Amended Petition. (ECF No. 28.) On December 26, 2017, Respondent filed an Opposition. (ECF No. 29.)

The proposed First Amended Petition, like the pro se Petition, initially headlines each claim in the "table of contents" and "preliminary allegations" sections as presenting ineffective assistance of trial counsel claims. (ECF No. 28-1 at 2, 15-23.) However, the "argument" section of the memorandum of points and authorities supporting the proposed First Amended Petition, like the pro se Petition, contains all the underlying evidentiary claims raised in the petition for review on direct appeal. (Id. at 45-87.) As set forth in detail below, Petitioner claims in the pro se Petition and the proposed First Amended Petition that his federal constitutional rights were violated by the cumulative effect (claim one) of the erroneous admission of, and ineffective manner in which trial counsel handled the admission of: evidence of text messages Petitioner exchanged with Devin Patton in the days after the murder (claim two); testimony that Petitioner deleted those text messages (which the prosecutor argued showed a consciousness of guilt), and evidence of telephone calls between him and Anthony Roy, one of the men he was with that night who testified he never spoke to Petitioner (which the prosecutor argued undermined Roy's credibility) (claim three); a pretext call to Petitioner from Devin Patton recorded and partially scripted by the police, which the prosecutor argued contained adoptive admissions (claim four); and the testimony of Devin Patton and David Glenn that they thought what Petitioner did was

a sin and that he murdered an innocent man, which constituted lay opinions on the ultimate legal and factual issues (claim five).

## III.   TRIAL PROCEEDINGS

Barbra Oborski, a San Diego County Deputy Sheriff, testified that she was on patrol on October 30, 2011, and responded to a radio call at the Lemon Grove Avenue trolley station about 3:45 a.m. (Lodgment No. 2, Reporter's Tr. ["RT"] at 133-140.)  When she arrived she found an overturned taxicab with an unresponsive driver hanging upside down by his seatbelt having trouble breathing.  (RT 141-43.)  Deputy Oborski requested an ambulance, and the paramedics determined that the driver had been shot.  (RT 142-45.)  The taxicab had knocked down a palm tree, a metal signpost and a length of construction fence before overturning.  (RT 150.)  A specialist in accident reconstruction opined that the taxicab hit a curb which caused it to jump onto a sidewalk, and then hit a palm tree which caused it to overturn.  (RT 271-83.)  A $20 bill was found loose in the taxicab, and the driver had $300 in cash in his pants pocket.  (RT 921, 933-34.)

Michael Arroyo, a San Diego County Deputy Sheriff, testified that he responded to the Lemon Grove Trolley station about one minute after Deputy Oborski reported an overturned taxicab.  (RT 176-77.)  The taxicab driver was having trouble breathing, and he squeezed Deputy Arroyo's hand as the deputy spoke to him.  (RT 177-78.)  The paramedics arrived about two minutes later, determined the driver had a gunshot wound to his chest, was not breathing and had no pulse, and pronounced him dead at 4:11 a.m.  (RT 178-82.)  An autopsy revealed an entrance wound to the victim's chest from a bullet found inside his body, and death was caused by internal bleeding from the bullet.  (RT 607, 617.)  The bullet traveled on a slight downward trajectory from the victim's right to left side, appeared to have been fired from between one to three feet away, and was consistent with having been fired from a .38 caliber weapon.  (RT 613, 621, 965-66.)

Suzanne Fiske, a San Diego County Sheriff Homicide Detective, testified that she identified the victim as a taxi driver named Jalaludin Hamrah, determined he picked up his last fare at the El Cajon trolley station, and obtained surveillance video from that station

and the Lemon Grove trolley station. (RT 324-30.) The El Cajon station video showed several individuals entering a taxicab about 3:30 a.m., and the Lemon Grove station video showed the same taxicab flipping over about 3:40 a.m. (RT 361-72.) Detective Fiske was told that Kim Patton, a former Deputy Sheriff with whom Detective Fiske had worked twenty years earlier, wanted to speak to her. (RT 334-35.) Kim Patton arranged for her son Devin to come to the police station for an interview, after which a consensual search was conducted of Devin's bedroom in Kim's home, and a hat, a shirt and a pair of shoes were seized. (RT 335-38, 348.)

Devin Patton testified that when he lived in New Jersey in 2008, he visited his mother in La Mesa, California, where he met and became friends with David Glenn, who he called Jodi. (RT 414-15.) When Patton moved to San Diego in 2011, he moved in with his mother and reconnected with Glenn, who introduced him to Petitioner, who Patton knew as Meech or Metrie. (RT 415-16.) Patton described Petitioner as one of his best friends, and said they went to school together and worked and hung out together after school nearly every day. (RT 416-17.) Patton often ate dinner at Petitioner's house, and said Petitioner's mother and uncle were "good to me, like family." (RT 417.)

On October 29, 2011, a Saturday, Patton was invited to a Halloween party in El Cajon, and texted Petitioner about the party. (RT 421-22.) Patton left his house about 6:00 p.m., took a bus to the nearby Lemon Grove trolley station, rode the trolley to El Cajon where he met a friend, and they took a bus to their friend Natasha's house before going to the party, which was at Natasha's uncle's house. (RT 423-24.) Patton was 21 years old at the time, and said he had four or five alcoholic drinks at the party. (RT 425.)

Patton texted Petitioner throughout the evening asking him to come to the party. (RT 426.) Petitioner, who was 19 years old at the time, arrived at the party about 11:00 p.m. with Glenn, Anthony Roy, and another male Patton did not know but who was about 17 or 18 years old with braided hair. (RT 427-29.) Those four left after about an hour and a half, and Patton left about thirty minutes later and caught up with them. (RT 429-33.)

/ / /

Patton said it was a very cold night and their group seemed to be walking without purpose or destination, and eventually decided to walk to the El Cajon trolley station, a long walk. (RT 432-33.) They arrived at the trolley station about 1:30 or 2:00 a.m., waited for about thirty minutes, and were told by a taxicab driver that the next trolley would not come until 4:00 or 5:00 a.m. (RT 433-35.) Patton said Petitioner went down to the line of taxicabs to negotiate a price, and came back and told the group he had paid a cabdriver $20 to take them to Lemon Grove. (RT 436.) Petitioner sat in the front of the taxicab, Patton sat behind the driver, Roy was to Patton's right, the unknown teenager to Roy's right, and Glenn was next to the right rear passenger door behind Petitioner, which Patton said was a very tight squeeze. (RT 436-37.) It was about 2:00 a.m., and the trip to the Lemon Grove took about 15 minutes. (RT 437.) Patton said the driver was cool during the trip, making jokes, and the atmosphere in the taxicab was cool. (RT 438-39.)

When they arrived at the Lemon Grove trolley station, Patton said he and Roy popped out quickly because they had been squeezed in together. (RT 438.) Patton walked about twenty steps when he heard a loud pop, which he recognized as a gunshot, and immediately ran several blocks before stopping, with Roy running right behind him and the unknown teenager close behind Roy. (RT 440-41.) Roy was crying and the unknown teenager looked shocked and frightened. (RT 441.) While they were running Patton said: "What was that? What happened?" and he "heard someone say that 'Meech shot him. Meech shot the cab driver,'" but he did not know who said it, although it must have been either Roy or the unknown teenager. (RT 442, 522.) Petitioner and Glenn caught up with them a couple of seconds later and Patton heard Glenn ask Petitioner: "What the fuck did you do? Why the fuck did you do that?" (RT 442.) Patton said Petitioner appeared scared rather than angry, and had "a cold, blank look" on his face when he responded by saying the cabdriver had "laughed at him or smiled at him." (RT 442-44.)

Patton went home, slept for about an hour, and began texting Petitioner. (RT 444.) He testified that he asked Petitioner in the texts "to do the right thing and turn himself in." (RT 444-45.) Petitioner did not text Patton back at that time, and Patton decided to give

him "a day to realize what he did" and turn himself in to the police. (RT 446.) When Petitioner eventually responded to his texts, it appeared to Patton that Petitioner did not intend to turn himself in to the police. (Id.) On Monday, Patton told his mother what happened and she immediately called the police. (RT 447.) Patton told the police what happened, including what clothes he was wearing, and allowed the police to search his room and seize his clothes. (RT 448-49.)

The prosecutor projected printouts of the text messages exchanged between Patton and Petitioner on a screen for the jury. (RT 457.) Defense counsel objected to a lack of foundation regarding the times the texts were sent and received, and the prosecutor had Patton read each text aloud for the jury. (RT 455-59.) They included one at 5:51 a.m. on Sunday, October 30, 2011, which read: "Meech, turn yourself in, Meech. This shit is not going to be on my heart. This is crazy, nigga. I'm so serious." (RT 455-57.) Petitioner texted back at 5:52 a.m.: "I'ma call you later." (RT 456-57.) At 5:54 a.m. Patton texted: "You hear what I'm telling you? This is way back." (Id.) Petitioner replied at 5:54 a.m.: "I know." (Id.) Patton texted Petitioner at 11:03 p.m. that evening: "Nigga, this ain't cool at all. I can't sleep or nothing. Yo, I didn't even do shit. You need to be a man and own up, Meech." (RT 458.) With no reply, Patton sent another text at 11:05 p.m.: "You ain't thinking about my life, my fam, and this shit hurts like fuck." (RT 458-59.) Again without a reply, Patton sent a text at 11:13 p.m.: "Do the right thing, please, yo." (RT 459.)

Patton testified that he fell asleep after that last text, and the next morning, Monday, October 31, he read a text from Petitioner which had been sent the previous midnight: "You have to pray." (Id.) Patton texted back: "No, you pray, nigga. That's some coward ass shit. I got nothing else to say." (Id.) Patton determined at that point that Petitioner was not going to turn himself in, and decided to tell his mother what happened. (RT 461.)

Patton testified that when he made his statement to the police he offered to help in any way, and they asked him to make a pretext call to Petitioner, which he did on November 1 at 10:42 p.m., with the police present telling him what questions to ask. (RT 462-63, 537-38, 567-70, 584-86.) A recording was played for the jurors, who were given a

16cv2287-BAS (JLB)

transcript of the call. (RT 568-70.) A transcript is in the record. (CT 135-41.) In that call Petitioner did not directly admit or deny shooting the victim, although he was never asked if he had, but he did deny that he "got any money out of it." (Id.) At a pretrial hearing, Petitioner's trial counsel argued that the statements in the pretext call "are not true admissions," but after the trial court ruled it contained "some incriminating language," defense counsel stated: "I'm conceding [it] has admissions, your honor, what could be deemed admissions." (RT 46, 79, 82.) During closing argument defense counsel argued that Petitioner had made no admissions during that call, and pointed out that despite the fact it was scripted by the police, Petitioner was never asked if or why he shot the driver. (RT 1331-32.) The prosecutor argued to the jury that Petitioner's failure to deny he shot the driver was an adoptive admission. (RT 1351-52.) Patton testified that he made a similar pretext call to Glenn that night. (RT 570.) A transcript is in the record. (CT 66-85.) Glenn told Patton during that call, which was not played for the jury, that Petitioner admitted shooting the driver but did not mean to kill him, and Glenn asked Patton to wait to contact the police to give Petitioner time to turn himself in because he had promised he would and was scared and remorseful. (Id.) Defense counsel succeeded in having three recorded calls excluded, the call from Patton to Glenn, a call to Petitioner from his mother when he was in custody, and a second pretext call from Patton to Petitioner. (RT 79-82, 93-106.)

Patton testified that he moved back east in order to spare his family having to deal with the situation, as they might be in danger living with a snitch, and said he had been receiving monthly payments from the District Attorney of $450 for food and $650 for rent. (RT 463-64, 561-62.) He identified himself, Petitioner, Roy, Glenn and the unknown teenager on the El Cajon trolley station video. (RT 465-66.) When asked by the prosecutor why he had decided to come forward, Patton said: "Because certain things I can't live with, sir. Murder isn't – murder is just not one of them. It was wrong." (RT 473.) When asked what he did when he woke up the morning after the killing, he said he started texting Petitioner in order to try to get him to come forward because: "What happened that night was crazy, I know, but the victim, he was – the cab driver, he was innocent." (RT 444-45.)

Defense counsel's hearsay objection was overruled. (RT 445.) When then asked "What did you text him," Patton replied: "I asked him to man up and I asked him to turn himself in because if he didn't, things were going to get really bad, things like this is what I was saying to him, things like this don't just pass over, this is a sin." (Id.)

Patton testified that he used to smoke marijuana but stopped on the day of the murder. However, he admitted he texted Glenn a couple of days later that he was planning to pick up some marijuana, although he denied he was actually going to do so. (RT 543-44.) Patton admitted he had been convicted of misdemeanor embezzlement of less than $200 in 2010. (RT 454-55.) He also admitted he was with Petitioner on May 8, 2011, when Petitioner was pulled over driving a stolen car after a high speed chase. (RT 566-67.) He testified Petitioner ran from the police while he, Patton, stayed in the car. (Id.) He testified he later cooperated with the police. (RT 534-35.) Petitioner pleaded guilty to vehicle theft and evading the police, and Patton was not charged. (RT 532-35, 579-80.)

David Glenn testified, under a grant of immunity, that he has lived in San Diego his entire life, and has known Petitioner, who he calls Meech and Metrie, for about four years, and thinks of him as a little brother. (RT 638-39.) Roy is Glenn's cousin who he has known his entire life, and Patton is a friend Glenn has known for three or four years. (RT 639-40.) Glenn said that about 5:00 or 6:00 p.m. on Saturday, October 29, 2011, he, Petitioner, Roy, and a mutual friend he did not really know who had braids in his hair, went to a party in El Cajon to which Patton had invited them. (RT 640-42.) The four of them took the trolley to the El Cajon station, and from there walked to the party, arriving about 11:00 p.m., where they met Patton. (RT 642-43.) Glenn drank "quite a bit" of liquor at the party, with the rest of the group also drinking, left after about two hours because the party was boring, and said Patton caught up with them less than an hour later. (RT 643-45, 678, 687-88, 722-23.) The five of them walked to the El Cajon trolley station, arriving about 3:00 a.m., and waited on the platform. (RT 645.) Glenn said he was no longer drunk at that time but was high because he smoked marijuana before, during and after the party,

/ / /

but it did not affect his memory of the events because, although he is a heavy marijuana smoker, he could "handle" his marijuana. (RT 684-85, 722-23.)

As far as Glenn knew no one had any money, and when they arrived at the the El Cajon trolley station he suggested they wait for the trolley to start running at 5:00 a.m. and "trolley hop," ride without paying, but Petitioner said "he wanted to ditch a cab," which meant take a taxicab and not pay. (RT 646.) All five of them agreed to Petitioner's plan and Petitioner went to ask the taxicab drivers for a ride, but Glenn said the drivers were hesitant to give them a ride because they were "five black males in the middle of the night." (RT 646-47, 693.) Petitioner returned to the platform and said he found a taxicab driver willing to give them a ride, and they left in the taxicab about thirty minutes after they had arrived at the trolley station. (RT 647-48.) Petitioner sat in the front passenger seat with Glenn directly behind him. (RT 648.) They arrived at the Lemon Grove trolley station about ten or fifteen minutes later after a pleasant trip, with the cab driver laughing and talking to them and no tension or hostility between anyone. (RT 649, 696.)

Glenn testified that as soon as the taxicab arrived at the station, he, Patton, Roy and the unknown male all quickly exited the cab and began to run away. (RT 650.) After the four of them had run a short distance, Glenn heard a gunshot, and slowed down to allow Petitioner to catch up. (RT 651-52.) Glenn asked Petitioner: "What happened. What the fuck did you just do?" and "Did you just shoot that guy?" (RT 651-52, 704.) Glenn said Petitioner did not say anything but: "He just looked at me like he peed on hisself." (RT 652.) Glenn then noticed Petitioner had a gun, a small .38 caliber semiautomatic pistol which Glenn found about a month earlier and had given to Petitioner the previous day because Petitioner "wanted it," but Glenn said he did not know until that moment Petitioner had the gun with him that night. (RT 655-56, 659, 661-63.)

They continued running until they stopped behind a Home Depot where Glenn "jumped in [Petitioner's] face" and asked him again what he had done, but Petitioner just had a blank look on his face. (RT 652.) Glenn said Roy was crying and Patton was "real hysterical about the situation, saying 'Meech, you need to turn yourself in, dog, like right

now.'" (Id.)  Glenn said to Petitioner: "You just smoked the cab driver.  We just came from the El Cajon trolley station.  They got video surveillance cameras of us getting inside the cab.  Now it's going to incriminate all of us.  You know what I mean?  Possibly everybody could go down for this."  (RT 653.)  Glenn said he was "in [Petitioner's] face" and "was going to do something to him," but Petitioner said: "Since I'm the one that did it, there's no need to take everybody down with me."  (Id.)  Glenn told Petitioner he would hold him to his word, Patton adamantly told Petitioner, "You need to turn yourself in," and they all went home.  (Id.)  When Glenn asked Petitioner a couple of days later why he shot the driver, Petitioner said "the dude had laughed at him."  (RT 654-55.)  Glenn admitted that when he was initially interviewed by the police he falsely denied that he had heard Petitioner make that statement.  (RT 1089-90.)

Glenn wore jail clothing during his testimony, and stated that he was incarcerated because he had failed to respond to a subpoena to testify because he loved Petitioner and because "snitches get found in ditches."  (RT 656-58.)  Glenn admitted he could not be prosecuted for aiding and abetting the murder because he was testifying with immunity, and that according to the terms of the agreement he was to be released immediately after testifying, which he was.  (RT 659, 667-69, 720-21.)  With respect to the pretext telephone call initiated by Patton to Glenn recorded by the police but not heard by the jury, Glenn was asked what he was "trying to get across in the conversation."  (RT 724-25.)  Glenn testified that Patton was adamant Petitioner turn himself in, and Glenn was trying to convince Patton to give Petitioner a little more time before Patton went to the police because Petitioner had agreed to "take the rap for what he did."  (RT 724-25.)  When asked if he felt responsible because he supplied Petitioner with the gun used to shoot the victim, Glenn said: "I felt like everybody is responsible for their own actions.  I didn't give him a gun to shoot anybody.  I don't believe in murdering nobody.  I don't believe anybody should deserve to die by the hands of another, that's God's choice."  (RT 656.)

Naseer Yousif, a taxicab driver, testified that he was in his taxicab waiting in line behind Jalaludin Hamrah's taxicab at the El Cajon trolley station around 3:30 a.m. on

October 30, 3011. (RT 741-43.) Hamrah was first in line, a man named Johar was second, the third man was asleep in his taxicab, Yousif was fourth, and a taxicab driver named Habeel was there but not in line. (RT 742-43.) Yousif said several black men were up on the trolley platform, and one of them, whose hair was in braids, came down and told Johar that they did not have any money and asked, "Can you take us to Lemon Grove for the sake of God, without money?" (RT 744-45.) Yousif said that person then returned to his friends on the platform, and a different man from the group came down and asked Habeel if he would take them to Lemon Grove, but Habeel told him he could not because he had to leave on a call. (RT 745-46.) The five men from the platform eventually got into Hamrah's taxicab. (RT 746.) After Hamrah drove away, Habeel told Yousif that the men had given Hamrah $20. (Id.)

Habeel Othman testified that he is a cabdriver and was at the El Cajon trolley station about 3:00 a.m. on October 30, 2011. (RT 843.) Habeel said he was not in line, having just stopped to talk, when a young black man offered him $20 for a ride, to which he replied he could not because he was not in line and pointed to Jalaludin Hamrah's taxicab, which was first in line. (RT 845-47.) Habeel saw that man offer the other drivers $20 to take him to Lemon Grove but they refused because it was a $27 fare, and he then saw Hamrah accept $20 and saw five young black men get into Hamrah's taxicab. (RT 847-48.)

Anthony Roy testified that he lived with Petitioner for two years and thought of him as a brother. (RT 770.) On October 29, 2011, he met Petitioner, who goes by the names Meech and Metrie, along with Roy's cousin (Glenn) and an unknown male with braids in his hair, at a trolley stop on their way to a party in El Cajon, where they met Patton, who Roy said was also a friend. (RT 771-76, 798.) They drank alcohol and smoked marijuana at the party, left without Patton but soon met up with him, went to a park where they again smoked marijuana, and then walked to the El Cajon trolley station, but the trolley had stopped running for the night. (RT 779-81, 782.) That night their group smoked about 15 "blunts," cigar-sized marijuana cigarettes. (RT 779, 814.) At the trolley station, Petitioner
/ / /

walked down to the area where taxicabs were parked, and when he returned Patton told Roy that Petitioner had paid for a cab.  (RT 783.)

Roy said Petitioner rode in front of the taxicab with Glenn sitting behind him, the unknown male was next to Glenn, and Roy was next to Patton, who was by the door behind the driver.  (RT 785.)  When they arrived at the Lemon Grove trolley stop Patton jumped out and started running, Roy started running as soon as he saw Patton running, and then everybody started running.  (RT 786-87.)  As they were running Roy heard a loud bam like a tire popping or a small firecracker.  (RT 788, 841.)  When they all finally stopped at Roy's house, which was near a Home Depot, Roy asked why they were running, because he assumed they had been running to avoid paying the taxicab driver but had also been told it had been paid for.  (RT 788-89.)  He said no one in the group said anything about what had happened, and in fact they "didn't talk about nothing," even though they stayed on Roy's porch for twenty or thirty minutes.  (RT 789, 792-93, 813, 820-21.)  Roy said Petitioner's facial expression was: "Like plain, looked like nothing happened."  (RT 828.)  Roy and Glenn went into Roy's house where they spent the night, Patton walked away by himself, and Petitioner and the unknown teenager walked away together back toward the trolley station.  (RT 801-02, 822-23.)

Roy said he thought the only thing they did wrong that night was to run from the taxicab without paying.  (RT 790, 813.)  The next day he saw on the news about a taxicab driver who had flipped his taxicab after being shot but did not make a connection until he was contacted by the police investigating the incident.  (RT 791-92.)  He denied ever speaking to Petitioner, Glenn, Patton or the unknown male about the incident at any time.  (RT 793.)  When confronted with records showing a series of calls between his telephone and Petitioner's telephone in the days after the incident, Roy said his sister may have used his telephone to call Petitioner.  (RT 810-12, 830-35.)

Daniel Pearce, a San Diego County Sheriff Homicide Detective, testified that he performed data extraction from cellular telephones belonging to the victim, Petitioner, Glenn and Patton, by connecting them to a Cellebrite software program.  (RT 872-76.)  The

victim made a 911 call at 3:44 a.m. on October 30, but did not speak, and only the sound of a car crash is heard. (RT 878-79, 1070-71.) Patton's telephone had a contact number for Petitioner listed as Meech, but no contact numbers for Glenn or Roy. (RT 877.) Petitioner's telephone had contact numbers for Patton, Roy and Glenn. (RT 880.) Petitioner's telephone had a 20 second incoming call from Roy at 6:52 p.m. on October 30, and a 36 second incoming call from Roy at 2:33 p.m. the next afternoon; it had a 34 second outgoing call to Roy at 6:55 p.m. on October 30, and a 46 second outgoing call to Roy at 2:50 p.m. the next afternoon. (RT 881-83.) Glenn's telephone had a contact for Petitioner listed as Meech but no contact numbers for Patton or Roy. (RT 883-85.) Glenn's telephone received a one minute, 34 second call from Petitioner at 12:15 p.m. on October 31, and a 52 second call at 9:52 a.m. the next day. (RT 885.) Roy's telephone placed a two minute, 55 second call to Glenn's telephone on November 2 at 11:48 a.m., and a one minute, 15 second call at 1:42 p.m. the next afternoon. (RT 885-86.) Glenn's telephone placed the following calls to Roy's telephone: on October 30 a 26 second call at 5:45 p.m.; on October 31 a one minute, 12 second call at 2:40 p.m. and a one minute, 12 second call at 5:56 p.m.; on November 1 a three minute, 18 second call at 5:31 p.m. and a one minute, 51 second call at 5:34 p.m.; and on November 2 a 33 second call at 8:40 a.m., a 31 second call at 9:08 a.m., a 31 second call at 9:29 a.m., a 36 second call at 9:34 a.m., a three minute, eight second call at 11:42 a.m., a one minute, 19 second call at 11:54 a.m., a 55 second call at 2:37 p.m., and a 33 second call at 3:37 p.m. (RT 885-88.) On Patton's telephone Detective Pearce found the text messages exchanged between Petitioner's telephone and Patton's telephone which had been shown to the jury, but did not find them on Petitioner's telephone, leading Detective Pearce to conclude Petitioner must have deleted them. (RT 888-89.)

Evidence collected at the crime scene included a $20 bill, but no shell casings. (RT 905-37.) A Criminalist with the San Diego County Sheriff's Department Crime Laboratory testified that she performed DNA analysis on 21 items, including a $20 bill, and compared it to the DNA of Petitioner, the victim, Patton and Glenn. (RT 942-43.) Glenn's DNA was

found on the right rear interior door handle of the taxicab, but no other DNA matches were found other than from the victim. (RT 945-47.)

An Investigator with the office of the San Diego County District Attorney testified that his office provided financial assistance to Patton through the California Witness Relocation Assistance Program after conducting a positive threat assessment. (RT 984-87.) Beginning on May 21, 2012, Patton was given $450 a month for food and $618 a month for rent, which rose to $650 as a result of a rent increase, which he was continuing to receive at the time of trial, and which would ordinarily continue until three months after the last court date, for a total of about $15,922 at the time of trial. (RT 987-90.)

Kimberly Patton, Devin Patton's mother, testified that Petitioner was good friends with Devin, and she knew Petitioner as Meech or Meechy. (RT 998.) On Monday, October 31, 2011, after a discussion with Devin, Kimberly contacted Detective Fiske, with whom she had worked years earlier. (RT 999-1004.) She and Devin were interviewed and they consented to the search of Devin's room. (RT 1004.)

A search of Petitioner's house on November 2, and Glenn's house on November 3, yielded no evidence. (RT 1010, 1015-16, 1062.) Henry Lebitsky, a Sergeant with the San Diego County Sheriff's Office, testified that he asked Devin Patton to make a pretext call to Petitioner in order to test Patton's credibility and perhaps to obtain a confession from Petitioner, and also a pretext call to Glenn, both of which were recorded and partially scripted. (RT 1050-53.) Sergeant Lebitsky described the video taken at the El Cajon trolley station, which was played for the jury. (RT 1055-61.) It showed Petitioner, Glenn, Patton, Roy and a person who was never identified approaching the trolley station; the unidentified person breaking off from the group and approaching the line of taxicabs while the other four proceed up to the platform; the unidentified person going up to the platform; and then Petitioner walking down toward the line of taxicabs and speaking with the drivers. (Id.) The People rested. (RT 1106.)

During the defense case, Leslie Hall, a San Diego County Deputy Sheriff, testified that when she searched Devin Patton's bedroom she was told to look for clothing worn on

the night of the murder, not a gun. (RT 1109-12.) James Stam, a Criminalist, testified that he would expect to see the absence of soot on a body which was shot with a .38 caliber semiautomatic handgun from more than five inches away. (RT 1119-20.) He found no soot and little to no gunshot residue on the victim's clothing, from which he opined that the shot was fired from more than three feet away. (RT 1121-31.) He also opined, based on a reconstruction with a mannequin, that it was unlikely the victim was sitting in a normal driving position facing the front when shot, and much more likely he was turned around as if speaking to someone in the back seat with the shot coming from outside the rear door. (RT 1140-58.) The defense rested and there was no rebuttal. (RT 1184.)

Defense counsel argued in closing that Petitioner did not form the required mental state for murder due to his intoxication and the lack of evidence he expressed a plan or an intent to kill, and there was a reasonable doubt as to who shot the taxicab driver because: (a) no one saw it happen and the case is entirely circumstantial; (b) Glenn was intoxicated, admitted the gun was his, initially denied that Petitioner admitted shooting the driver and only implicated him after he was granted immunity which permitted him to be released from custody if he testified against Petitioner, and both Glenn and the unknown teenager, whom everyone seemed to be protecting, were in a position to shoot the driver according to the defense reconstruction, and both looked in the video as if they might be concealing a gun; (c) Patton had a financial interest in convicting Petitioner, lied about his own marijuana use, and knew how to work the system because he had previously blamed Petitioner and escaped liability when the police pulled them over in a stolen car, and because his mother was a former police officer and a long-time friend of the investigating officer who designed her son's cooperation, including not searching his room for the gun; (d) Roy was a credible witness who testified Petitioner did not make the admissions immediately after the shooting as testified to by Patton and Glenn; and (e) Petitioner's statements in the text messages and pretext call were vague and were not admissions when viewed in light of the presumption of innocence, particularly since the call was scripted by
/ / /

the police but he was not asked if he shot the driver, and reasonably could be interpreted as expressing regret that they were all caught up in a bad situation. (RT 1300-32.)

During deliberations the jury asked for and was allowed to view the video from the El Cajon trolley station, and asked for and was given a transcript of the pretext call Patton made to Petitioner. (CT 342-44.) They deliberated two hours the first day, an entire second day, and late into the morning of the third day before informing the court they were deadlocked 5-7 on first degree murder. (CT 342-45; RT 1381-82.) The prosecutor dismissed the first degree murder charge, and after deliberating another half hour the jury returned a verdict of guilty on second degree murder and found the firearm use allegations true. (CT 209-10, 345-46.) Petitioner was sentenced to 40 years to life. (RT 1426.)

## IV. **PETITIONER'S CLAIMS**

Petitioner claims in his pro se Petition, which is currently the operative pleading, as well as his proposed First Amended Petition, that his Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process, a fair trial, a reliable determination of guilt, confrontation and cross-examination of witnesses, and the effective assistance of counsel, were violated by the cumulative and synergistic effect of the introduction of evidence (and counsel's ineffectiveness in failing to prevent that introduction) which was not properly authenticated and for which a proper foundation had not been laid (claim one), including the text messages exchanged by Petitioner and Patton after the murder, which also constitute unreliable hearsay falling outside the adoptive admissions exception (claim two), testimony from Detective Pearce that Petitioner must have deleted the text messages from his telephone, and cellular telephone records insinuating that Roy had testified falsely when he said he did not speak to Petitioner or Glenn about the incident (claim three), the pretext call by Patton to Petitioner, which was also irrelevant hearsay as it did not contain admissions by Petitioner (claim four), and the improper lay opinions on ultimate factual and legal issues when Patton testified he thought the victim was innocent and what Petitioner had done was a sin, and when Patton and Glenn testified they thought Petitioner had murdered the victim (claim five). (ECF Nos. 1 at 6-22, and 28-2 at 15-22, 45-85.)

## V.    **MOTION TO AMEND**

The proposed amended petition is accompanied by a Motion to Amend the pro se Petition.  (ECF No. 28.)  Petitioner correctly notes that the Motion to Amend, which was filed on December 21, 2017, is timely under this Court's October 27, 2017 Order setting a December 22, 2017 deadline to file such a motion, and argues, without specificity, that "there is plainly no prejudice" to Respondent from amendment.  (Id. at 2-4.)  The proposed First Amended Petition states, incorrectly, that the ineffective assistance of counsel claims which were presented to the state appellate court in the habeas petition were also presented in the state supreme court petition for review.  (Id. at 13.)  It is clear that Petitioner raised no ineffective assistance of counsel claims in the petition for review, but merely presented the evidentiary claims raised on direct appeal and argued he should "be spared from the forfeiture rule under the doctrine of ineffective assistance of counsel."  (Lodgment No. 8 at 20-21, 24, 26-27.)

Although it is clear Petitioner exhausted his state court remedies as to his evidentiary claims by presenting them to the state appellate court on direct appeal and then to the state supreme court in the petition for review, the proposed First Amended Petition fails to adequately allege exhaustion of state court remedies as to the ineffective assistance of counsel claims, as counsel for Petitioner erroneously contends they were exhausted by presenting them to the state appellate court (see ECF No. 21 at 1), and erroneously contends they were presented on direct appeal (see ECF No. 28-2 at 12-14).  Respondent correctly argues the ineffective assistance claims were never presented to the state supreme court, but incorrectly contends they are the only claims presented in this action.  (ECF No. 7 at 2; ECF No. 7-1 at 6-7.)  As discussed below, the ineffective assistance of counsel claims are technically exhausted because it has been over three years since they could have been timely presented to the state supreme court, and state court remedies no longer remain available.

There are five factors to consider in determining whether amendment, which Federal Rule of Civil Procedure 15(a) provides should be "freely" given "when justice so requires,"

is appropriate, including: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." United States v. Corninthian Colleges, 655 F.3d 984, 995 (9th Cir. 2011). Those factors and the interests of justice favor amendment in this case. The proposed First Amended Petition presents Petitioner's claims in a manner more closely resembling how they were presented to and adjudicated in the state courts than how they are presented in the original pro se Petition, which has never been amended. There is no bad faith in seeking amendment, which results from Petitioner retaining counsel. There is no undue delay because the motion is timely. There is no futility, but in fact utility, in the more extensive briefing in the amended petition. Finally, there is no prejudice to Respondent by amendment because no new claims are raised.

The Court recommends granting the Motion to Amend, directing that the proposed First Amended Petition become the operative pleading, and allowing the Answer to the pro se Petition to remain in place as the Answer to the First Amended Petition.[1]

## VI.  **MERITS**

For the following reasons, the Court finds habeas relief unavailable because: (a) the state court adjudication of all claims, other than the ineffective assistance of counsel aspect of claim one, is objectively reasonable within the meaning of 28 U.S.C. § 2254(d); (b) the

---

[1]  An alternate recommendation would be to strike the Answer as insufficient pursuant to Fed.R.Civ.P. 12(f), grant the Motion to Amend as of right under Fed.R.Civ.P. 15(a)(1)(B), and require Respondent to file a new Answer. Counsel for Petitioner could then be provided an opportunity to correct the error in the proposed First Amended Petition regarding exhaustion. The basis for striking the Answer is that Respondent, having interpreted the Petition as raising only ineffective assistance of counsel claims, filed an Answer the substance of which consists of one page arguing failure to exhaust and three pages arguing, rather summarily, the lack of merit of Petitioner's ineffective assistance of counsel claims only. (ECF No. 7-1 at 7-10.) This course of action (striking Respondent's Answer) is not this Court's first recommendation because, as detailed in this Report, it is clear that Petitioner is not entitled to federal habeas relief on any of his claims. Thus, requiring Petitioner to correct the First Amended Petition and requiring Respondent to file an adequate Answer would result in unnecessary delay.

alleged evidentiary errors are harmless; and (c) the ineffective assistance of counsel aspect of claim one fails under a de novo review. Because claim one alleges cumulative error based on the other claims, the Court will address it last. There are two aspects to each claim, one challenging the admission of evidence, which has several subparts, and one alleging ineffective assistance of counsel as to the manner in which trial counsel handled the admission of that evidence.

## A. Standard of Review

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision is "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision involves an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief is available under the unreasonable application clause "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). In order to satisfy § 2254(d)(2), the factual findings upon which a state court's adjudication of a claim rests must be objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007).  A petitioner must also show that any federal constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors."  Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing "most constitutional errors can be harmless."); but see Holloway v. Arkansas, 435 U.S. 475, 489 (1978) (holding that constitutionally ineffective assistance of counsel can never be treated as harmless error).

**B.** **Technical Exhaustion and Procedural Default of Ineffective Assistance of Counsel Aspects of Claims One through Five**

Each of the five claims presented in this action has an ineffective assistance of counsel aspect.  None of those claims were presented to the state supreme court in the petition for review.  Although Petitioner sought review of the appellate court opinion affirming his conviction on direct appeal in case D064910, he did not seek review of the appellate court habeas order in case D065927.  (See Lodgment No. 8 at 1.)  Although Petitioner argued in the petition for review that he should be excused from operation of the forfeiture rule as a result of constitutionally ineffective assistance of counsel (see id. at 20-21, 24, 25-27), he presented his ineffective assistance of counsel claims only in his state appellate court habeas petition (see Lodgment No. 6 at 6-11), and never filed a habeas petition in the state supreme court.  Counsel for Petitioner erroneously contends that Petitioner raised the same claims in the petition for review as he did in his state appellate court habeas petition (see ECF No. 28-2 at 13-14), and erroneously contends these claims were exhausted when the state appellate court denied the habeas petition (ECF No. 21 at 1).

A state prisoner exhausts state court remedies by presenting the state supreme court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition.  Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  A claim is "fairly presented" to a state's highest court if it is presented in a manner which allows that court to have "the

first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." Picard v. Connor, 404 U.S. 270, 275-76 (1971).

Petitioner clearly exhausted his state court remedies as to the underlying evidentiary claims by presenting them to the state appellate court on direct appeal and then to the state supreme court in the petition for review of the appellate court's opinion affirming his conviction. However, the ineffective assistance of counsel claims were never presented to the state supreme court. Sissac petitioned the California Supreme Court to review the appellate court's opinion on direct appeal, which found that, irrespective of any possible forfeiture of claims two through four due to trial counsel's failure to object, and despite the forfeiture of claim five on that basis, the evidentiary errors in claims two through four were harmless, the error in claim five did not prejudice Petitioner, and there was no cumulative error. In the petition for review he argued: "So while [trial counsel's] objections were adequate to preserve the issue and further objections here would have been futile, assuming *arguendo* a more specific objection was required, Sissac should be spared the effects of the forfeiture rule under the doctrine of ineffective assistance of counsel." (Lodgment No. 8 at 20.)

California law provides that "as a matter of policy, on petition for review we normally will not consider any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal." Conservatorship of Susan T., 8 Cal.4th 1005, 1013 (Cal. 1994), citing Cal. Rules of Court, Rule 29(b)(1). The California Supreme Court has noted that Rule 29(b)(1) "is not absolute," because that rule "recognizes that this court may decide 'any issues that are raised or fairly included in the petition or answer.'" People v. Braxton, 34 Cal.4th 798, 809 (Cal. 2004), quoting Cal. Rules of Court, Rule 29(b)(1). Although the California Supreme Court was asked to excuse any forfeiture of the claims based on ineffective assistance of counsel, the petition for review does not contain freestanding claims seeking to have the conviction reversed based on constitutionally ineffective assistance of trial counsel. By arguing in the petition for review that any forfeiture of the underlying evidentiary claims can be excused by ineffective assistance of

trial counsel, Petitioner did not fairly present the California Supreme Court with an opportunity to reach the merits of his claims that he received constitutionally ineffective assistance of counsel. Thus, the Court finds that Petitioner did not present the ineffective assistance of counsel claims to the state supreme court. Nevertheless, for the following reasons, the Court finds that state court remedies are exhausted as to those claims notwithstanding that failure because state court remedies no longer remain available.

When Petitioner initiated this action by handing his pro se Petition to prison officials for mailing to the Court on August 31, 2016 (see ECF No. 1 at 26), and thereby constructively filing it, nearly one and one-half years had elapsed after the state appellate court denied habeas relief on March 3, 2015 (see Lodgment No. 7 at 1). Now that over three years have passed since that denial, it is clear that the exhaustion requirement is technically satisfied as to the claims that should have been but were not presented to the state supreme court because there is now an absence of available state judicial remedies. See Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'"); Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him."), quoting Coleman v. Thompson, 501 U.S. 722, 732 (1991). Now that over three years have passed since the state appellate court denied the habeas petition, a return to the state supreme court to present the ineffective assistance of counsel claims would likely be met with a state timeliness bar. See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied); see also Harris v. Reed, 489 U.S. 255, 268 (O'Connor, J., concurring) ("[I]n determining whether a remedy for a particular constitutional claim is 'available,' the federal courts are authorized, indeed

required, to assess the likelihood that a state court will accord the habeas petitioner a hearing on the merits of his claim.")

Thus, the ineffective assistance of counsel claims are technically exhausted and procedurally defaulted in this Court. See Coleman, 501 U.S. at 735 n.1 (1991) (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); see id. at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently applied.); Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003) ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground."); Walker, 562 U.S. at 312-21 (holding that California's timeliness rule is clearly established and consistently applied).

The Court may reach the merits of a procedurally defaulted claim if there is cause for the failure to satisfy the timeliness rule and prejudice arising from the default, or a fundamental miscarriage of justice arises from not reaching the merits of the claim. Coleman, 501 U.S. at 750. The Court need not determine whether Petitioner could make a showing sufficient to excuse the default because the ineffective assistance of counsel claims are, as will be seen, insufficiently meritorious to provide for federal habeas relief, and the Ninth Circuit has stated: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

16cv2287-BAS (JLB)

Id. Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. Petitioner must establish both deficient performance and prejudice to establish ineffective assistance of counsel. Id. at 687.

"The standards created by Strickland and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105. These standards are "difficult to meet" and "demand that state court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Based upon the merits analysis set forth below as to each claim, the Court recommends denying relief as to the ineffective assistance of counsel claims irrespective of the failure to present them to the state supreme court.

## C.     **Claim Two**

Petitioner contends, as he did on direct appeal, that the text messages between himself and Devin Patton were erroneously ruled admissible at a pretrial hearing as adoptive admissions, that they were never properly authenticated and no foundation was ever laid, and that defense counsel's objection during trial that they were hearsay was erroneously overruled, resulting in a violation of Petitioner's federal constitutional rights to due process, a fair trial, confrontation and cross-examination of witnesses, and a reliable determination of guilt under the Fifth, Sixth, Eighth and Fourteenth Amendments. (ECF No. 8-12 at 35-55.) The state appellate court denied the claim:

> Sissac contends the court prejudicially erred by admitting evidence of text messages found on Patton's cell phone that he and Patton exchanged with each other after the shooting incident. In support of this contention, he asserts that (1) the prosecution failed to provide an adequate foundation to authenticate the text messages and, thus, failed to "satisfy the authentication and reliability requirements of the business record or past recollection recorded exceptions to the hearsay rule"; (2) "[e]ven if the prosecution laid an

adequate foundation," the "purported statements in the text messages" at issue here "were not *direct* accusations that Sissac had shot Hamrah or had committed any other specific crime" and, thus, the statements "were not admissible under the 'adoptive admission' exception to the hearsay rule"; and (3) the "probative value [of the statements] to the question of guilt or innocence was minimal at best given their vague and ambiguous meaning," and, thus, the court should have excluded the evidence of the text messages under Evidence Code section 352 because the probative value of the statements in the text messages was "substantially outweighed by the risk of undue prejudice and confusion of the issues in allowing the prosecution to rely upon them as evidence of Sissac's having effectively admitted that he shot Hamrah." Sissac's contention and supporting assertions are unavailing because, even if were we to assume the court erred in admitting the text message evidence, any such error was harmless.

A. *Background*

1. *Pretrial proceedings*

In its trial brief, the prosecution argued that Sissac's out-of-court statements to Patton were admissible as admissions of a party opponent. With his own trial brief, Sissac brought a motion in limine seeking to exclude the evidence of text messages between Patton and Sissac that Sheriff personnel downloaded from Patton's cell phone, arguing that the unauthenticated messages lacked proper foundation and they were inadmissible hearsay because they did not constitute admissions by a party opponent.

The prosecution opposed Sissac's in limine motion, asserting that it would provide a sufficient foundation at trial that would authenticate the text messages and allow a jury to conclude that Sissac sent the messages:

"Upon [his] arrest, [Sissac] was in possession of a cellular telephone, the phone number for that phone is 619–799–3642. Further, the People expect that Patton will testify as follows: (1) That the number 619–799–3642 is the number he used to communicate with [Sissac] via cell phone; (2) that number is programmed into his phone with the name 'Meech' or 'Meechie Sissac' . . . attached to it; (3) that he sent the text messages to that number, prompting the responses at issue; (4) that the messages were sent soon after the murder; and (5) . . . that he called [Sissac] about six hours after the text message exchange and [Sissac] answered the phone."

At the hearing on the parties' in limine motions, the court commented that admission of the text messages between Patton and Sissac was subject to a foundation being laid by the person who either sent or received the messages in order to authenticate the messages. The court, however, noted that some of the text messages between Sissac and Patton did not appear to have evidentiary value. The prosecutor responded that the "string of texts" between Sissac and Patton were relevant because it showed the chronology of events and corroborated the testimony of witnesses that Sissac was with the group at a party. The prosecution also argued that Sissac's statements were admissible as admissions of a party opponent. The court ruled that if a statement by Sissac in a text message was an admission, "it's admissible."

2. *Trial evidence of text messages*

During trial Patton testified that Sissac, whom he called "Meech," was one of his best friends, and Sissac's contact information was in his (Patton's) cell phone under the name "Meech." Patton testified that he was texting "back and forth" with Sissac while he (Patton) was at the party on the night of the murder. Patton also testified that he texted Sissac after the murder and "asked him to do the right thing and turn himself in." The following exchange occurred between the prosecutor and Patton:

"[Prosecutor]: [W]hen you texted him, what did you text him if you recall?

"[Patton]: I asked him to do the right thing. I asked him to man up and I asked him to turn himself in because if he didn't, things were going to get really bad, things like this is what I was saying to him, things like this don't just pass over, this is a sin.

"[Prosecutor]: Now, did you get any response from him at that point?

"[Patton]: No. [Sissac] didn't text me back at that time."

Defense counsel objected to this testimony, arguing the text messages were inadmissible hearsay. The court overruled Sissac's hearsay objection, stating that Patton could testify about what he had said in the text messages. Patton then testified that Sissac ultimately responded to his texts, but Patton did not get the impression that Sissac was going to turn himself into the police.

Patton also testified he later told his mother what had happened, and she called the police.

Shortly thereafter, outside the presence of the jury, defense counsel discussed People's exhibit No. 117, which showed several text messages between Sissac and Patton. Sissac's counsel objected that the evidence was hearsay even if Patton was on the witness stand. The trial court responded, "It is hearsay in the classic sense that it's an out of court statement, but [Patton] can certainly testify as to what he said."

In the presence of the jury, the prosecutor showed Patton People's exhibit No. 116, which depicted a portion of the text messages he and Sissac exchanged on the morning of the crime (Oct. 30, 2011). Patton read the text messages. Patton testified that, in his first text message to Sissac "[he] said, 'Meech, turn yourself in, Meech. This shit is not going to be on my heart. This is crazy, Nigga. I'm so serious.'" The prosecutor then asked Patton, "So you sent that [text message] that morning from your phone, correct?" Patton answered, "Yes, sir." The prosecutor then asked, "To [Sissac's] phone?" Patton replied, "Yes, sir." The prosecutor then asked Patton what was Sissac's response, and Patton responded, "'I'ma call you later.'"

The prosecutor then asked Patton, "[D]id you send [Sissac] another text back a couple [of] minutes later?" Patton replied, "I did, sir." The prosecutor asked Patton what he said in that text, and Patton answered, "I said, 'You hear what I'm telling you? This is way back.'" The prosecutor asked what was Sissac's response, and Patton responded, "'I know.'"

At that point a juror indicated he was unable to see the time of that text indicated on the exhibit, and, at the court's request, the prosecutor then listed all the times of the texts. Defense counsel then stated, "Your Honor, I'm going to object as to lack of foundation for the times." In response, addressing the prosecutor, the court stated, "Well, all right, then, ask the witness, 'Are those the times of those texts?'" The prosecutor complied and asked Patton, "Are those the times of those texts?" Patton answered, "Yes, sir." Following up, the prosecutor asked, Patton, "When you think back, was it early morning, a couple of hours after this incident?" Patton replied, "Yes, sir."

The prosecutor then showed Patton People's exhibit No. 117, which depicted a portion of the text messages exchanged between Patton and Sissac later that evening. Patton confirmed that he sent a text to Sissac at 11:03 p.m. that stated, "Nigga, this ain't cool at all. I can't sleep or nothing. Yo, I didn't even do shit. You need to be a man and own up, Meech."

Patton testified he sent another text to Sissac two minutes later that stated, "You ain't thinking about my life, my fam[ily], and this shit hurts like fuck." The prosecutor asked whether he got any response to that text, and Patton answered, "No."

The prosecutor then asked Patton whether he sent another text message to Sissac at 11:13 p.m. that night, and Patton replied, "I did." When asked what he said to Sissac in the text, Patton replied, "'Do the right thing, please, yo.'" Patton testified that he got a response from Sissac at 12:00 a.m. that stated, "You have to pray." Patton also testified that he did not see that response until 9:00 a.m. the next morning. The prosecutor asked Patton, "How did you respond to that?" Patton answered, "I said, 'No, you pray, Nigga. That's some coward ass shit. I got nothing else to say.'"

Later in the trial, Deputy Pearce testified that he downloaded the contents of Patton's phone, the phone number of which was 564–1296. One of the contacts in Patton's phone was Meech (Sissac) with a phone number of 619–799–3642. Deputy Pearce also testified that several phone calls between Patton and Meech were listed in the incoming and outgoing call log of Patton's phone, and there were text messages to and from Meech. He further testified that he downloaded the contents of Sissac's phone that had a phone number of 619–799–3642 and contained a contact for "D" which listed Patton's phone number.

At the close of the prosecution's case-in-chief, the court admitted exhibit Nos. 116 and 117 into evidence without objection.

B. *Standard of Review*

"(A)n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

"The 'routine application of state evidentiary law does not implicate (a) defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.) A trial court's error under state law in the admission or exclusion of evidence following an exercise of discretion is properly reviewed for

16cv2287-BAS (JLB)

prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203 (*McNeal*).) Under the *Watson* harmless error test, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the (defendant) would have been reached in the absence of the error." (*Watson,* at p. 836.)

C. *Analysis*

We need not and do not reach the merits of Sissac's claim that the court erroneously admitted evidence of text messages (discussed, *ante*) that he and Patton exchanged with each other after the shooting incident because Sissac has not shown and cannot demonstrate that any such error was prejudicial. Assuming without deciding the court abused its discretion in admitting that evidence, and applying the applicable *Watson* harmless error test (*McNeal, supra,* 46 Cal.4th at p. 1203), we conclude—in light of the strong evidence of Sissac's guilt apart from the challenged text message evidence—that Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result absent the admission of the text message evidence.

As discussed more fully, *ante,* a video recording at the El Cajon trolley station shortly before Sissac, Patton, Glenn, Roy, and a fifth male got into Hamrah's taxicab the morning Hamrah was shot showed Sissac speaking to the taxicab drivers there. This evidence corroborated the testimony of Othman, one of the cab drivers at that station, who testified that a "black young man" {footnote: The record shows Sissac is an African-American who was born in mid-1992 and was 19 years of age at the time of the shooting in late October 2011} approached him with a $20 bill and begged him for a ride at around 3:30 a.m.; that Othman took the money to Hamrah, who was at the front of the cab line; and that the young Black male and four other Black males got into Hamrah's taxicab a few minutes later as shown in a video that was played for Othman.

The prosecution presented evidence that Sissac managed to obtain a $20 fare for the group to travel to Lemon Grove. {Footnote: Glenn testified Sissac said he wanted to "[d]itch a cab," which meant to get in the cab and not pay because they had no money}. Glenn's testimony established that he, Sissac, Patton, Roy, and the other male got into Hamrah's cab. Both Patton and Glenn testified that Sissac got into the front seat while the other four sat in the back seat.

The prosecution also presented testimony—apart from the challenged text message evidence—showing that Sissac made self-incriminating

34

statements. For example, Patton testified that, after he heard the gunshot, he heard someone say, "Meech [(Sissac)] shot the cab driver." Patton then testified that Glenn yelled at Sissac, "What the fuck did you do? Why the fuck did you do that?" Patton testified that Sissac looked at Glenn with a blank look on his face and said the cab driver had laughed or smiled at him. Any reasonable jury could find that such a response is an implicit admission demonstrating consciousness of guilt.

The trial record also shows that *before* the prosecutor presented to the jury the contents of exhibits Nos. 116 and 117 depicting various text messages found on Patton's cell phone, Patton testified from his own recollection that he texted Sissac later in the morning, after the shooting of Hamrah, and "asked [Sissac] to do the right thing and turn himself in."

Glenn's testimony placed Sissac in the front passenger seat of Hamrah's taxicab prior to the shooting and established that Sissac admitted to Glenn that he was the shooter. Specifically, Glenn testified that he, Sissac, Patton, Roy, and the fifth male got into the taxicab. {Footnote: Although Glenn did not identify Hamrah as the driver of the taxicab, an eyewitness– Naseer Yousif, another taxicab driver–testified that he saw five Black individuals get into Hamrah's cab around 3:30 a.m. on October 30, 2011.} Both Patton and Glenn testified that Sissac got into the front seat while the other four sat in the back seat. Glenn testified that, after he heard the gunshot, he asked Sissac, "What happened? What the fuck did you just do?" Glenn further testified that he "jump[ed] in [Sissac's] face" and told him, "You just smoked the cab driver." According to Glenn's testimony, Sissac told him, "Since *I'm the one that did it,* there's no need to take everybody down with me." (Italics added.)

The trial record also shows that Sissac made self-incriminating statements during Patton's second November 1 pretext phone call to him, which was recorded, transcribed, and played for the jury. Specifically, Patton told Sissac, "*To do some shit like that,* like *that's not my Nigga right there.*" (Italics added.) Sissac responded, "*Yeah, it wasn't me.* You know? You gotta, you gotta, what you gotta see is *that was the devil. . . .*" (Italics added.) Patton then asked Sissac, "[D]id you . . . [¶] . . . feel like the devil was in you?" Sissac replied, "Yeah. It was, I just—just fuckin' else that would do somethin' like that. *God wouldn't, wouldn't do nothing like that. He wouldn't put that in me. . . .* [¶] . . . [¶] . . . *That was the devil.*" (Italics added.) Patton also told Sissac, "[T]*his isn't [Sissac] that's doin' this. This is . . . somebody else inside of this dude.*" (Italics added.) Sissac responded, "*Yeah.* [¶ . . . [¶] . . . I mean it's sad to say this had to happen but it will turn me around, you know, so. . . ."

(Italics added.) Although Sissac challenges the admissibility of this evidence, for reasons we shall explain, *post,* the court did not err in admitting this evidence.

Circumstantial forensic evidence also supported the jury's finding that Sissac fatally shot Hamrah. The prosecution presented evidence establishing that the bullet recovered from Hamrah's body was consistent with having been fired from a .38–caliber weapon. Glenn testified he had given a .38–caliber gun to Sissac the day before the shooting.

In sum, Sissac has failed to meet his burden of showing that any error by the court in admitting evidence of the text messages between Patton and Sissac was prejudicial.

(Lodgment No. 5, <u>People v. Sissac</u>, No. D064910, slip op. at 9-18) (square bracketed changes in original).)

The United States Supreme Court has held that an inquiry into whether evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas review of a state conviction." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Id.</u> at 67-68. The Ninth Circuit, relying on <u>McGuire</u>, has noted that "[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." <u>Johnson v. Sublett</u>, 63 F.3d 926, 930 (9th Cir. 1995); <u>see also</u> <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.") (internal citations omitted).

Nevertheless, because the United States Supreme Court has not yet found that the admission of prejudicially irrelevant evidence violates due process, the state appellate court opinion, which did not determine whether a federal due process violation occurred but

16cv2287-BAS (JLB)

merely found that any state law evidentiary error was harmless, cannot, with one proviso addressed in footnote 2, be contrary to, or involve an unreasonable application of, clearly established federal law.  See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (observing that even though the petitioner received a fundamentally unfair trial as a result of the introduction of prejudicially irrelevant evidence, a federal habeas court applying AEDPA could not grant the writ on that basis because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.")

Setting aside this fatal flaw in Petitioner's position, Petitioner's claim two would also have to be denied because any error by the trial court was harmless.  In assessing the prejudicial impact of any federal constitutional error in a state-court criminal trial, a federal court must apply the harmless error standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993): whether the error "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 623.  "Under this standard, an error is harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'"  Padilla v. Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995) and citing Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")[2]

---

[2]    This is true even though the harmless error standard the California Court of Appeal applied is not the appropriate standard for evaluating the harmlessness of constitutional errors under United States Supreme Court law.  The Court of Appeal applied the harmless error standard established in People v. Watson, 46 Cal.2d 818, 836 (1956) (whether it was "reasonably probable that a result more favorable to the (defendant) would have been reached in the absence of the error") instead of the "harmless beyond a reasonable doubt" standard of Chapman v. California, 386 U.S. 18, 24 (1967) (holding that a federal

For the following reasons, any federal due process error in the admission of the text messages is harmless under <u>Brecht</u>. Patton testified that he heard a shot shortly after he walked away from the taxicab, heard someone from their group, either Roy or the unknown teenager, say that Petitioner had shot the driver, and then heard Petitioner respond to Glenn's question as to why he shot the driver by saying, with "a cold, blank look" on his face, that the driver had "laughed at him or smiled at him." (RT 442-44.) Glenn testified that when he confronted Petitioner moments after the shooting, Petitioner said: "Since I'm the one that did it, there's no need to take everybody down with me." (RT 653.) Glenn also testified that moments after the shooting he saw Petitioner with a handgun of a caliber that was consistent with the caliber of the ammunition that killed the driver, which Glenn had given him the previous day. (RT 655-56, 965-66.) Glenn testified that two or three days later Petitioner told Glenn he shot the driver because "the dude had laughed at him." (RT 654-55.) All of that testimony of Petitioner's actual admissions overshadowed the considerably weaker adoptive admissions in the text messages, which defense counsel was able to argue were not admissions at all, and which the prosecutor argued were adoptive admissions by virtue of Petitioner not denying he shot the driver.

Additional, strong evidence against Petitioner included the incriminating recorded telephone calls with Petitioner in which, among other things, he claimed the devil had taken hold of him and was responsible for his actions.

Petitioner supports his argument for the harmfulness of the admission of the text messages by pointing out that Patton's credibility was suspect because he knew how to

_____

constitutional error can be considered harmless only if a court is "able to declare a belief that it was harmless beyond a reasonable doubt.") Regardless of which harmless error standard the state court applied, however, this Court must use the <u>Brecht</u> standard to determine if federal habeas relief is available. <u>See</u> <u>Fry</u>, 551 U.S. at 121-22 ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in <u>Brecht</u>, <u>supra</u>, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in <u>Chapman</u>.")

16cv2287-BAS (JLB)

play the system and had a financial interest in testifying, as the District Attorney was paying him a monthly stipend for food and rent. The jury heard the evidence of this, as well as the countervailing evidence that the money was authorized only after a positive threat assessment, Patton moved away to protect his family from having to live with a snitch, and he had been good friends with Petitioner but did what his conscience told him was right even though it made him snitch on a friend he was as close to as family. Petitioner's contention that Glenn had an incentive to falsely identify him as the shooter because it was Glenn who had supplied the gun, and because Glenn did not testify that Petitioner made the admissions until after he was granted immunity with a virtual guarantee he would be released from custody upon testifying, was also heard and considered by the jury.

Even taking into consideration the credibility challenges faced by the prosecution's witnesses, the evidence in the case was strong enough that the admission of the text message evidence, even if erroneous, does not leave this Court with a "grave doubt" about its likely effect on the jury's verdict. Brecht, 507 U.S. at 623. Rather, the text messages amounted to much weaker admissions of guilt than those contained in the testimony of Patton and Glenn. In addition, Patton testified as to the contents of the texts, and they are cumulative to his testimony. Further, as discussed above, there was strong additional evidence of guilt admitted at trial.

The state court adjudication of this aspect of claim two alleging Petitioner's federal constitutional right to due process was violated because the text messages lacked an adequate foundation, were unauthenticated, and constituted unreliable double hearsay, is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts, and even if Petitioner could make such a showing, the Court finds any error is harmless.

Petitioner next claims the admission of the text messages violated his rights under the Confrontation Clause of the Sixth Amendment because: "The ultimate goal of the Confrontation Clause, from which the hearsay rule originates, is to ensure reliability of the evidence." (ECF No. 28-2 at 51.) He contends the text messages are hearsay which the

prosecutor never identified as falling into an exception, which were never authenticated, for which no foundation was laid by an expert witness, and which contain statements too vague to fit under the adoptive admissions exception. (Id. at 52-62.)

"The Sixth Amendment guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'" United States v. Romo-Chavez, 681 F.3d 955, 961 (9th Cir. 2012). However, the Confrontation Clause does not apply to non-testimonial evidence. Davis v. Washington, 547 U.S. 813, 821 (2006). Testimonial statements are the functional equivalent of court testimony, such as affidavits, depositions, confessions, or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available to use at a later trial." Crawford v. Washington, 541 U.S. 36, 51-52 (2004). Under that definition, the text messages are not testimonial under Crawford. Even assuming they are, Patton testified at trial regarding the content of the texts, and was subject to cross-examination. See Romo-Chavez, 681 F.3d at 961 ("All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections."), citing Crawford, 541 U.S. at 59 ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.")

In addition, a Confrontation Clause violation is subject to harmless error review. United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004). As discussed above, any error is harmless because Petitioner has not shown that the text messages had a "substantial or injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. The Court recommends denying relief as to this aspect of claim two.

Petitioner next contends that the introduction of the text messages deprived him of a fair trial and a reliable determination of guilt under the Eighth Amendment. The Supreme Court has stated that: "[T]he criminal trial has one well-defined purpose – to provide a fair and reliable determination of guilt." Smith v. Phillips, 455 U.S. 209, 225 (1982); see also Herrera v. Collins, 506 U.S. 390, 434 (1993) (recognizing that "at least in capital cases, the Eighth Amendment requires more than reliability in sentencing. It also mandates a reliable

determination of guilt.")  As just discussed, and as the state court observed, the evidence of the text messages were cumulative to Devin Patton's testimony, and were overshadowed by the evidence of Petitioner's admissions to Patton and Glenn after the shooting, as well as Glenn's testimony that Petitioner was then in possession of a gun consistent with that used to fire the fatal bullet.  Petitioner has not established that the state court rejection of this aspect of claim two alleging the deprivation of his right to a fair trial and a reliable determination of guilt is contrary to, or involves an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts.  Even if he could make such a showing, the Court would find any error harmless for the reasons discussed above.  See Brecht, 507 U.S. at 623.

Finally, with respect to the ineffective assistance of counsel aspect of claim two, Petitioner states that although his trial counsel objected pre-trial to a lack of foundation as to the times and dates of the texts, he did not re-raise these matters and failed to object at trial: (1) to the prosecution's failure to properly authenticate and lay a sufficient foundation for the text messages; (2) that they constituted double hearsay which did not fall into a hearsay exception on either level; and (3) that they were unduly prejudicial and confusing to the jury even if otherwise admissible.  (ECF No. 28-2 at 17-18, 67-70.)  Petitioner contends he was prejudiced by counsel's errors because there is a reasonable probability of a better outcome had the evidence been excluded.  (Id. at 70.)

Respondent answers that this claim can be denied notwithstanding the failure to present it to the state supreme court because the state appellate court's determination on direct appeal (that Petitioner was not prejudiced by counsel's failure to object because in light of the overwhelming evidence of guilt from the unchallenged evidence there is no reasonable probability of a better result had the texts been excluded), is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  (ECF No. 7-1 at 8-9.)

This aspect of claim two was presented to the state appellate court in a habeas petition.  (Lodgment No. 6 at 6-7.)  It was rejected on the basis that Petitioner did not show

16cv2287-BAS (JLB)

prejudice under <u>Strickland</u> because, "in light of the strong evidence of Sissac's guilt apart from the challenged text message evidence – Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result absent the admission of the text message evidence." (Lodgment No. 5, <u>People v. Sissac</u>, No. D064910, slip op. at 15-16.)

As the appellate court correctly noted, and as was discussed above in the context of harmlessness, the evidentiary value of the texts (adoptive admissions that Petitioner shot the victim), paled in comparison to the more persuasive testimony of Patton and Glenn. They both testified that Petitioner was in a position to shoot the driver (front passenger seat) and that he admitted shooting the driver afterward. Glenn testified that Petitioner, immediately after the shooting, and while in possession of a weapon with a caliber consistent with the recovered bullet, announced that he was the only one responsible for the shooting, and again admitted he was the shooter several days later. In addition, adoptive admissions similar to those provided in the text messages were contained in the recorded pretext call, and during deliberations the jury asked for and received a transcript of that call but did not ask to view the text messages. Finally, Devin testified as to the content of the texts, and their admission was cumulative to his testimony. It was objectively reasonable for the state appellate court to find that, even if defense counsel was deficient in challenging the admissibility of the evidence, there is no prejudice under <u>Strickland</u> because there does not exist "a probability sufficient to undermine confidence in the outcome" as a result of their admission. <u>Strickland</u>, 466 U.S. at 694; <u>Richter</u>, 562 U.S. at 105. The Court recommends denying relief as to the ineffective assistance of counsel aspect of claim two irrespective of Petitioner's failure to present it to the state supreme court.

### D. <u>Claim Three</u>

Petitioner alleges in claim three that the prosecution gained an unfair advantage by the admission of Detective Pearce's testimony that Petitioner must have deleted the text messages on his telephone, which the prosecutor argued showed a consciousness of guilt, and by the evidence that the telephones belonging to Petitioner and Roy called each other

in the days after the murder, which the prosecutor argued showed Roy lied when he said he never discussed the incident with Petitioner.  (ECF No. 28-1 at 19-20, 71-74.)  He claims that the evidence is foundationless, inadmissible, unreliable hearsay and its admission violated his federal constitutional rights to due process, a fair trial, confrontation and cross-examination of witnesses, and a reliable determination of guilt, and that his trial counsel's failure to object  to its introduction amounted to ineffective assistance of counsel.  (Id.)  Respondent answers only as to the ineffective assistance of counsel claim, arguing that the state appellate court denial, on the basis Petitioner did not show prejudice as a result of counsel's failure to object in light of the unchallenged evidence of guilt, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  (ECF No. 7-1 at 8-9.)

Petitioner presented all aspects of this claim, other than the ineffective assistance of counsel aspect, to the state supreme court in his petition for review.  (Lodgment No. 8 at 17-21.)  The Court will look through the silent denial by the California Supreme Court on to the last reasoned state court opinion addressing these aspects of claim three, the appellate court opinion on direct appeal.  Ylst, 501 U.S. at 803-06.

Petitioner claimed on direct appeal that Detective Pearce's opinion that Petitioner deleted the text messages was based on evidence produced by Pearce in preparing for trial, but it is possible an expert examination of Petitioner's telephone could reveal an innocent technical reason why the text messages were absent from his telephone.  (ECF No. 8-12 at 60-63.)  He also argued that the evidence that Roy called Petitioner in the days after the shooting suffered from the same admissibility problems as the text messages, and hampered his ability to challenge the credibility of Patton and Glenn with respect to their testimony to Petitioner's admissions immediately after the shooting because Roy testified that no one said anything after the shooting.  (Id. at 63-65.)  The appellate court denied the claim:

> In a related and somewhat convoluted claim, Sissac asserts that "[t]he prejudicially erroneous admission of the various foundationless, inherently unreliable purported records of cell phone activity led to additional

prejudicially erroneous errors; namely, the admission of the evidence that [(1)] Sissac had supposedly 'deleted' the purported text messages between him[self] and [Patton]," which the prosecution "cite[d] . . . as showing consciousness of guilt"; and (2) "that Sissac and Roy had phone contacts after the incident [citations] contrary to Roy's testimony that they did not communicate after the incident [citations]." In his reply brief, Sissac asserts that "the concern is . . . that the evidence was introduced to prove [he] 'deleted' text messages to hide his involvement in the shooting, and that Roy—whose credibility was crucial to the defense since his testimony refuted the notion of Sissac's guilt—was not a believable witness." This, he maintains, "is precisely how the prosecution argued this evidence." Sissac also asserts that "[t]he erroneous admission of these extrapolations and conclusions drawn directly from the erroneously admitted records of cell phone activity could only serve to exacerbate the violation of Sissac's fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt." These assertions are unavailing.

A. *Background*

Deputy Sheriff Daniel Pearce, a member of the computer crimes task force, performed cell phone data extraction using a tool called "Celebrite" on several cell phones involved in this matter. Deputy Pearce testified that on October 31, 2011, he downloaded the contents of Patton's cell phone, which had a phone number of 564-1296. Without a defense objection, he testified that one of the contacts in Patton's phone was Meech (Sissac) with a phone number of 619-799-3642. Several phone calls between Patton and Meech were listed in the incoming and outgoing call log of Patton's phone. There also were text messages to and from Meech.

Deputy Pearce also testified that on November 15, 2011, he downloaded the contents of Sissac's cell phone which had a phone number of 619–799–3642. Sissac's phone contained contacts for "Little Ant" (Roy), "D" (Patton), and "Jodi" (Glenn). He also testified there were several text messages to and from Sissac on Patton's phone, and these text messages were not on Sissac's phone. The prosecutor then asked Deputy Pearce, "Based on that, what do you attribute that to?" Deputy Pearce replied: "There's only two reasons that text messages really wouldn't be on the phone. One is you have your phone turned off, you didn't use it. In this case, we know it's not true because we have corresponding text messages on Mr. Patton's phone. *The other reason would be that text messages were deleted off the phone.*" (Italics added.)

During his closing argument, the prosecutor argued that Sissac "hid the evidence when we're talking about the text messages."

B. *Analysis*

We reach the merits of Sissac's claim of prejudicial error notwithstanding the Attorney General's assertion that Sissac "has forfeited his claim that the phone records were erroneously admitted" because "[d]efense counsel did not object to Deputy Pearce's testimony regarding the data extraction he conducted from the various cell phones."

With regard to the merits of his claim, Sissac asserts that, apart from the forfeiture issue raised by the Attorney General, "[t]he only real issue[] here" is "whether the erroneous admission of this evidence was prejudicial."

As we did with respect to Sissac's preceding claim that the court erroneously admitted evidence of text messages, we shall assume without deciding that the court abused its discretion in admitting the additional evidence he challenges here and apply the applicable *Watson* harmless error test. (*McNeal, supra,* 46 Cal.4th at p. 1203.)  We conclude—in light of the strong evidence of Sissac's guilt apart from both the challenged text message evidence and the evidence challenged here—that Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result absent the assumed evidentiary error.  In claiming in his opening brief that he suffered prejudice that "served to exacerbate the violation of [his] fundamental constitutional rights," Sissac largely disregards the plethora of strong evidence of his guilt, discussed, *ante,* which we incorporate by reference here.

In his reply brief, Sissac asserts that "[t]he testimony of [Patton] and Glenn—the only witnesses who claimed to have seen or heard [him] incriminate himself in the shooting—was rife with obvious bias and reliability problems."  Sissac further asserts that, "[b]esides this testimony of dubious weight and credibility, the only other potential evidence [of his guilt]," other than Deputy Pearce's testimony that he (Sissac) deleted the text messages he and Patton exchanged after the shooting, was the evidence of Patton's pretext call to him.  These assertions are unavailing because it is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a credibility determination depends (*People v. Manibusan* (2013) 58 Cal.4th 40, 87), and—again, as we shall explain, *post* —the court properly admitted strong evidence that Sissac made self-

incriminating statements during Patton's second November 1 pretext phone call to him.

(Lodgment No. 5, <u>People v. Sissac</u>, No. D064910, slip op. at 19-22) (square bracketed changes in original).)

For the same reasons discussed above in claim two, the state court adjudication of Petitioner's claim that his federal due process rights were violated by the admission of this evidence cannot be contrary to or involve an unreasonable application of clearly established federal law because the Supreme Court has not ruled that the admission of overly prejudicial or irrelevant evidence violates due process. <u>Holley</u>, 568 F.3d at 1101. In addition, even if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d), or they did not apply, he can obtain federal habeas relief only if he shows the alleged error in the introduction of the evidence had a "substantial or injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623, quoting <u>Kotteakos</u>, 328 U.S. at 765 ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

Detective Pearce testified that he found the text messages which Patton testified he exchanged with Petitioner only on Patton's telephone and not on Petitioner's, leading him to conclude Petitioner must have deleted them. (RT 888-89.) The prosecutor argued to the jury in closing that: "He flees from the scene. He hid the evidence. He hid the evidence when we're talking about the text messages. He got rid of the gun. He hid the sweatshirt that he had on. It wasn't at his residence." (RT 1261.) The prosecutor also commented on: "The attempt by the defendant to hide the evidence. He discarded the sweatshirt, the gun, deleted his text messages." (RT 1368.) Although the prosecutor argued Petitioner showed a consciousness of guilt by, among other things, deleting the texts, other evidence showed an even stronger consciousness of guilt, such as his statements to Glenn and Patton immediately after the shooting that he was solely responsible for the shooting, and his statements to Patton during the pretext call that it was the devil inside him that made him

16cv2287-BAS (JLB)

shoot. That is in addition to his admission to Glenn immediately after the shooting and again weeks later that he was the shooter, and his being in possession of a firearm of a caliber consistent with the bullet used to kill the victim seconds after the victim was shot. The Court finds that the state court adjudication of this aspect of claim three alleging a federal due process violation from Detective Pearce's testimony that Petitioner must have deleted the texts, is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), and even if Petitioner could satisfy that standard, any error is harmless. <u>Brecht</u>, 507 U.S. at 623; <u>Kotteakos</u>, 328 U.S. at 765.

Petitioner also alleges his federal constitutional right to due process was violated by the admission of evidence that the telephones belonging to Petitioner and Roy called each other numerous times in the days after the murder, which the prosecutor used to argue Roy lied when he denied discussing the incident with Petitioner. Patton testified that, as he ran from the taxicab, Roy and the unknown male were right behind him, Roy was crying and frantic, and when Petitioner and Glenn caught up they all discussed what had happened. (RT 441-44.) Glenn testified that when all five of them met behind the Home Depot he discussed the shooting with Petitioner, that Patton was hysterical at that point, and that Roy "was crying. 'I got kids. I can't do this, whoopty-whoop. I can't be a part of this.'" (RT 652-53.) Roy testified that all five men were together immediately after the shooting but no one in the group said anything about what happened, and in fact "didn't talk about nothing," even though Roy said they stayed together on the porch of his house behind the Home Depot for twenty or thirty minutes after the shooting. (RT 789, 792-93, 813, 820-21.) He denied ever speaking to Petitioner about the events that night. (RT 793.) When confronted with the evidence that his telephone contacted Petitioner's telephone in the next couple of days, he denied speaking to Petitioner and said his sister may have used his telephone to call Petitioner. (RT 810-12, 830-35.)

Petitioner has not established that challenging Roy's testimony with the cell phone evidence had a substantial and injurious effect or influence on the jury's verdict. The jury was allowed to view Roy's testimony in the context of the evidence presented at trial

16cv2287-BAS (JLB)

regarding the stigma attached to testifying against friends and family, and the fact that Roy is Petitioner's cousin. If, as Petitioner contends, Roy was an otherwise credible witness, the jury could have credited his explanation that his sister used his telephone to call Petitioner. Even so, Roy's testimony confirmed Petitioner was likely the shooter, as he testified consistently with Patton and Glenn that he heard the gunshot while he ran from the taxicab ahead of Petitioner. The Court is not in grave doubt that the admission of evidence that Roy's telephone called Petitioner's telephone in the days after the murder had a substantial and injurious effect or influence on the jury's verdict. Thus, even if it was admitted without a proper foundation or authentication, and assuming the error amounted to a violation of federal due process, it is harmless. Brecht, 507 U.S. at 623; Kotteakos, 328 U.S. at 765.

Petitioner next contends the failure to authenticate and lay a foundation for that evidence interfered with his Sixth Amendment right to confront and cross-examine Detective Pearce and Roy. The state court's rejection of the Confrontation Clause aspect of this claim could not be contrary to or involve an unreasonable application of clearly established federal law because Roy and Detective Pearce both testified at trial and were cross-examined. See Romo-Chavez, 681 F.3d at 961 ("All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections."), citing Crawford, 541 U.S. at 59 ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.") Neither has Petitioner shown that the state court adjudication is based on an unreasonable determination of the facts. Thus, the state court adjudication is objectively reasonable, and even if Petitioner could show otherwise, any error is harmless for the reasons discussed above.

Petitioner's contention that his Eighth Amendment rights to a fair trial and a reliable determination of guilt were violated by Detective Pearce's testimony and the evidence that Roy's telephone called Petitioner's telephone is likewise without merit. Petitioner has not established that the state court rejection of this aspect of claim three is contrary to, or

involves an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Even if he could make such a showing, any error would be harmless for the reasons discussed above.

The Court next turns to the ineffective assistance of counsel aspect of claim three which was presented to the state appellate court in a habeas petition. (Lodgment No. 6 at 7-8.) It was denied in an order which stated: "For reasons explained in our opinion in the direct appeal, we reject Sissac's claims." (Lodgment No. 7, In re Sissac, No. D065927, order at 1.)

The state court adjudication of the ineffective assistance of counsel aspect of claim three is also objectively reasonable. As quoted above, the appellate court on direct appeal: "conclude[d]–in light of the strong evidence of Sissac's guilt apart from both the challenged text message evidence and the evidence challenged here–that Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result absent the assumed evidentiary error." (Lodgment No. 5, People v. Sissac, No. D064910, slip op. at 21.)

To the extent the jury drew an inference of consciousness of guilt from the absence of the texts on Petitioner's telephone, that evidence was cumulative to other, stronger evidence of consciousness of guilt, including, for example, testimony by Glenn and Patton that Petitioner agreed to turn himself in and take full responsibility for the shooting, and the evidence that Glenn had given Petitioner a gun of a caliber consistent with the bullet with which the victim was killed and Petitioner was holding that gun moments after the shooting. There does not exist "a probability sufficient to undermine confidence in the outcome" as a result of the admission of this evidence. Strickland, 466 U.S. at 694. The state court adjudication of the ineffective assistance of counsel aspect of claim three is therefore neither contrary to, nor does it involve an unreasonable application of, clearly established federal law, and it is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

/ / /

## E.    Claim Four

Petitioner alleges in claim four that the admission of the pretext call from Patton violated his federal constitutional rights to due process, a fair trial, a reliable determination of guilt, and confrontation and cross-examination of witnesses, because his statements during the call were vague and ambiguous as to any admission of guilt, and that he received ineffective assistance of counsel by trial counsel's concession it contained adoptive admissions.  (ECF No. 28-1 at 20-21, 75-81.)  Respondent answers only as to the state appellate court denial of the ineffective assistance of counsel aspect of this claim, arguing that the denial of the claim, on the basis that Petitioner did not show prejudice as a result of counsel's failure to object because the unchallenged evidence overwhelmingly established guilt, is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (ECF No. 7-1 at 8-9.)

Petitioner presented all aspects of this claim, other than the ineffective assistance of counsel aspect, to the state supreme court in the petition for review after presenting the claim to the state appellate court on direct appeal.  (Lodgment No. 3 at 56-63.)  The Court will look through the silent denial by the state supreme court and apply the provisions of 28 U.S.C. § 2254(d) to the appellate court opinion on direct appeal with respect to the evidentiary aspects of claim four.  Ylst, 501 U.S. at 803-06.

Petitioner alleged on direct appeal that because the pretext call did not contain adoptive admissions "it was fundamentally unfair to allow the prosecution to present this inherently unreliable hearsay evidence as a proxy for the jury to draw such inferences and thereby artificially bolster the prosecution's theory of the case that Sissac was his own worst witness against himself."  (ECF No. 8-12 at 64-70.)  The appellate court stated:

> Sissac next contends the court violated his fundamental constitutional rights to due process, to a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt by erroneously admitting evidence of the pretext call that Patton made to him on November 1, 2011, following the killing of Hamrah.  This contention is unavailing.

## A. *Background*

Prior to trial, in its trial brief, the prosecution argued that Sissac's statements to Patton in two pretext phone calls and a jail phone call were admissible as admissions of a party opponent pursuant to section 1220. During a pretrial hearing, the prosecution explained that Patton made two pretext phone calls to Sissac, one at 5:45 p.m. on November 1, 2011, and another at 10:42 p.m. that same night. The prosecution also sought admission of a jail call on November 2, 2011, between Sissac and his mother. Defense counsel argued the statements in the pretext call were "not true admissions," but conceded they were statements made by a party opponent.

The court indicated it would review the transcripts of the phone calls before it determined whether they were admissible. The court later indicated its tentative ruling was that the first pretext phone call and the jail phone call were inadmissible, but the second pretext phone call "has some incriminating language in it and would therefore be admissible." The prosecutor requested that the court listen to the actual recordings of the phone calls before making its rulings. When the trial court asked defense counsel whether he opposed admission of the second pretext phone call, defense counsel responded, "I'm conceding that the [second pretext phone call] has admissions, Your Honor, what could be deemed admissions."

The next day, outside the presence of the jury, the prosecution played the first pretext phone call and the jail phone call for the court. After argument by both counsel, the trial court reiterated its earlier ruling and excluded the first pretext phone call and the jail call, stating that those conversations "at best, are vague, speculative, they're ambiguous. There's no specific adoptive admission and even if there is, it's, at most, confusing to the jury. Those conversations are excluded." The court also reaffirmed its earlier ruling allowing the prosecution to present evidence of the second pretext phone call that Patton made to Sissac.

### 1. *Admission of Sissac's statements during the second pretext phone call*

At trial, the recording of Patton's second pretext phone call to Sissac, which started at 10:42 p.m. November 1, 2011, was played for the jury. Copies of the transcript of that phone call were handed out to the jurors. During that phone call, Patton told Sissac, "[I]t's . . . just fuckin' a stressful situation that I'm in right now," and Sissac replied that it "ain't your situation to stress" and that "you just got to let it go." Patton asked, "[W]hat does God say to you, you know, like, what is this doin' for you?" Sissac eventually

replied, "You know all sin is forgiven."  Patton indicated that he might need to talk to Sissac's pastor, and stated that "I need to fuckin' get an appointment with his ass" because "he got you all kinds of calm."  Responding that he had talked to his pastor, Sissac offered to take Patton to see him.

Sissac also told Patton during the pretext call that "everything happens for a reason.  You know, this is just an eye opener. . . ."  Shortly thereafter Patton said, "I don't want to look at you in a different light like that," and "that night, . . . I just didn't see Meech."  {Footnote: At trial Patton testified he knew Sissac as Meech.}  Patton added, "*To do some shit like that,* like *that's not my Nigga right there.*"  (Italics added.)  Sissac responded, "*Yeah, it wasn't me. You know?*  You gotta, you gotta, what you gotta see is *that was the devil.* . . ."  (Italics added.)  Patton then asked Sissac, "[D]id you . . . feel like the devil was in you?"  Sissac replied, "Yeah.  It was, I just—just fuckin' else that would do somethin' like that.  *God wouldn't, wouldn't do nothing like that. He wouldn't put that in me.*  [¶] . . . [¶] . . . *That was the devil.*"  (Italics added.) Patton also told Sissac, "[T]*his isn't* [*Sissac*] *that's doin' this.  This is . . . somebody else inside of this dude.*"  (Italics added.)  Sissac responded, "*Yeah.* [¶] . . . [¶] . . . I mean it's sad to say this had to happen but it will turn me around, you know, so . . . ."  (Italics added.)

Later during that recorded phone conversation, Patton asked Sissac whether he got "any money out of it."  Sissac responded, "No, I didn't." Patton told Sissac that the "devil makes you do crazy things," and Sissac replied, "He does, and that's what you need to know."  Patton said, "I don't never want to hear no shit like that.  *I don't know who the fuck you was that night dog but don't ever be that person again*.  You feel me?  That's not you . . . ."  (Italics added.)  Sissac responded, "*Yeah.*"  (Italics added.)  The phone call ended soon thereafter.

2. *Jury instructions*

The court instructed the jury regarding adoptive admissions under CALCRIM No. 357:

> "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in his presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the

circumstances, naturally have denied the statement if he thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

The court also instructed under CALCRIM No. 358 regarding evidence of a defendant's statements:

"You have heard evidence that the defendant made oral or written statements before the trial. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

B. *Adoptive Admission Exception to the Hearsay Rule* (§ *1221*)

Section 1221 codifies the adoptive admission exception to the hearsay rule and provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

The California Supreme Court has explained that, "[u]nder [section 1221], '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.' [Citation.] 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence,

evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

C. *Analysis*

We reach the merits of Sissac's claim of prejudicial error notwithstanding the Attorney General's assertion that Sissac "has forfeited the instant claim."

Sissac contends his statements to Patton during the recorded pretext phone call were not adoptive admissions of guilt within the meaning of the adoptive admission exception to the hearsay rule because "they did not express any sort of adoptive admission of guilt and, to the extent one might be able to glean such an inference from them, the vagueness and ambiguity of the statements ultimately rendered them too confusing to be admitted for this purpose." In support of this contention, he asserts that the statements he and Patton made during the call "vaguely refer to 'this' or 'that' in describing the topic of [his] conversation[] [with Patton], leaving it simply unclear as to just what (he and Patton) were discussing."

Sissac's claims that his and Patton's references to "this" and "that" in describing the topic of their conversation rendered his statements "too confusing" to be admitted as adoptive admissions and that his statements to Patton "did not express any sort of adoptive admission of guilt," are unavailing. The evidence shows that Hamrah was shot during night time in the early morning hours of October 30, 2011, and Patton made his pretext call to Sissac at 10:42 p.m. at the direction of the police two nights later on November 1. During their phone conversation, Patton, in a statement accusing Sissac (whom he knew as Meech) of wrongdoing that night, said, "[*T*]*hat night,* I just didn't see Meech," and added, "To do *some shit* like that, like that's not, that's not my Nigga right there." Any rational jury could infer from Patton's accusatory statement, in light other properly admitted evidence (discussed, *ante* ) showing that Sissac shot Hamrah, that Patton was accusing Sissac of shooting Hamrah during the night of October 29–30, and that Sissac would have denied the accusation if it were not true. A rational jury also could infer that Sissac's response to Patton's accusation was an implied or adoptive admission of guilt. Sissac responded to the accusation by telling Patton, "Yeah, it wasn't me. You know? You gotta, you gotta, what you gotta see is that was the devil . . . ." A rational jury could infer from this response that Sissac was expressing consciousness of guilt by impliedly admitting he committed the act, but "the devil" made him do it. We conclude that the

evidence of the statements made by Sissac and Patton during the pretext call was relevant to the central factual issue of whether Sissac shot Hamrah, and that the court properly found that evidence was admissible under the adoptive admission exception to the hearsay rule codified in section 1221.

(Lodgment No. 5, <u>People v. Sissac</u>, No. D064910, slip op. at 22-28) (square bracketed changes in original).)

The state court's adjudication of the Confrontation Clause aspect of this claim is neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner has cited no authority for the proposition that his own statements on the pretext call are testimonial within the meaning of the Sixth Amendment or otherwise implicate the Confrontation Clause.  See <u>Crawford</u>, 541 U.S. at 51-52 (indicating that testimonial statements are the functional equivalent of court testimony, such as affidavits, depositions, confessions, or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available to use at a later trial."); <u>United States v. Crowe</u>, 563 F.3d 969, 976 n.16 (9th Cir. 2009) ("[D]efendant does not explain how her own out-of-court statements raise hearsay or Confrontation Clause concerns, . . . and at trial, her counsel could – and did – cross-examine the [other party to the conversation].")  Again, as with claims two and three, even if Petitioner can demonstrate that the introduction of the pretext call violated his right to federal due process, he can prevail here only if its introduction had a "substantial or injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 623.  Petitioner's failure to deny during the pretext call that he shot the taxicab driver was an adoptive admission the evidentiary weight of which was far exceeded by the direct admissions he made to Patton and Glenn.  As the state court observed, that evidence, coupled with Glenn's testimony that seconds after the shooting Petitioner was in possession of a gun of a caliber consistent with the bullet which killed the victim, overwhelmed any adoptive admission in the pretext call. After considering "all that happened without stripping the erroneous action from the whole," the Court is not left with a grave doubt that the admission of the pretext call had a substantial and injurious effect or influence on the jury's verdict.  <u>Kotteakos</u>, 328 U.S. at

765; Brecht, 507 U.S. at 623. The Court recommends habeas relief be denied as to the due process aspect of claim four.

Petitioner's contention that his Eighth Amendment right to a reliable determination of guilt was violated by the pretext call is also without merit. Petitioner has not established that the state court adjudication is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts. Even if he could make such a showing, any error would be harmless for the reasons discussed above.

Finally, with respect to Petitioner's contention that counsel was deficient in conceding that the pretext call contained adoptive admissions (ECF No. 28-2 at 20), this claim was presented to the state appellate court in a habeas petition. (Lodgment No. 6 at 8-9.) It was denied in an order which stated: "For reasons explained in our opinion in the direct appeal, we reject Sissac's claims." (Lodgment No. 7, In re Sissac, No. D065927, order at 1.)

At a pretrial hearing Petitioner's trial counsel first argued that the statements in the pretext call "are not true admissions." (RT 46.) After the trial court ruled it contained "some incriminating language" (RT 79), defense counsel stated: "I'm conceding [it] has admissions, your honor, what could be deemed admissions." (RT 82.) Defense counsel argued to the jury that Petitioner's statements in the pretext call were reasonable responses to Patton's vague attempts to get him to confess, which could reasonably be interpreted through the lens of the presumption of innocence as not containing admissions at all, but rather expressing a heartfelt regret for being present when the driver was killed, not for pulling the trigger; and counsel pointed out that, although the call was scripted by the police, Petitioner was never asked "the money question": if or why he shot the taxicab driver. (RT 1331-33.) The prosecutor began his rebuttal closing argument by playing the recording of the pretext call and inviting the jury "to listen to what are adoptive admissions, where anybody in their right mind, if somebody was saying that to them would jump up and say 'what are you talking about? I had nothing to do with this.' But that's not what was

said.  To characterize it differently is just wrong." (RT 1351-52.)  About midway through their deliberations the jury asked for and was given a transcript of the pretext call.  (CT 344.)

The state appellate court denied the ineffective assistance of counsel aspect of this claim in an order which stated: "For reasons explained in our opinion in the direct appeal, we reject Sissac's claims."  (Lodgment No. 7, In re Sissac, No. D065927, order at 1.)  As quoted above, the appellate court on direct appeal concluded that Petitioner "was expressing consciousness of guilt by impliedly admitting he committed the act, but 'the devil' made him do it.  We conclude that the evidence of the statements made by Sissac and Patton during the pretext call was relevant to the central factual issue of whether Sissac shot Hamrah, and that the court properly found that evidence was admissible under the adoptive admission exception to the hearsay rule codified in section 1221." (Lodgment No. 5, People v. Sissac, No. D064910, slip op. at 28.)

It is unclear whether the state appellate court, in denying the ineffective assistance of counsel aspect of this claim on the same basis it denied the underlying evidentiary claim (i.e., because the call was admissible as containing adoptive admissions) was addressing the performance or the prejudice prong of Strickland or both.  To the extent the appellate court addressed one prong without addressing the other, a de novo review is required in this Court of the omitted prong.  See Wiggins v. Smith, 539 U.S. 510, 534 (2003) (reviewing de novo the question whether petitioner suffered Strickland prejudice where the state court adjudication of the claim was predicated only on the Strickland deficient performance prong).  Even if it is unclear which prong the state court relied on, federal habeas relief can nevertheless be denied based on a de novo review of the claim.  See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (holding that irrespective of whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one); Strickland, 466 U.S. at 687 (holding that a petitioner must establish both deficient performance and prejudice to establish ineffective assistance of counsel).

Because the appellate court found the pretext call was admissible as containing adoptive admissions, and because the trial judge made the same determination after defense counsel argued they contained no admissions at all, Petitioner has not established deficient performance by his trial counsel's concession they "arguably" contained such admissions. That is particularly so in light of counsel's argument to the jury that the pretext call did not contain admissions but showed an expression of empathy for everyone involved in the situation. See Strickland, 466 U.S. at 687 (holding that deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.") Neither has Petitioner shown he was prejudiced under Strickland. Petitioner points to the fact that the jury asked for the transcript of the pretext call during deliberations despite having heard the recording twice during trial. It appears at least as likely they did so in order to determine whether Petitioner had formed the intent for murder rather than, as Petitioner contends, to judge the credibility of Patton, Glenn and Roy. In any case, because any adoptive admissions in the pretext call were cumulative to, and weaker than, evidence that Petitioner admitted he shot the driver immediately after the shooting while holding a gun of a caliber consistent with that of the bullet fired in the shooting, and again several days later, Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" as a result of his trial counsel's concession that the pretext call arguably contained adopted admissions. Strickland, 466 U.S. at 694. The state court adjudication of the ineffective assistance of counsel aspect of claim four is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Furthermore, even if this claim were subject to de novo review, the Court's recommendation would be the same.

**F.  Claim Five**

Petitioner alleges in claim five that admission of the improper lay opinions of Patton and Glenn regarding ultimate legal and factual issues violated his federal constitutional rights to due process, a fair trial, a reliable determination of guilt, and confrontation and

cross-examination of witnesses, and that counsel was ineffective for failing to object to the introduction of that evidence. (ECF No. 28-1 at 21-23, 81-85.) Respondent argues that the state appellate court denial of the ineffective assistance of counsel aspect of this claim, on the basis that Petitioner did not show prejudice as a result of counsel's failure to object because the unchallenged evidence overwhelmingly established guilt, is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. (ECF No. 7-1 at 9-10.)

Petitioner presented all aspects of this claim, other than the ineffective assistance of counsel aspect, to the state supreme court in his petition for review. (Lodgment No. 8 at 25-27.) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 9.) The claim was presented to the state appellate court on direct appeal, absent the ineffective assistance aspect. (Lodgment No. 3 at 63-66.) A footnote in his appellate brief indicated Petitioner had filed a contemporaneous habeas petition arguing he received ineffective assistance of counsel in this respect. (Id. at 2 n.2.) The appellate court, despite denying the motion to consolidate the habeas petition with the direct appeal, found that although Petitioner had forfeited the evidentiary claim by failing to object at trial, he did not receive ineffective assistance of counsel in that respect. (Lodgment No. 5.)

The Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal, Ylst, 501 U.S. at 803-06, which stated:

> Sissac also claims the court prejudicially abused its discretion and violated his federal constitutional right to a jury trial by erroneously admitting improper lay opinion testimony by both Patton and Glenn on "the central factual and legal issues that *the jury* was to decide." Specifically, he asserts the court prejudicially erred (1) by allowing Patton to testify that the victim (Hamrah) was "innocent" and that what Sissac had done was a "sin," it was "wrong," and it was "murder"; and (2) by permitting Glenn to testify that Sissac "murder[ed]" the victim. Sissac also contends his trial counsel rendered prejudicial ineffective assistance of counsel by failing to object to this testimony as improper opinions. Sissac's contentions are unavailing.

Sissac forfeited his claim of prejudicial evidentiary error by failing to object at trial to the foregoing testimony on the ground it constituted inadmissible lay opinion. [Evidence Code] Section 353 precludes a party from complaining on appeal that evidence was inadmissible on a certain ground unless he or she made a timely and specific objection on that ground below. (§ 353, subd. (a).) {Footnote: Section 353, subdivision (a) provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason on the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."} Here, the record shows that defense counsel did not object to any of the foregoing testimony on the ground that it constituted inadmissible lay opinion.

We reject Sissac's claim of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and, of particular importance here, (2) that the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) To show prejudice, the defendant must show a reasonable probability he would have received a more favorable result had his counsel's performance not been deficient. (*Strickland,* at pp. 693–694; *Ledesma,* at pp. 217–218.) We conclude that, in light of the strong evidence of Sissac's guilt (discussed, *ante*) that does not include the lay opinion testimony challenged here, Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result but for his counsel's failure to object to Patton's and Glenn's lay opinion testimony. We note that Sissac, in arguing he was prejudiced by his trial counsel's failure to properly object to this testimony, disregards the plethora of strong evidence of his guilt, which we incorporate by reference here.

(Lodgment No. 5, <u>People v. Sissac</u>, No. D064910, slip op. at 28-30) (square bracketed changes in original).)

The state appellate court's finding of a lack of prejudice is an objectively reasonable application of the <u>Strickland</u> prejudice prong. Glenn's response that "I don't believe in murdering nobody" came in response to the question whether he felt responsible because he had supplied Petitioner with the gun used to shoot the victim. (RT 656.) Patton's

60

16cv2287-BAS (JLB)

response that there are "certain things I can't live with, sir. Murder isn't – murder is just not one of them" came in response to the prosecutor asking why he had decided to come forward. (RT 473.) When asked what he did when he woke up the morning after the killing, Patton said he started texting Petitioner in order to try to get him to come forward because: "What happened that night was crazy, I know, but the victim, he was – the cab driver, he was innocent." (RT 444-45.) Defense counsel immediately objected to that answer on hearsay grounds but was overruled, and Patton was then asked "what did you text him," to which Patton replied: "I asked him to man up and I asked him to turn himself in because if he didn't, things were going to get really bad, things like this is what I was saying to him, things like this don't just pass over, this is a sin." (Id.) Without having been able to anticipate this testimony, trial counsel was left with the less-than-ideal option of moving to strike afterward.

Petitioner's trial counsel may well have had a strategic reason to avoid moving to strike the opinions and thereby calling the jury's attention to the quite reasonable basis Patton and Glenn had for their opinions, that the killing was unprovoked. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") Either way, whether the testimony was heard by the jury and then stricken or heard by the jury and left to lie did not reasonably change the probability of a more favorable outcome. Id. at 694 (prejudice is shown by the existence of "a probability sufficient to undermine confidence in the outcome.")

Importantly, the opinions of Patton and Glenn were based on their observations that the taxicab driver was friendly, the ride was pleasant and fun, and that Petitioner shot the driver for no apparent reason. Thus, their testimony was based on their observations that the driver did not provoke the shooting or do anything to deserve to be shot. The jury was instructed:

> Witnesses who were not testifying as experts gave their opinions during the trial. You may, but are not required to accept those opinions as true or accurate. You may give the opinions whatever weight you think appropriate.

Consider the extent of the witnesses' opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion and the facts or information on which the witness relied on forming that opinion. [¶] <u>You must decide whether information on which the witness relied was true and accurate.</u> You may disregard all or any part of an opinion that you find unbelievable, unreasonable or unsupported by the evidence.

(RT 1247) (emphasis added).

Thus, the jury would not have credited the opinions under that instruction unless they also believed the testimony.

This Court is not persuaded, based on the strength of the evidence in this case as discussed repeatedly above, that the characterizations by these witnesses of the victim's innocence (which was not in dispute) or the lack of rational motive for the shooting (which was not in dispute) had a substantial and injurious effect or influence on the jury's verdict. In light of all of the evidence, and in light of the jury's instruction to consider the information upon which the lay opinions of Patton and Glenn were based, there does not exist a reasonable probability of a more favorable outcome had counsel objected to the offending testimony. Accordingly, the state court adjudication of this aspect of claim five, on the basis that Petitioner was not prejudiced by counsel's failure to object, is neither contrary to, nor an unreasonable application of, federal law as clearly established by <u>Strickland</u>, and is not based on an unreasonable determination of the facts.

With respect to the aspects of claim five alleging violations of Petitioner's right to due process, to a fair trial, to confront witnesses, and to a reliable determination of guilt, the state appellate court found they had been forfeited by defense counsel's failure to object. Respondent has waived the affirmative defense of procedural default by failing to raise it in the Answer. <u>See</u> <u>Trest v. Cain</u>, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv(e)' if it is not to 'lose the right to assert the defense thereafter.'"), quoting <u>Gray v. Netherland</u>, 518 U.S. 152, 166 (1996); <u>Francis v. Rison</u>, 894 F.2d 353, 355 (9th Cir. 1990) (holding that a federal habeas

court is not required to raise procedural default sua sponte when the State has waived the defense).

The Court has discretion to deny the procedurally defaulted aspect of claim five for the same reasons set forth above regarding the technically exhausted and procedurally defaulted ineffective assistance of counsel claims. As with claims two through four, Petitioner can prevail only if the introduction of the opinion evidence had a "substantial or injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. Assuming the admission of the testimony violated Petitioner's federal rights to due process, to a fair trial, to confront witnesses, and to a reliable determination of guilt, any such errors are clearly harmless. The opinions of Glenn and Patton that Petitioner's shooting of the taxicab driver was a sin and amounted to murder were based on their observations that Petitioner shot the driver for no apparent reason, and the jury was instructed they must take that into account. "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them." Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985). Thus, the jury would not have credited the opinions under that instruction unless they also believed the underlying testimony. After considering "all that happened without stripping the [admission of the opinion testimony] from the whole," the Court is not left with a grave doubt that the admission of the opinions by Patton and Glenn had a substantial and injurious effect or influence on the jury's verdict. Kotteakos, 328 U.S. at 765; Brecht, 507 U.S. at 623. The Court recommends habeas relief be denied as to these aspects of claim five.

## G. Claim One

Finally, Petitioner alleges in claim one that the cumulative and synergistic effect of the admission of the evidence challenged in all of his other claims violated his federal constitutional rights to due process, a fair trial, a reliable determination of guilt, and to confrontation and cross-examination of witnesses, and he received ineffective assistance
/ / /

of counsel as a result of his trial counsel's handling of that evidence.  (ECF No. 28-1 at 15-17, 45-47.)

Respondent argues that the state appellate court denial of this claim, on the basis that the "claims of evidentiary error are unavailing because any errors that occurred were harmless, whether considered individually or collectively," is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  (ECF No. 7-1 at 10.)

Petitioner presented this claim, absent the ineffective assistance of counsel aspect, to the state supreme court in his petition for review.  (Lodgment No. 8 at 27.)  That petition was denied with an order which stated: "The petition for review is denied."  (Lodgment No. 9.)  The same claim was presented to the state appellate court on direct appeal, but included an ineffective assistance of counsel aspect to the cumulative error claim.  (Lodgment No. 3 at 24-26.)  The appellate court denied the claim in a written opinion.  (Lodgment No. 5.)  The Court will look through the silent denial by the state supreme court to the last reasoned state court opinion addressing the cumulative error aspect of claim one, the appellate court opinion on direct appeal.  *Ylst*, 501 U.S. at 803-06.  That court stated:

> Last, Sissac contends the cumulative effect of all of the foregoing claimed evidentiary errors was prejudicial and warrants reversal of the judgment.  We reject this contention.
>
> "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  A defendant is "entitled to a fair trial but not a perfect one."  (*Ibid.*)
>
> Here, we have concluded that all of Sissac's claims of evidentiary error are unavailing because any errors that occurred were harmless, whether considered individually or collectively.  Accordingly, we reject his claim of prejudicial cumulative error.

(Lodgment No. 5, People v. Sissac, No. D064910, slip op. at 30) (square bracketed change in original).)

/ / /

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973). Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988). "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." Frederick, 78 F.3d at 1381.

Although the case against Petitioner was circumstantial, the prosecution's case was not weak. Three of the four men with Petitioner at the time the victim was shot testified at trial, all reluctantly testifying against someone they thought of as a brother. Glenn testified that immediately after the murder he saw a gun in Petitioner's hand of a caliber consistent with the murder weapon, and Petitioner at that time took sole responsibility for the shooting. Glenn and Patton both testified that Petitioner was in a position to shoot the driver and admitted shooting the driver. Although Roy testified that no one in the group spoke of the incident in the twenty or thirty minutes they were together immediately after the shooting, he also testified Petitioner was in the front passenger seat when Roy ran out of the car and then heard a loud bam.

The introduction of the text messages and pretext call did not introduce unfairness into the proceedings because their evidentiary value was weaker than and cumulative to the testimony of Patton and Glenn. Independent of the testimony of Glenn and Patton, evidence was presented that Petitioner was seen giving the victim $20 to take the group to the Lemon Grove trolley station after speaking to all the taxicab drivers present, and that he rode in the front of the victim's taxicab while everyone else squeezed into the back seat.

There was no unfairness in the introduction of the lay opinions of Patton and Glenn because they were based on their observation that the victim did not provoke Petitioner, and on Petitioner's own admission that he shot the victim merely because the driver smiled or laughed at him. The jury was instructed to credit those opinions only if they found the basis for them - that Petitioner shot the driver without provocation - to be true. The Court finds that, even to the extent any or all of these items of evidence were admitted erroneously, they do not, individually or cumulatively, support a finding that Petitioner received a fundamentally unfair trial. Accordingly, the state court adjudication of this claim on that basis is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.

Finally, Petitioner contends that the cumulative effect of his trial counsel's handling of the admission of the evidence amounted to ineffective assistance. (ECF No. 28-2 at 15-17.) This aspect of claim one was presented to the state appellate court on habeas (Lodgment No. 6 at 5-6), but not to that court on direct appeal (Lodgment No. 3 at 24-26), and not to the state supreme court (Lodgment No. 8 at 27). It was denied by the state appellate court in an order which stated: "For reasons explained in our opinion in the direct appeal, we reject Sissac's claims." (Lodgment No. 7, In re Sissac, No. D065927, order at 1.) The state appellate court found on direct appeal that any errors in admitting the challenged evidence were harmless. (Lodgment No. 5, People v. Sissac, No. D064910, slip op. at 30.)

However, harmless error analysis is not appropriate in applying Strickland. See Holloway, 435 U.S. at 489 (constitutionally ineffective assistance of counsel can never be treated as harmless error). Thus, to the extent the state appellate court addressed this aspect of claim one, which, as with the other ineffective assistance of counsel claims is technically exhausted and procedurally defaulted, it applied a standard inconsistent with Strickland. Yet, irrespective of whether Petitioner can overcome the procedural default, or whether AEDPA applies to the claim, it is clear, for the following reasons, that he is not entitled to federal habeas relief because it fails under a de novo review. See Berghuis, 560 U.S. at

390 (holding that irrespective of whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).

"It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986), quoting Strickland, 466 U.S. at 689. A review of the actions by defense counsel in this case does not rebut that presumption. Petitioner's trial counsel successfully objected to the admission of three of the four recorded telephone calls, and only conceded the pretext call from Patton to Petitioner "arguably" contained admissions after the trial court ruled it was admissible, a ruling upheld on appeal. Counsel could not have anticipated the opinions given by Patton and Glenn that they thought Petitioner murdered an innocent victim because they came in answer to questions unlikely to call for such answers, so defense counsel, at that point, could only have moved to strike. (RT 445, 473, 656.) Counsel may have had a strategic reason to avoid moving to strike those opinions and thereby calling to the jury's attention the reasons upon which those opinions were based - that Petitioner shot the driver for no discernable reason. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") Even had counsel raised objections to the admission of the text messages, the telephone communications between Petitioner and Roy, or Detective Pearce's testimony that the absence of the text messages on Petitioner's telephone led him to conclude Petitioner had deleted them, on the basis of a lack of foundation or authentication, there has never been a showing, here or in the state court, that the prosecutor could not have laid a proper foundation and authenticated that evidence if required. Rather, such objections might have highlighted the evidence to the jury to Petitioner's disadvantage, for example, by requiring the prosecutor to call an expert witness to testify in place of Detective Pearce that the text messages were recovered from Patton's telephone but not from Petitioner's. Finally, defense counsel thoroughly addressed the

challenged evidence in closing argument, successfully arguing it did not support first degree murder, and arguing it raised a reasonable doubt as to who shot the driver, arguments which might not have been as effective if counsel had made futile challenges to inevitably admissible evidence. Thus, the Court finds that Petitioner is not entitled to habeas relief in this Court as to this aspect of claim one because, based on a de novo review, he has shown neither deficient performance nor prejudice as a result of his trial counsel's handling of the evidentiary issues raised throughout this action. Kimmelman, 477 U.S. at 386; Strickland, 466 U.S. at 687-94.

## VII. CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, (2) granting Petitioner's Motion to Amend [ECF No. 28] and directing that the proposed First Amended Petition [ECF No. 28-2] become the operative pleading in this action, and (3) directing that Judgment be entered denying the First Amended Petition.

**IT IS ORDERED** that no later than **August 1, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 10, 2018.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated: July 11, 2018

*Jill Burkhardt*

Hon. Jill L. Burkhardt
United States Magistrate Judge

16cv2287-BAS (JLB)